**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**Jerald.E.Gilbert@tn.gov**

February 06, 2014

Penn-Star Insurance Company                     Certified Mail
Three Bala Plaza East, Ste 300                   Return Receipt Requested
Bala Cynwyd, PA  19004                           7012 3460 0002 8941 9497
NAIC # 10673                                     Cashier # 14117

Re:    Imperial Park, Llc And Rerun Of Tennessee  V.  Penn-Star Insurance Company

       Docket # 14Cv131

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of Commerce and Insurance was served February 06, 2014, on your behalf in connection with the above-styled proceeding.  Documentation relating to the subject is herein enclosed.

Jerald E. Gilbert
Designated Agent
Service of Process

Enclosures

cc: Chancery Court Clerk
    Rutherford County
    20 Public Square North, Rm 302
    Murfreesboro, Tn  37130

| STATE OF TENNESSEE 16th JUDICIAL DISTRICT CHANCERY COURT | SUMMONS | CASE FILE NUMBER 14 CV·131 |
|---|---|---|

| PLAINTIFF | DEFENDANT |
|---|---|
| IMPERIAL PARL, LLC, and RERUN OF TENNESSEE, LLC | PENN-STAR INSURANCE COMPANY, and/or its parent, GLOBAL INDEMINTY GROUP, INC. |

TO: (NAME AND ADDRESS OF DEFENDANT)

Penn-Star Insurance Company, and/or it parent,
Global Indemnity Group, Inc.
C/O TN. Dept. of Commerce & Insurance
500 James Robertson Parkway
Nashville, TN 37243

Method of Service:

G  Certified Mail
G  Davidson Co. Sheriff
G  *Comm. Of Insurance
G  *Secretary of State
G  *Out of County Sheriff
G  Private Process Server
G  Other
       *Attach Required Fees

List each defendant on a separate summons.

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, RUTHERFORD COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) Bob Lynch, Jr. Washington Square, Suite 316 222 Second Avenue North Nashville, TN 37201 615-255-2888 Telephone 615-256-5737 Facsimile Email: office@boblynchlaw.com | FILED, ISSUED & ATTESTED 1·31·14 John Bratcher, Clerk and Master By: Judicial Building, Suite 302 20 Public Square North Murfreesboro, TN 37130 _Tanya Webster_ Deputy Clerk & Master |
|---|---|

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | Sheriff |

THE UNDERSIGNED, CLERK AND MASTER OF THE CHANCERY COURT AND NOTE HEREBY CERTIFIES THAT THE FOREGOING IS A CORRECT COPY OF THIS INSTRUMENT FILED IN THE FOREGOING CAUSE IN THE CHANCERY COURT OF MURFREESBORO, TENNESSEE

THIS ___31st___ DAY OF ___Jan '14___
JOHN A.W. BRATCHER, CLERK AND MASTER
BY _Tanya Webster_
DEPUTY CLERK AND MASTER

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____ _____ . _____

☐ Served _____ _____ ☐ Not Found _____
☐ Not Served _____ _____ ☐ Other _____

| DATE OF RETURN: | By: |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case ____ _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20__.
The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| Sworn to and subscribed before me on this _____ day of _____ _____, 20__. Signature of _____ Notary Public or _____ Deputy Clerk | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
| My Commission Expires: | |

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

Mail list to: Clerk & Master
Judicial Building, Suite 302
20 Public Square North
Murfreesboro, TN 37130
Please state file number on list.

IN THE CHANCERY COURT OF RUTHERFORD COUNTY
IN MURFREESBORO, TENNESSEE

IMPERIAL PARK, LLC, and      )
RERUN OF TENNESSEE, LLC,     )
                               )
       Plaintiffs,          )
                               )    Case No. 14CV431
Vs.                      )
                               )    Jury Demand
PENN-STAR INSURANCE       )
COMPANY, and/or its parent,    )
GLOBAL INDEMINTY GROUP, INC, )
                               )
       Defendant.         )

## VERIFIED COMPLAINT

Come now the Plaintiffs, Imperial Park, LLC, and ReRun of Tennessee, LLC, by and

through undersigned counsel, Bob Lynch, Jr., and hereby states their causes of action as follows:

### I.    Introduction:

The Plaintiffs are seeking relief against the Defendant Penn-Star Insurance Company on

various claims set forth below as a result of the Defendant's failure to pay legitimate monies

pursuant to a commercial property and liability insurance policy.

### II.    Parties, Jurisdiction and Venue:

1. Plaintiff Imperial Park, LLC (hereinafter "Imperial Park") is a Tennessee limited liability

   company with its principal address located at 1001 Rosemont Terrace, Smyrna,

   Tennessee 37167.

1

2. Plaintiff ReRun of Tennessee, LLC (hereinafter "ReRun") is a Tennessee limited liability company with its principal address located at 1001 Rosemont Terrace, Smyrna, Tennessee 37167.

3. Defendant Penn-Star Insurance Company (hereinafter "Defendant") is a Pennsylvania corporation owned or controlled by Global Indemnity Group, Inc. The Defendant is registered with the Tennessee Department of Insurance, Company #604505, NAIC# 10673, and its principle place of business located at Three Bala Plaza East, Suite 300, Bala Cynwyd, PA 19004.

4. This court has jurisdiction of this matter pursuant to T.C.A. § 16-11-102 and venue pursuant to T.C.A. § 20-4-101 and T.C.A. § 20-4-104.

### III.     Statement of Facts:

5. The Plaintiff Imperial Park is the owner of a commercial building located at 783 14th Avenue and D Street, Smyrna, Tennessee 37167. At all times material herein, it's only lessee was ReRun. (Attached hereto as **Exhibit A** is a copy of said lease.)

6. Plaintiff ReRun is a solid waste processing facility located at 783 14th Avenue and D Street, Smyrna, Tennessee 37167. It utilizes the commercial building in both manufacturing and storage of recycling products. It is the sole tenant of the commercial building.

7. Imperial Park and ReRun are closely held corporations, both owned by John Lenahan and Cathy Luna Lenahan, who are husband and wife. Cathy Luna Lenahan owns 51% of each LLC and John Lenahan owns 49% of each LLC. Imperial Park has no employees and its sole source of income is the rent paid to it by ReRun. All times material herein

2

the Defendant was aware that the two corporate entities were closely held by John Lenahan and Cathy Luna Lenahan.

8.  In 2009, Imperial Park purchased both a commercial property policy and liability policy with the Defendant regarding the building located at 783 14th Avenue and D Street, Smyrna, Tennessee 37167. Although the insurance was purchased in the name of Imperial Park, a ReRun check was used to purchase the policies. Both policies were in effect on June 15, 2011.

9.  On June 15, 2011, a windstorm and/or tornado substantially damaged the building located at 783 14th Avenue and D Street, Smyrna, Tennessee 37167. At the time of the loss, Imperial Park's building was insured for such an event with the Defendant. The same policy also insured personal property of ReRun. Thus, the Plaintiff ReRun, without waiving any other claims it has and in the alternative, is suing the Defendant both as a party to the contract and as third party beneficiary of the contract. (A copy of said policy and declarations are attached hereto as **Exhibit B.**)

10. Under the policy, the insured was required to perform "Duties in the Event of Loss." (*See* **Exhibit B,** #3, "Duties in the Event of Loss or Damage", p. 10 of 15 of the Building and Personal Property Coverage Form.) The insured fully complied with the obligations set forth in this "Duties in the Event of Loss" clause.

11. After the windstorm/tornado struck the building, Mr. John Lenahan (hereinafter "Lenahan"), the owner/agent of both Imperial Park and ReRun, was notified by the police of the damage to the building, and he immediately went to the building and personally observed the damage to it. The windstorm/tornado substantially damaged the front

3

section of the building. Lenahan himself proceeded to the damaged area of the building and assisted the first responders in securing the building and preventing further damage.

12. Lenahan provided the Defendant and its agents prompt notice of the direct physical loss and damage to the building. Agents of the Defendant told Lenahan that it was his responsibility to protect the contents of the building and do whatever was required to prevent further loss. He did so. Under the policy, the personal property of ReRun was covered. *(See* **Exhibit B**, Building and Personal Property Coverage Form, p. 1 of 15, Section A.1(c).).

13. Within 24 hours, Lenahan met with Defendant's agent, Mr. Robert Zander of Zander Insurance Group, at the premises and Mr. Zander fully observed and took photos of the condition of the damaged building. During that meeting, Lenahan provided Mr. Zander a full description of how, when, and where the direct physical loss and damage occurred. Lenahan also fully disclosed to Mr. Zander that Imperial Park and ReRun were closely held corporate entities and that he was utilizing ReRun employees and assets to secure and salvage the property because Imperial Park has no employees.

14. In the meantime, Lenahan, utilizing ReRun employees and assets with the approval of Mr. Zander, immediately took reasonable steps to protect the covered property from further damage including tarping the roof, tarping the goods inside the property and placing barrels and various plastic containers inside in an effort to collect the water leaking into the building. ReRun employees also removed the extensive debris and water from the affected area. At this point, ReRun incurred expenses for which it anticipated payment from the Defendant under either the property policy and/or under the liability policy written by the Defendant.

4

15. On June 16, 2011, Defendant's agent, Mr. Robert Massaro, Senior Claims Examiner I, wrote Lenahan informing him that he would be the claims examiner on the loss and assigned it the claim number #11028765. (Attached hereto as **Exhibit C** is said letter.)

16. It was obvious to Lenahan through discussion with the Smyrna Fire Department and Codes Department that the building had suffered severe structural damage. Thus, on June 16, 2011, Lenahan contacted Mr. Wilburn Honeycutt of Honeycutt Engineering, who within 24 hours physically inspected and photographed the damage to the building.

17. Lenahan reasonably obtained the services of Mr. Honeycutt because he is a structural engineer and given the structural damage, Lenahan was very concerned about the physical integrity of the building itself because ReRun employees worked in it. Plaintiffs have paid Honeycutt Engineering approximately $46,000 for services, which despite Lenahan's numerous requests that the Defendant pay for these reasonable fees, it has it ignored him. Plaintiffs allege in the alternative, that the Defendant's actions in failing to pay the expense of Honeycutt Engineering and other third parties constitutes common law breaches of contract and thus creates a claim under the Tennessee Consumer Protection Act.

18. Defendant retained Donan Engineering Co. (hereinafter "Donan") to visit, inspect and prepare an engineering report to determine the cause and extent of damage to the structure. Lenahan fully cooperated with Mr. Jeffrey Coyne of Donan who visited and inspected the site on June 30, July 1, and July 6, 2011.

19. While conducting the inspection, Mr. Coyne was aware that Lenahan was using ReRun employees and assets to assist him in the inspection. Because of the substantial structural

5

damage to the building, Lenahan requested the Donan Report in order to speed the replacement of the affected property.

20. On July 11, 2011, Lenahan emailed Mr. Coyne and requested the report. Mr. Coyne referred Lenahan to Mr. Jim Crofts. Lenahan did so and Mr. Crofts informed Lenahan that he would be Defendant's claims adjuster on this project.

21. From July 2011 until August 15, 2011, Lenahan continually sought the Donan Report from the Defendant without success. Finally, Lenahan sought the assistance of Mr. Zander to obtain the report. Mr. Zander provided the report to Lenahan on August 14, 2011. It is significant to note that the report was dated July 18, 2011, and thus the replacement of the building was delayed almost a month. (Attached hereto as **Exhibit D** is the July 18, 2011 Donan Report.)

22. Lenahan was concerned and anxious because the Donan Report did not provide an estimate of the cost of the replacement of the damaged building. The report concluded that "repair recommendations for this building cannot be provided without the guidance of a design engineering firm." (*See* **Exhibit D**.) Donan was not a design engineering firm.

23. Lenahan communicated with the Defendant that Honeycutt Engineering had been and was available to provide the "guidance" requested by Donan. The Defendant did not respond to the request.

24. On August 24, 2011, Mr. Rob West of Fresh Start Restoration (hereinafter "Fresh Start") appeared at the site and informed Lenahan that he had been retained by Mr. Crofts to perform an estimate of the repair costs. Lenahan was perplexed because under the property loss policy, the insured is entitled to recover the full replacement cost of the loss

6

rather than the repair cost. Lenahan told both Mr. West and Mr. Crofts that he wanted the full replacement of his building, not the repair. Lenahan also told Mr. West and Mr. Crofts on many occasions that any estimate should incorporate the informed opinion of a structural engineer and that he had retained Honeycutt Engineering for that purpose. This was consistent with the Donan Report.

25. The Defendant did not respond to Lenahan's request to retain Honeycutt Engineering, even though the Donan Report required a structural engineer to design the replacement of the property before an estimate could be determined.

26. On or about September 13, 2011, Lenahan received the Fresh Start estimate in the amount of $887,539.00. At that point, Lenahan realized that the Defendant was treating the claim as one for repair, rather than replacement.

27. On September 16, 2011, Lenahan received an unsolicited check from Defendant in the amount of $622,559.63. The check was identified as "ACV Payment." This "ACV" is defined in the policy as the "actual cash value" of the loss which represents repair rather than replacement. Pursuant to the policy, when using the term "actual cash value", the policy refers to depreciation and in this case it was $262,478.89. If the cost of the repair went beyond the "actual cash value", then Lenahan could draw the additional amount after the "repair" was actually performed and documented if approved by the Defendant. Lenahan determined that this estimate was not realistic because:

    a.  It was an estimate for a repair not replacement.

    b.  It did not incorporate the structural engineer report required by the Donan Report, which had been commissioned by the Defendant.

28. Lenahan refused this proposal because it was not sufficient to replace the loss. The Defendant's delay in resolving the property loss caused both Imperial Park and ReRun substantial damage as will be more fully demonstrated below.

29. The Plaintiffs allege that the Defendant's failure to pay for the replacement value of the loss after Lenahan had notified it that he was seeking replacement rather than repair constitutes bad faith failure to pay promptly. Otherwise the replacement of the loss would have begun immediately thereby avoiding damage to the Plaintiffs.

30. After receiving the check, Lenahan informed Mr. Crofts that he expected the Defendant to pay the full replacement value of the loss as provided for in the policy and that because no structural engineer analysis had been incorporated in the Fresh Start estimate, it was impossible to place the replacement value on the loss until a structural engineer provided the appropriate analysis.

31. Because no engineering report had been done and because the Defendant took no action, thereafter and beginning in November of 2011, Lenahan requested Honeycutt Engineering to begin its work in earnest to design and frame a plan to assist a contractor to replace the property. Mr. Crofts was fully aware of Honeycutt's work and approved it.

32. On December 24, 2011, the Defendant in violation of T.C.A. 56-7-1805, informed Lenahan that it was not going to renew Imperial Park's polices, both property and liability, because of the claim made in this case. Lenahan asserts that in the context of this case, the Defendant's action constitutes bad faith because Imperial Park had been a customer of the Defendant since 2009.

33. During the winter of 2011 and early spring of 2012, Honeycutt Engineering proceeded to do design and drafting work in connection with the replacement of the building.

8

34. Beginning in May 2012, Honeycutt Engineering informed Lenahan that it would be necessary for ReRun to remove its stored materials from the building in order for Honeycutt to complete its design plan.

35. On or about June 12, 2012, Defendant's claims adjuster, Mr. Crofts, authorized Lenahan to include a full-time employee from ReRun to facilitate and track the movement of its product from the building to storage in order that Honeycutt Engineering could complete its design work.

36. From July 24, 2012, through July 30, 2012, in a series of emails between Mr. Mac Finley, and employee of ReRun, and Mr. Robert Massaro, Claims Adjuster for the Defendant, Mr. Massaro agreed to permit ReRun to move its inventory from the damaged building to another location with the Defendant paying up to $200,000 for the cost. Mr. Finley warned Mr. Massaro that if the construction project were delayed for over 3 months, the costs to ReRun would exceed the $200,000 allotment. Mr. Massaro agreed with ReRun to fund the movement and storage of the inventory. Plaintiffs would assert that this series of emails constitutes an agreement between ReRun and the Defendant. The Defendant breached this agreement thereby damaging ReRun by failing to act in good faith and complete the replacement of the damaged building. In the alternative and without waiving any other claims, ReRun alleges that this agreement was separate and distinct from any contract of insurance and thus, constitutes a violation of the Tennessee Consumer Protection Act and other common law claims because Mr. Massaro was deceptive. As will be shown below, the Defendant never intended to replace the property within 4 months. This act of deception and misrepresentation has substantially damaged the Plaintiffs.

9

37. In the alternative and without waving any of its claims, the Plaintiffs allege that not only does ReRun have a claim for breach of contract with respect to its losses in storing its property, ReRun is also a third party beneficiary under the policy which provides coverage to a third party for damage to personal property on the premises. *(See Exhibit B, Building and Personal Property Coverage Form, p. 1 of 15, Section A.1(c).).* The Plaintiffs assert that this property was damaged because ReRun did not have use of it because the Defendant failed to replace the building in which said property was used and/or stored. In the alternative, the Plaintiffs allege that ReRun also has a right to recover for its damages under the liability policy of Imperial Park with the Defendant.

38. Because of the Defendant's delay in replacing the loss, ReRun is still storing property off the premises and is incurring additional damages. During this period of time, Lenahan waited on the Honeycutt Engineering report and continually kept the Defendant and Mr. Crofts apprised of any and all issues for which it was dealing to resolve this complicated proposed rebuilding and replacing of the building, in addition to the return of ReRun's property and machinery.

39. On or about October 12, 2012, Lenahan received the Honeycutt Engineering report. Lenahan provided the report to Mr. Crofts, who provided it to the Defendant's designated contractor, Fresh Start, in order for it to prepare a complete and thorough estimate as to the cost to restore and replace the damaged building consistent with the appropriate code regulations. Relying on the Honeycutt Engineering report, Fresh Start estimated that the cost to restore and replace the property would be approximately $2,953,257.00. This estimate was within the policy limits, which was 3.2 million dollars.

10

40. At this point, without any discussion or explanation to the Lenahan, Defendant rejected the Fresh Start estimate, refused to authorize the construction to fully replace the damaged building, and informed Lenahan on November 16, 2012, that it was replacing Mr. Crofts with Mr. Greg Martin as claims adjuster. After Defendant rejected the Fresh Start estimate and replaced Mr. Crofts with Mr. Martin, Lenahan became very concerned about the status of the replacement of its loss. This concern was reflected in an email Lenahan sent to Mr. Massaro on November 16, 2012. (Attached hereto as **Exhibit E** is said email.) The Plaintiffs allege that the act of the Defendant in rejecting the Fresh Start estimate constitutes intentional, reckless, malicious and fraudulent conduct, thereby creating Plaintiffs' claim for punitive damages.

41. On November 27, 2012, Lenahan met with Mr. Martin. During that meeting, Lenahan expressed concern that the Defendant was not serious about authorizing sufficient monies to replace his loss and complained about ReRun's mounting losses. Mr. Martin reassured Lenahan and informed him that the Defendant intended to fulfill its obligation to replace the loss, but that it desired additional estimates from different contractors and engineers. Mr. Martin specifically promised Lenahan that the process would be completed by the end of the year and that construction would begin in January. Lenahan relied on the promise and agreed to this proposal. Although Lenahan was skeptical, he, pursuant to his perceived obligations under the policy, continued to cooperate with a multitude of contractors, engineers, and adjusters. Absent the property insurance policy, the Plaintiffs lacked sufficient funds to proceed with the construction.

42. The Defendant's delay in replacing the insured's loss damaged and continues to damage ReRun because it has lost the use of its productive property. ReRun employees also

11

continue to work in and around a safety hazard because of the continued water intrusion upon the premises since the time of the storm. ReRun has its own claim against the Defendant for breach of contract or in the alternative, as third party beneficiary under the policy.

43. On December 17, 2012, Defendant offered Lenahan the sum of $953,800 to complete the project. Plaintiffs would assert that this offer was itself bad faith because it was not based upon any legitimate estimate. The Plaintiffs rejected this offer.

44. On January 25, 2013, the Defendant offered Lenahan the sum of $1,650,293. Lenahan rejected this offer. Four days later on January 29, 2013, the Defendant offered Lenahan the sum of $1,685,000 to complete the project.

45. At this point, Lenahan and Mr. Martin agreed that ReRun could obtain estimates on its own with respect to the replacement of the loss. Plaintiffs have paid $11,000 to hire Mr. Benton Garrison, BSIE, who thoroughly investigated the necessary constructive work based on the Honeycutt Engineering report, and he obtained bids for the performance of it. The Defendant has not paid for Mr. Garrison's services.

46. On March 1, 2013, the Defendant offered Lenahan the sum of $1,174,644 to complete the project. This offer was approximately $500,000 less than the Defendant had offered in January of 2013. Lenahan asserts that there was no rational basis for this offer and thus rejected it.

47. Plaintiffs allege that the Defendant's offers on December 17, 2012, January 25, 2013, January 29, 2013, and March 1, 2013 were all acts of bad faith by the Defendant because there was no rational basis for them and all of the offers failed to include the structural

12

design performed by Honeycutt Engineering, which had been authorized by the Defendant's agent, Mr. Crofts.

48. On or about May 20, 2013, Lenahan relying on Mr. Garrison, who had obtained estimates for the cost of replacement, submitted the replacement cost necessary to restore the building to Mr. Martin, said cost being $2,907,001.79. This estimate for the replacement of the loss was very close to the Fresh Start estimate first proposed in October of 2012, and rejected by the Defendant.

49. On May 29, 2013, Lenahan realized that under the terms of the policy any repairs or replacement must begin within two years of the covered cause of loss and that the policy holder was required to obtain an extension in writing from the Defendant permitting this delay. Lenahan never heard back from the Defendant except Mr. Martin, on that same date, acknowledged receiving the email from Lenahan and stated in a return email to him that he would "work with UNIC to obtain the extension."

50. On or about June 14, 2013, Mr. Greg Martin informed Lenahan that he had finished his report and sent it to the Defendant. Mr. Martin's estimate to replace the property was approximately $1,700,000.00, and if Lenahan did not accept this estimate, Defendant would require the bidding process to start over again. Lenahan objected to Mr. Martin submitting this estimate to Defendant. Lenahan rejected this estimate because both he and Mr. Martin knew that the estimate did not include all the necessary items based on the specs in the Honeycutt engineering report, but Mr. Martin submitted the estimate to the Defendant anyway.

51. On June 26, 2013, Lenahan and ReRun received notice from the Smyrna Department of Codes and Building Safety that the building area could not be occupied until designs

13

were completed by a registered engineer and repairs completed. (Attached hereto as **Exhibit N** is said notice and incident report.[1])

52. By letter dated July 3, 2013, the Defendant informed Lenahan that the total payment that he could expect to receive was $1,684,085.11. Based on Lenahan's due diligence, he determined that it was impossible to retain the appropriate contractor and/or engineer to perform the necessary construction to replace the property consistent with codes regulations for the monies offered in Defendant's July 3rd letter. (Attached hereto as **Exhibit F** is said letter.)

53. At this point, the Plaintiffs were forced to obtain counsel to assist it to obtain the monies to which they are entitled under the policies. By letter dated September 6, 2013, Plaintiffs' counsel sought from the Defendant the necessary sworn proof of loss as required at <u>Commercial Property Coverage Part Declaration</u> on p. 9, under "<u>E., Loss Conditions</u>", Section 3, and subsection (7). (Attached hereto as **Exhibit G** is said letter.)

54. The Defendant provided the proper proof of loss to Plaintiffs' counsel, and on October 7, 2013, the Plaintiffs properly submitted the sworn statement in proof of loss for the policy limits of 3.2 million dollars and attached letter to Defendant from Plaintiffs' counsel. (Attached hereto as **Exhibit H** is said sworn statement in proof of loss and attached letter.)

55. By letter dated October 17, 2013, the Defendant rejected Plaintiffs' proof of loss without explanation. (Attached hereto as **Exhibit I** is said letter.)

56. On November 8, 2013, Plaintiffs' counsel wrote an email with attachments to Mr. Massaro where he:

---

[1] Exhibits A- N are not in Alphabetical Order.

14

a. Acknowledged that Defendant had rejected Plaintiffs' proof of loss;

b. Informed Defendant that the Plaintiffs would continue to work with Defendant's adjuster, Mr. Greg Martin; and

c. Requested a tolling agreement to freeze the running of any timelines in order that this complex matter could be resolved.

The Defendant did not response to Plaintiffs' counsel's November 8th email. (Attached hereto as **Exhibit J** is said email with attachments.)

57. In the same November 8th email, Plaintiffs' counsel, without waiving any other claims of the Plaintiffs, informed the Defendant that it should pay ReRun's expenses and damages under the general liability coverage of Imperial Park. As of the date of this complaint, the Defendant has not provided coverage to ReRun for its losses. Plaintiffs assert that they are entitled to coverage under this liability policy, a copy of which is attached hereto as **Exhibit K**. At this time, the Defendant has not declined coverage to reimburse ReRun for its expenses and losses under the liability policy. Based on the facts and circumstances of this case, the Plaintiffs allege that ReRun has an equitable right to recover its losses from Imperial Park's liability policy and, without waiving any other claims, ReRun asserts that right herein. The Plaintiffs reserve the right to amend this complaint to assert any legal or equitable claims they have concerning this liability policy.

58. By letter dated November 26, 2013, the Plaintiffs placed the Defendant on notice of bad faith under T.C.A. § 56-7-105. (Attached hereto as **Exhibit L** is said letter.)

15

59. On December 4, 2013, the Defendant responded to Plaintiffs' notice of bad faith and denied acting in bad faith and did not respond with any meaningful offer to replace Plaintiffs' loss. (Attached hereto as **Exhibit M** is said letter.)

60. The cumulative effect of the Defendant's acts and omissions set forth herein was and is to deny the Plaintiffs any meaningful replacement for their losses. If the Defendant had acted in good faith and fair dealing, it could have offered the Plaintiffs a fair "ACV" with a depreciation amount up to the policy limits without any loss to it because the Defendant could have approved any subsequent payments as the need arose. Its failure to do so is the central event from which all claims of the Plaintiffs arise as set forth herein.

## IV.   Causes of Action:

The Plaintiffs allege that the following causes of action exist from the facts set forth herein, both cumulative and in the alternative.

### A. Breach of Contract with Respect to Contract for Insurance:

61. Based upon the above facts, the Plaintiffs and the Defendant, Penn-Star Insurance Company, have entered into a valid contract for Insurance.

62. Under said policies of insurance, the Defendant was required to pay for losses to each Plaintiff as set forth above.

63. The Plaintiffs suffered losses as set forth above.

64. The Defendant has refused to pay said losses.

16

65. As a result of the Defendant's refusal to pay the valid and just claims, Plaintiffs have been damaged to the extent of their claim not being paid and other damages to be proven at trial.

### B. Breach of Contract:

66. Based upon the above facts, the Plaintiffs and the Defendant entered into contracts which are separate and distinct from a contract for insurance.

67. The Defendant breach these contracts thereby damaging the Plaintiffs.

### C. Bad Faith and Refusal to Pay:

68. Plaintiffs in this matter made a demand for payment under a valid insurance policy pursuant to T.C.A. § 56-7-105.

69. The Defendant has no basis for denying the claim.

70. The Defendant has refused to pay the claim.

71. The Defendant's actions in refusing to pay the claim were not in good faith.

72. As a direct result of Defendant's actions herein, the Plaintiffs have suffered losses.

### D. Negligence:

73. The Defendant owed Plaintiffs a duty to properly investigate the claims made before determining that it was not responsible for payment or sufficient payment under the polices.

74. The Defendant by accepting premium payments on the insurance policies further owed Plaintiffs a duty to pay valid claims.

17

75. The Defendant breached this duty by failing to investigate properly and failing to pay valid claims.

76. The Defendant's failure to investigate properly and/or in conducting a goal oriented investigation was negligent.

77. As a direct result of the Defendant's negligence and breach thereof, the Plaintiffs have suffered damages.

### E. Misrepresentation and Fraud:

78. The verified facts set forth above establish that on numerous occasions the Defendant and its agents represented to the Plaintiffs that they would fairly investigate and pay the Plaintiffs' claims.

79. As was demonstrated above, these representations were false and the Plaintiffs relied on them which has substantially damaged them.

80. These acts of misrepresentations and omissions of fact constitutes fraud and/or gross negligence.

### F. Claim for Punitive Damages:

81. As was set forth above, the Defendant and its agents continually engaged in intentional, reckless, malicious and fraudulent acts in an effort to reduce or defeat the Plaintiffs'' legitimate claim for reimbursement of losses which resulted from the windstorm/tornado of June 15, 2011.

82. These acts of Defendant provide Plaintiffs a claim for punitive damages.

18

### G. Unjust Enrichment and/or Quantum Meruit :

83. The Defendant accepted premium payments from the Plaintiffs in exchange for insurance coverage identified in **Exhibits B** and **K**.

84. The Defendant accepted the premium payments and refused to provide the insurance coverage after valid claims were made under the policies for losses.

85. The Plaintiffs acted at the direction of the Defendant and expended monies at the direction of the Defendant in order to comply with their duties under the insurance policies which directly benefitted the Defendant.

86. As a direct result of said actions and conduct of the Defendant, the Defendant has received valuable consideration from the Plaintiffs and they should be compensated under the common law claim of quantum meruit and/or unjust enrichment.

### H. Tennessee Consumer Protection Act:

87. Plaintiffs seek relief under the Tennessee Consumer Protection Act (hereinafter "act"), T.C.A. §§ 47-18-101, *et seq*.

88. Plaintiff are consumers, natural persons, or individuals and this is a "person" under T.C.A. § 47-18-109 (3).

89. The Defendant is a "corporation" or "other legal commercial entity however organized" and thus is a "person" under the T.C.A. § 47-18-103 (9).

90. The Defendant engaged in trade or commerce as defined by T.C.A. § 47-18-109 (11).

91. The acts and omissions of the Defendant as set forth above constitute unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act.

19

92. Pursuant to T.C.A. § 47-18-112, the Consumer Protection Act remedies are cumulative and supplemental to all other existing remedies. Invoking it does not prohibit or exclude using another remedy.

93. Plaintiffs bring this claim under T.C.A. § 47-18-109, because each, individually and jointly, suffered an ascertainable loss of money, property or thing of value as a result of the Defendant's use or employment of an unfair or deceptive act or practice prohibited by the Tennessee Consumer Protection Act.

94. The Defendant's unfair or deceptive acts or practices were willful or knowing and Plaintiffs are entitled to treble damages and attorney's fees under T.C.A. § 47-18-109.

95. As a result of the Defendant's violation of the Tennessee Consumer Protection Act, the Plaintiffs suffered losses.

### I. Duty of Good Faith and Fair Dealing:

96. Every contract performed in the state of Tennessee places on the parties the duty to perform it in good faith and fair dealing.

97. The Defendant violated this duty thereby damaging the Plaintiffs.

### H. Equitable Relief and Constructive Trust:

98. Based on the facts set forth above, the Defendant's acts and omissions constitute unclean hands, which has damaged the Plaintiffs, individually and jointly. Plaintiffs are therefore entitled to equitable relief which requires that the Defendant make the Plaintiffs whole. Therefore, the Court should award the Plaintiffs the equitable relief of a constructive trust to fully compensate them and make them whole, if the other causes of action fail to do so.

20

## V.    Prayer for Relief:

WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS PRAY:

1. Plaintiffs are suffering irreparable harm as a result of the Defendant's acts and omissions described above; therefore the Plaintiffs are entitled to injunctive relief including but not limited to an order from the Court requiring the Defendant to specifically perform its duties under the insurance policies;

2. That the Plaintiffs, jointly and severally, be awarded damages up to the policy limits of the insurance policies for which they purchased;

3. That the Plaintiffs, jointly and severally, be awarded 25% of any award under the commercial property policy pursuant to T.C.A. § 56-7-105;

4. That the Plaintiffs, jointly and severally, be awarded compensatory damages in the amount of 2.5 million dollars or in an amount to be determined at trial based on their common law claims;

5. That the Plaintiffs, jointly and severally, be awarded punitive damages in the amount of 5 million dollars or in an amount to be determined at trial;

6. That the Plaintiffs, jointly and severally, be awarded treble damages pursuant to the Tennessee Consumer Protection Act (T.C.A. § 47-18-101, et seq.);

7. That the Plaintiffs, jointly and severally, be awarded reasonable attorney's fees pursuant to the Tennessee Consumer Protection Act (T.C.A. § 47-18-101, et seq.), and the Tennessee Bad Faith Refusal to Pay (T.C.A. § 56-7-105);

8. That the Plaintiffs, jointly and severally, recover both prejudgment and post judgment interest against the Defendant;

9. That the Plaintiffs, jointly and severally, be allowed to recover all other damages allowed under Tennessee law;

10. That the Plaintiffs, jointly and severally, demand a jury of six (6) to consider this action;

11. That the Plaintiffs, jointly and severally, be allowed to recover their discretionary costs as authorized by the rules of statute;

12. That the Court find that the Defendant has unclean hands and therefore the Plaintiffs, jointly and severally, be entitled to all equitable relief including but not limited to a constructive trust to make them whole;

13. That the Defendant be taxed with the court costs of this civil action; and

14. For such other and further and other relief as justice or equity may require.

Respectfully submitted,

Bob Lynch, Jr. (BPR #6292)
222 Second Avenue North, Suite 316
Nashville, TN 37201
(615) 255-2888
(615) 256-5737 *facsimile*
Email: *office@boblynchlaw.com*
*Attorney for Plaintiffs*

22

## VERIFICATION

STATE OF TENNESSEE       )
                                )
COUNTY OF RUTHERFORD    )

I, CATHY LUNA LENAHAN, being first duly sworn make oath that the statements contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

_Cathy Luna Lenahan_
**Plaintiff Cathy Luna Lenahan**

Sworn to and subscribed before me on this 31 day of January, 2014.

_Jananne Rose Blankenship_
Notary Public

My Commission Expires: May 3, 2014

## VERIFICATION

STATE OF TENNESSEE       )
                             )
COUNTY OF RUTHERFORD    )

       I, **JOHN LENAHAN**, being first duly sworn make oath that the statements contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief.

_____
Plaintiff John Lenahan

Sworn to and subscribed before me this 3$^{d}$ day of January, 2014.

_____
Notary Public

My Commission Expires: May 27, 2016

... (already provided above)

## LEASE AGREEMENT

THIS LEASE made and entered into this 1st day of July, 2007, by and between Imperial Park LLC , a limited liability corporation, organized under the laws of the State of Tennessee, whose record address is 1001 Rosemont Terrace, Smyrna, Rutherford County, Tennessee 37167 hereinafter referred to as LESSOR and ReRun of Tennessee LLC, whose record address is 1001 Rosemont Terrace, Smyrna, Rutherford County, Tennessee 37167, hereinafter referred to as LESSEE

### WITNESSETH:

1.  LESSOR does hereby lease to LESSEE the following described premises: approximately 93,000 +/- square feet warehouse space located at 14th Street and "D" Street, Smyrna, Tennessee, for the term of ten (10) years beginning July 19, 2007 and ending June 30, 2017.

2.  The leased premises shall be used by the LESSEE for the purpose of warehousing, storage, and processing various types of plastic, paper, cardboard, metals or other materials for further recycling processes. LESSEE shall restrict its use to such purposes, and shall not use or permit the use of the demised premises for any other purpose without the prior, express, and written consent of LESSOR, or LESSOR's authorized agent.

3.  IN consideration of this Lease, LESSEE hereby covenants and agrees to pay to LESSOR as rent for the aforesaid premises the sum of SIX THOUSAND FIVE HUNDRED AND NO/100 ($6,430.00) per month to be paid to SunTrust Bank on the 27th of each month.

4.  Application for Lease is expressly Waived.

5.  At the commencement of the lease term, LESSOR shall deliver possession of the premises to LESSEE.

6.  No security deposit is required.

7.  LESSEE further covenants and agrees that LESSEE shall: (1) keep all parts of the premises occupied and used as clean and safe as the condition of the premises when LESSEE took possession; (2) keep the premises free of infestation of insects; (3) not deliberately nor negligently destroy, deface, damage, impair or remove any part of the premises or permit any person to do so; (4) not engage in any illegal or disorderly conduct on the premises; (5) conduct themselves and require other persons on the premises with their consent to conduct themselves in a manner that will not disturb their neighbors' peaceful enjoyment of the premises.

LESSEE further covenants and agrees not to create any nuisance on the premises and to abate any nuisance that may arise promptly and free of expense to LESSOR.

8.  LESSEE shall not make any changes, alterations or additions to or about the building or premises without the consent of LESSOR, and LESSEE shall not use or permit anything upon the said premises that will invalidate or increase the rate of any policy of insurance which LESSOR may now have or hereafter have upon the said building or premises.

9.  LESSEE does have the right without the written consent of the LESSOR to pledge or assign their leasehold interest or to sublet the leased premises, or any part thereof.

Page 1 of 4


EXHIBIT
A

10. LESSOR shall have such rights of access to the premises as are given by law, including the right to enter the premises without the consent of the LESSEE in case of an emergency.

11. LESSEE'S act of taking possession shall be conclusive evidence that the premises were in satisfactory condition and in conformity with this Agreement between the parties. LESSEE has examined the lease premises and agrees to take them in their present condition without further alteration or repairs.

LESSEE shall surrender the demised premises at the end of the lease term, or any renewal of such term, in the same condition as when LESSEE took possession, allowing for reasonable use and wear, and damage by acts of God, including fires and storms. Before delivery, LESSEE shall remove all business signs placed on the demised premises by LESSEE and restore the portion of the demised premises on which they were placed in the same condition as when received.

12. All covenants, agreements and obligations herein are to be construed also as conditions. LESSOR shall have all remedies available at law, without demand or notice to LESSEE, demand and notice being specifically waived in the case of nonpayment of rent as well as in the case of any and all other incidences of noncompliance with the terms of this Agreement.

13. LESSEE shall pay and be responsible for all expenses and reasonable attorney's fees incurred by LESSOR and occasioned by the LESSEE'S default or failure to perform any of the obligations, covenants or provisions imposed by this Agreement or by law. Additionally, LESSOR shall have the right of immediate possession of the said premises in case of such default or failure to perform; and LESSEE expressly agrees to vacate and surrender possession of said premises to the LESSOR promptly upon notice of such breach.

14. It is agreed that any rent that is accepted by LESSOR from LESSEE which is insufficient to bring LESSEE into total compliance with the rent requirements of this Lease, is deemed to be accepted by LESSOR with the specific reservation of LESSOR's right to terminate the rental agreement for that breach. The amount accepted is to be applied in mitigation of damages caused by LESSEE's breach. Failure on the part of the LESSOR to terminate the Lease for any default or breach shall not be considered as a waiver of LESSOR's right of election as to any subsequent breach, the right being a continuing one; or, the LESSOR may, at LESSOR's election, continue the Lease and recover damages from the LESSEE for said default or breach, this right also being a continuing one.

15. The LESSEE shall be responsible for the maintenance of the heat, air conditioning, plumbing and electrical systems. The LEASEE shall pay all utilities furnished to the demised premises for the term of this lease agreement, including, but not limited to, electricity, gas, water and sewer.

16. LESSEE shall be liable for all insurance on the contents of the premises leased not owned by the LESSOR, including fire and theft insurance, and for liability insurance for injuries to person or property of the LESSEE, LESSEE's agents, guests or invitees IN AN AMOUNT NOT LESS THAN ONE MILLION ($1,000,000.00) DOLLARS.

18. THE LESSEE ACCEPTS THE RESPONSIBILITY FOR ANY HARM COMING TO PERSON OR PROPERTY OF THE LESSEE, THE LESSEE'S GUESTS, AGENTS OR INVITEES. THE LESSEE ALSO AGREES TO HOLD THE LESSOR HARMLESS FROM ANY LIABILITY CAUSED BY ANY ACT OR NEGLIGENCE OF THE LESSEE, THE LESSEE'S GUESTS, AGENTS OR INVITEES.

19. The LESSEE further covenants to repair, and pay for, any damage to the premises caused by LESSEE, LESSEE's guests, agents or invitees.

Page 2 of 4

20.     The LESSEE agrees for themselves, their successors and assigns, that the LESSOR may enter and inspect the premises at any reasonable time.

21.     The terms of this Lease Agreement shall be binding upon the heirs, representatives, successors and assigns of the parties hereto.

22.     In the event that any petition in bankruptcy shall be filed on behalf of the LESSEE, either voluntary or involuntary, then this Lease shall be terminated immediately and shall be of no further force and effect, and the LESSEE shall vacate the premises and surrender the same to the LESSOR immediately and shall have no further right to occupy the said premises or to reaffirm or reinstate this Lease, any provision in the bankruptcy laws to the contrary notwithstanding.

23.     Wherever the terms LESSOR and LESSEE are used throughout this Agreement, the singular shall include the plural of such terms and the plural shall refer to and include the singular.

24.     This Lease shall not be affected, varied or modified by any agreements or representations not contained herein, except as may be subsequently agreed to by the parties in writing.

25.     LESSOR grants to LESSEE an option to renew this Lease Agreement for one (1) year after expiration of the term of this Lease Agreement at a rental rate to be determined and agreed by both parties, with all other terms and conditions of the renewal lease to be the same as those in this Lease Agreement.  To exercise this option to renew, LESSEE must give LESSOR written notice of intention to do so at least THIRTY (30) days before this Lease Agreement expires.

26.     It is agreed that this Lease Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Tennessee.

IN WITNESS WHEREOF, the parties have executed this instrument IN DUPLICATE and one original retained by each party on the day and date written above.

**Signatures on Following Page**

Page 3 of 4

LESSOR:

IMPERIAL PARK LLC

By:

*[signature: Cathy Luna]*

Cathy Luna
Owner and Finance & Admin

LESSEE:

RERUN OF TENNESSEE LLC

By:

*[signature: Cathy Luna]*

Cathy Luna



# COMMERCIAL PROPERTY COVERAGE PART
## DECLARATIONS

Stock
Company

**POLICY NUMBER:** PAC6895329

**NAMED INSURED:** IMPERIAL PARK, LLC

| Prem. # \ Bldg.# | Location | Coverage | Limit of Insurance | Covered Causes of Loss | Valuation | Coins % | Rates | Premium Min Prem Indication |
|---|---|---|---|---|---|---|---|---|
| 001 / 001 | 783 14TH AVENUE & D STREET | BUILDING | 3,200,000 | SPECIAL | RC | AA | .25 | 8,000.00 |
| | SMYRNA          TN   37167 | | | # of Stories 1 | | | | |
| | Construction NON-COMBUSTIBLE Prot. Class 3 | Occupancy RECYCLING OPERATION | | | Yr. Built 1967 | | Class Code | 001400 |
| 001 / 001 | 783 14TH AVENUE & D STREET | BUSINESS INCOME - WITH EXTRA EXPENSE | 200,000 | SPECIAL | 1/3 | | .25 | 566.00 |
| | SMYRNA          TN   37167 | | | # of Stories | | | | |
| | Construction NON-COMBUSTIBLE Prot. Class 3 | Occupancy RECYCLING OPERATION | | | Yr. Built 1967 | | Class Code | 001400 |
| / | | | | # of Stories | | | | |
| | Construction | Prot. Class | Occupancy | | Yr. Built | | Class Code | |
| / | | | | # of Stories | | | | |
| | Construction | Prot. Class | Occupancy | | Yr. Built | | Class Code | |
| / | | | | # of Stories | | | | |
| | Construction | Prot. Class | Occupancy | | Yr. Built | | Class Code | |
| / | | | | # of Stories | | | | |
| | Construction | Prot. Class | Occupancy | | Yr. Built | | Class Code | |

**TOTAL $        8,566.00**

**VALUATION:** If no valuation is indicated, an ACV will apply.
ACV = Actual Cash Value / AGREED = Agreed Value / RC = Replacement Cost

## MORTGAGE HOLDERS:

| PREM # \ BLDG # | MORTGAGE HOLDER NAME | MORTGAGEE ADDRESS | MORTGAGEE CITY | STATE ZIPCODE |
|---|---|---|---|---|
| 1          1 | SUNTRUST BANK | P.O. BOX 4418 MC 039 | ATLANTA | GA 30302 |

**DEDUCTIBLE:** $2,500

EXHIBIT

B

**FORMS APPLICABLE:** See Schedule of Forms and Endorsements Attached.

This page alone does not provide coverage and must be attached to a Commercial Lines Common Policy Declarations
Common Policy Conditions, Coverage Part Coverage Form(s) and any other applicable forms and endorsements.

S3000 (08/2009)                         INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 32 of 186 PageID #: 36

CP 00 90 07 88

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits Of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.
2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.
2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:
   a. Someone insured by this insurance;
   b. A business firm:
      (1) Owned or controlled by you; or
      (2) That owns or controls you; or
   c. Your tenant.

This will not restrict your insurance.

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 33 of 186 PageID #: 37

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 1 | 1 | P-9 |

Describe any "P-9":     SMOKE & FIRE DETECTORS.

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

A. The following is added to the:

Commercial Property Conditions

General Conditions in the Farm Property - Other Farm Provisions Form - Additional Coverages, Conditions, Definitions

General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form

General Conditions in the Livestock Coverage Form

PROTECTIVE SAFEGUARDS

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

"P-1" Automatic Sprinkler System, including related supervisory services.

Automatic Sprinkler System means:

a. Any automatic fire protective or extinguishing system, including connected:

   (1) Sprinklers and discharge nozzles;

   (2) Ducts, pipes, valves and fittings;

   (3) Tanks, their component parts and supports; and

   (4) Pumps and private fire protection mains.

b. When supplied from an automatic fire protective system:

   (1) Non-automatic fire protective systems; and

   (2) Hydrants, standpipes and outlets.

Copyright, Insurance Services Office, Inc., 1997
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 34 of 186 PageID #: 38

"P-2" Automatic Fire Alarm, protecting the entire building, that is:

    a.    Connected to a central station; or

    b.    Reporting to a public or private fire alarm station.

"P-3" Security Service, with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

"P-4" Service Contract with a privately owned fire department providing fire protection service to the described premises.

"P-9" The protective system described in the Schedule.

B. The following is added to the EXCLUSIONS section of:

    CAUSES OF LOSS - BASIC FORM

    CAUSES OF LOSS - BROAD FORM

    CAUSES OF LOSS - SPECIAL FORM

    MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM

    STANDARD PROPERTY POLICY

    CAUSES OF LOSS FORM - FARM PROPERTY

    MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM

    LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

A. We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

  1. The failure, malfunction or inadequacy of:

    a. Any of the following, whether belonging to any insured or to others:

      (1) Computer hardware, including microprocessors;

      (2) Computer application software;

      (3) Computer operating systems and related software;

      (4) Computer networks;

      (5) Microprocessors (computer chips) not part of any computer system; or

      (6) Any other computerized or electronic equipment or components; or

    b. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph A.1.a. of this endorsement;

    due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

  2. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph A.1. of this endorsement.

B. If an excluded Cause of Loss as described in Paragraph A. of this endorsement results:

  1. In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

  2. Under the Commercial Property Coverage Part:

    a. In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss - Special Form; or

    b. In a Covered Cause of Loss under the Causes Of Loss - Basic Form or the Causes Of Loss - Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

C. We will not pay for repair, replacement or modification of any items in Paragraphs A.1.a. and A.1.b. of this endorsement to correct any deficiencies or change any features.

Copyright ISO Properties, Inc., 2001
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 36 of 186 PageID #: 40

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

## SCHEDULE

The Exception Covering Certain Fire Losses (Paragraph C) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part Or Policy |
|---|---|
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The following exclusion is added:

CERTIFIED ACT OF TERRORISM EXCLUSION

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**C.** Exception Covering Certain Fire Losses

The following exception to the exclusion in Paragraph B. applies only if indicated and as indicated in the Schedule of this endorsement.

If a "certified act of terrorism" results in fire, we will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements which apply to those forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

Copyright ISO Properties, Inc., 2007
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 37 of 186 PageID #: 41

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

Copyright ISO Properties, Inc., 2007
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 38 of 186 PageID #: 42

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D. Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

Copyright ISO Properties, Inc., 2007
INSURED

# BUILDING AND PERSONAL PROPERTY
# COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section H., Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery and

(b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire-extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation Of Coverage form:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

Case 3:14-cv-00609    Document 1-1    Filed 03/06/14    Page 40 of 186 PageID #: 44

c. **Personal Property Of Others** that is:

    (1) In your care, custody or control; and

    (2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

## 2. Property Not Covered

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

    (1) The lowest basement floor; or

    (2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, does not apply to your "stock" of prepackaged software;

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

    (1) Are licensed for use on public roads; or

    (2) Are operated principally away from the described premises.

    This paragraph does not apply to:

        (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

        (b) Vehicles or self-propelled machines, other than autos, you hold for sale;

        (c) Rowboats or canoes out of water at the described premises; or

        (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers;

 Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 41 of 186 PageID #: 45

q. The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

## 3. Covered Causes Of Loss

See applicable Causes Of Loss Form as shown in the Declarations.

## 4. Additional Coverages

### a. Debris Removal

(1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Extract "pollutants" from land or water; or

(b) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph (4), the following provisions apply:

(a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5) Examples

The following examples assume that there is no Coinsurance penalty.

**EXAMPLE #1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

**EXAMPLE #2**

| | | |
|---|---|---|
| Limit of Insurance: | | $ 90,000 |
| Amount of Deductible: | | $ 500 |
| Amount of Loss: | | $ 80,000 |
| Amount of Loss Payable: | | $ 79,500 |
| | | ($80,000 - $500) |
| Debris Removal Expense: | | $ 30,000 |
| Debris Removal Expense Payable | | |
| | Basic Amount: | $ 10,500 |
| | Additional Amount: | $ 10,000 |

Case 3:14-cv-00609 Document 1-1 Filed 03/06/14 Page 42 of 186 PageID #: 46

The basic amount payable for debris removal expense under the terms of Paragraph (3) is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph (4), because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph (4). Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

b. **Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

c. **Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000, unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

No Deductible applies to this Additional Coverage.

d. **Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

e. **Increased Cost Of Construction**

(1) This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this Additional Coverage.

(3) The ordinance or law referred to in e.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 43 of 186 PageID #: 47

The basic amount payable for debris removal expense under the terms of Paragraph (3) is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000). .

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph (4), because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph (4). Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000, unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this Additional Coverage.

**(3)** The ordinance or law referred to in e.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 44 of 186 PageID #: 48

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

   (a) You were required to comply with before the loss, even when the building was undamaged; and

   (b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

   (a) The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

   (b) Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(6) The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

   (a) We will not pay for the Increased Cost of Construction:

      (i) Until the property is actually repaired or replaced, at the same or another premises; and

      (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

   (b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the Increased cost of construction at the same premises.

   (c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the Increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in e.(6) of this Additional Coverage, is not subject to such limitation.

f. Electronic Data

(1) Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

(2) Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 45 of 186 PageID #: 49

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

(a) If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(b) If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

(c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Electronic Data, is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

5. Coverage Extensions

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

a. Newly Acquired Or Constructed Property

(1) Buildings

If this policy covers Building, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) Your Business Personal Property

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i) Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

(iii) Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 46 of 186 PageID #: 50

**(b)** This Extension does not apply to:

   **(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

   **(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(3)** If the Causes Of Loss Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 47 of 186 PageID #: 51

(2) This Extension does not apply to property:

   (a) In or on a vehicle; or

   (b) In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

(3) The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

   (a) The trailer is used in your business;

   (b) The trailer is in your care, custody or control at the premises described in the Declarations; and

   (c) You have a contractual responsibility to pay for loss or damage to the trailer. .

(2) We will not pay for any loss or damage that occurs:

   (a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

   (b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of Insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost Of Construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

Case 3:14-cv-00609 Document 1-1 Filed 03/06/14 Page 48 of 186 PageID #: 52

## D. Deductible

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

### EXAMPLE #1

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $250 |
| Limit of Insurance - Building #1: | $60,000 |
| Limit of Insurance - Building #2: | $80,000 |
| Loss to Building #1: | $60,100 |
| Loss to Building #2: | $90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$60,100
- 250
$59,850    Loss Payable - Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

### EXAMPLE #2

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1: | $70,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss to Building #2: | $90,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss Payable - Building #1: | $60,000 |
| (Limit of Insurance) | |
| Loss Payable - Building #2: | $80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $140,000 |

## E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each arty will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny the claim.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 49 of 186 PageID #: 53

### 3. Duties In The Event Of Loss Or Damage

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

### 4. Loss Payment

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 50 of 186 PageID #: 54

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

5. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6. **Vacancy**

a. **Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

b. **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

7. **Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 51 of 186 PageID #: 55

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety-glazing material if required by law.

e. Tenants' Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

## F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE #1 (UNDERINSURANCE)**

| When: | | |
|---|---|---|
| | The value of the property is | $250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $100,000 |
| | The Deductible is: | $250 |
| | The amont of loss is: | $40,000 |

Step (1): $250,000 x 80% = $200,000 (the minimum amount of insurace to meet your Coinsurance requirements)

Step (2): $100,000 / $200,000 = .50
Step (3): $40,000 x .50 = $20,000
Step (4): $20,000 - $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 52 of 186 PageID #: 56

## EXAMPLE #2 (ADEQUATE INSURANCE)

When: The value of the property is: $250,000
The Coinsuranc percentage
for it is: 80%
The Limit of Insurance for it is: $200,000
The Deductible is: $250
The amount of loss is: $40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

    b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

## EXAMPLE #3

When: The value of the property is:
Building at Location #1: $75,000
Building at Location #2: $100,000
Personal Property
at Location 2: $75,000
$250,000

The Coinsurance percentage
for it is: 90%
The Limit of Insurance for
Buildings and Personal Property
at Locations #1 and #2 is: $180,000
The Deductible is: $1,000
the amount of loss is:
Building at Location #2: $30,000
Personal Property
at Building #2: $20,000
$50,000

Step (1): $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)
Step (2): $180,000 / $225,000 = .80
Step (3): $50,000 x .80 = $40,000
Step (4): $40,00 - $1,000 = $39,000
We will pay no more than $39,000. The remaining $11,000 is not covered.

## 2. Mortgageholders

    a. The term mortgageholder includes trustee.

    b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

    c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

    d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

        (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

        (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

        (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

    All of the terms of this Coverage Part will then apply directly to the mortgageholder.

    e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

        (1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

        (2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

    At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

    f. If we cancel this policy, we will give written notice to the mortgageholder at least:

        (1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

        (2) 30 days before the effective date of cancellation if we cancel for any other reason.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 53 of 186 PageID #: 57

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

a. The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

### EXAMPLE

| If: | | |
|---|---|---|
| | The applicable Limit of Insurance is | $ 100,000 |
| | The annual percentage increase is: | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| | The amount of increase is: | |
| | $100,000 x .08 x 146 / 365 = | $ 3,200 |

### 3. Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 54 of 186 PageID #: 58

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

    **(a)** Of comparable material and quality; and

    **(b)** Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

 Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 55 of 186 PageID #: 59

# BUSINESS INCOME (AND EXTRA EXPENSE)
# COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.**, Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b. Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

(1) Business Income Including "Rental Value".

(2) Business Income Other Than "Rental Value".

(3) "Rental Value".

If option (1) above is selected, the term Business Income will include "Rental Value". If option (3) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(a) The portion of the building which you rent, lease or occupy; and

(b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

### 2. Extra Expense

a. Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

(1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2) Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

Copyright, ISO Properties, Inc., 2007
INSURED

3. **Covered Causes Of Loss, Exclusions And Limitations**

    See applicable Causes Of Loss Form as shown in the Declarations.

4. **Additional Limitation    Interruption Of Computer Operations**

    a. Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage  Interruption Of Computer Operations.

    b. Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage  Interruption Of Computer Operations.

    c. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

5. **Additional Coverages**

    a. **Civil Authority**
    In this Addition Coverage-Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends;

whichever is later.

b. **Alterations And New Buildings**
    We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

(1) New buildings or structures, whether complete or under construction;

(2) Alterations or additions to existing buildings or structures; and

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 57 of 186 PageID #: 61

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

    (a) Used in the construction, alterations or additions; or

    (b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

c. Extended Business Income

(1) Business Income Other Than "Rental Value"

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

    (a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

    (b) Ends on the earlier of:

        (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

        (ii) 30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) "Rental Value"

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

    (a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

    (b) Ends on the earlier of:

        (i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

        (ii) 30 consecutive days after the date determined in (2)(a) above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

d. Interruption Of Computer Operations

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation - Interruption Of Computer Operations.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss.

Case 3:14-cv-00609    Document 1-1    Filed 03/06/14    Page 58 of 186 PageID #: 62

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

   (a) If the Causes Of Loss Special Form applies, coverage under this Additional Coverage Interruption Of Computer Operations is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

   (b) If the Causes Of Loss Broad Form applies, coverage under this Additional Coverage Interruption Of Computer Operations includes Collapse as set forth in that form.

   (c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage Interruption Of Computer Operations.

   (d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage Interruption of Computer Operations is $2,500 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage Interruption in Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

## 6. Coverage Extension

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

### NEWLY ACQUIRED LOCATIONS

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 59 of 186 PageID #: 63

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

    (1) This policy expires;

    (2) 30 days expire after you acquire or begin to construct the property; or

    (3) You report values to us.

    We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Alterations And New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

a. You must see that the following are done in the event of loss:

    (1) Notify the police if a law may have been broken.

    (2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

    (3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

    (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

    (5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

    Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    (6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

    (7) Cooperate with us in the investigation or settlement of the claim.

    (8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 60 of 186 PageID #: 64

3. **Loss Determination**

   a. The amount of Business Income loss will be determined based on:

      (1) The Net Income of the business before the direct physical loss or damage occurred;

      (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

      (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

      (4) Other relevant sources of information, including:

         (a) Your financial records and accounting procedures;

         (b) Bills, invoices and other vouchers; and

         (c) Deeds, liens or contracts.

   b. The amount of Extra Expense will be determined based on:

      (1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

         (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

         (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

      (2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

   c. **Resumption Of Operations**

      We will reduce the amount of your:

      (1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

      (2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

   d. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

4. **Loss Payment**

   We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

   a. We have reached agreement with you on the amount of loss; or

   b. An appraisal award has been made.

**D. Additional Condition**

   **COINSURANCE**

   If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

   We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

   1. The Coinsurance percentage shown for Business Income in the Declarations; times

   2. The sum of:

      a. The Net Income (Net Profit or Loss before income taxes), and

      b. Operating expenses, including payroll expenses,

      that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 61 of 186 PageID #: 65

instead, we will determine the most we will pay using the following steps:

**Step (1):** Multiply the Net income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

**Step (2):** Divide the Limit of Insurance for the described premises by the figure determined in Step (1); and

**Step (3):** Multiply the total amount of loss by the figure determined in Step (2).

We will pay the amount determined in Step (3) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

(1) Prepaid freight outgoing;

(2) Returns and allowances;

(3) Discounts;

(4) Bad debts;

(5) Collection expenses;

(6) Cost of raw stock and factory supplies consumed (including transportation charges);

(7) Cost of merchandise sold (including transportation charges);

(8) Cost of other supplies consumed (including transportation charges);

(9) Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

(10) Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

(11) All ordinary payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

(12) Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**EXAMPLE #1 (UNDERINSURANCE)**

When: The Net income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described
premises would have been: $ 400,000
The Coinsurance percentage is: 50%
The Limit of Insurance is: $ 150,000
The amount of loss is: $ 80,000

Step (1): $400,000 x 50% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)
Step (2): $150,000 / $200,000 = .75
Step (3): $80,000 X .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

When: The Net income and the operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described
premises would have been: $ 400,000
The Coinsurance percentage is: 50%
The Limit of insurance is: $ 200,000
Te amount of loss is: $ 80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**
If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period of Indemnity**
a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 62 of 186 PageID #: 66

**b.** The most we will pay for the total of Business Income loss and Extra Expense, is the lesser of:

    **(1)** The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

    **(2)** The Limit of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

  **a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

  **b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

    **(1)** The Limit of Insurance, multiplied by

    **(2)** The fraction shown in the Declarations for this Optional Coverage.

**EXAMPLE**

| When: | | |
|---|---|---|
| The Limit of Insurance is: | | $ 120,000 |
| The fraction shown in the Declarations for this Optional Coverage is: | | 1/4 |
| The most we will pay for loss in each period of 30 consecutive days is: | | $ 30,000 |
| ($120,000 x 1/4 = $30,000) | | |
| If, in this example, the actual amount of loss is: | | |
| Days 1-30: | | $ 40,000 |
| Days 31-60: | | $ 20,000 |
| Days 61-90: | | $ 30,000 |
| | | $ 90,000 |
| We will pay: | | |
| Days 1-30: | | $ 30,000 |
| Days 31-60: | | $ 20,000 |
| Days 61-90: | | $ 30,000 |
| | | $ 80,000 |

The remaining $ 10,000 is not covered.

**3. Business Income Agreed Value**

  **a.** To activate this Optional Coverage:

    **(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

      **(a)** During the 12 months prior to the date of the Work Sheet; and

      **(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

    **(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

      **(a)** The Coinsurance percentage shown in the Declarations; multiplied by

      **(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

  **b.** The Additional Condition, Coinsurance, is suspended until:

    **(1)** 12 months after the effective date of this Optional Coverage; or

    **(2)** The expiration date of this policy;

    whichever occurs first.

  **c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

    **(1)** Within 12 months of the effective date of this Optional Coverage; or

    **(2)** When you request a change in your Business Income Limit of Insurance.

  **d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

    **(1)** The Business Income Limit of Insurance; divided by

    **(2)** The Agreed Value.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 63 of 186 PageID #: 67

**EXAMPLE**

When:  The Limit of Insurance is:      $ 100,000
       The Agreed Value is:           $ 200,000
       The amount of loss is:         $ 80,000
Step (1): $100,000 / $200,000 = .50
Step (2): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

    4. **Extended Period Of Indemnity**

Under Paragraph **A.5.c.**, **Extended Business Income**, the number 30 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**F. Definitions**

1. "Finished Stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactuered that is held for sale on the premises of any retail outlet insrued under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premies, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately afrter the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

         (2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   (1) Regulates the construction, use or repair, or requires the tearing down, of any property; or

   (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including:

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 64 of 186 PageID #: 68

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

   **1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

   **2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

Copyright ISO Properties, Inc., 2006,
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 65 of 186 PageID #: 69

## CAUSES OF LOSS   SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section G., Definitions.

### A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations;

that follow.

### B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

Copyright, ISO Properties, Inc., 2007
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 66 of 186 PageID #: 70

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

  (a) Foundations, walls, floors or paved surfaces;

  (b) Basements, whether paved or not; or

  (c) Doors, windows or other openings.

But if Water, as described in g.(1) through g.(4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

1. When "fungus", wet or dry rot or bacteria results from fire or lightning; or

2. To the extent that coverage is provided in the Additional Coverage Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions B.1.a. through B.1.h. apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 67 of 186 PageID #: 71

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

    **(a)** Electrical current, including arcing;

    **(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

    **(c)** Pulse of electromagnetic energy; or

    **(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. (1)** Wear and tear;

    **(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

    **(3)** Smog;

    **(4)** Settling, cracking, shrinking or expansion;

    **(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

    **(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

    **(7)** The following causes of loss to personal property:

        **(a)** Dampness or dryness of atmosphere;

        **(b)** Changes in or extremes of temperature; or

        **(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

    **(1)** You do your best to maintain heat in the building or structure; or

    **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

    **(1)** Acting alone or in collusion with others; or

    **(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 68 of 186 PageID #: 72

**k.** Collapse, including any of the following conditions of property or any part of the property:

    **(1)** An abrupt falling down or caving in;

    **(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

    **(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

    **(a)** To the extent that coverage is provided under the Additional Coverage Collapse; or

    **(b)** To collapse caused by one or more of the following:

        **(i)** The "specified causes of loss";

        **(ii)** Breakage of building glass;

        **(iii)** Weight of rain that collects on a roof; or

        **(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

    **(1)** Planning, zoning, development, surveying, siting;

    **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    **(3)** Materials used in repair, construction, renovation or remodeling; or

    **(4)** Maintenance;

    of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

    **(1)** Any loss caused by or resulting from:

        **(a)** Damage or destruction of "finished stock"; or

        **(b)** The time required to reproduce "finished stock".

    This exclusion does not apply to Extra Expense.

    **(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

    **(3)** Any increase of loss caused by or resulting from:

        **(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

Case 3:14-cv-00609 Document 1-1 Filed 03/06/14 Page 69 of 186 PageID #: 73

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.**, Ordinance Or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

**LOSS OR DAMAGE TO PRODUCTS**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 70 of 186 PageID #: 74

## C. Limitations

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income Coverage or to Extra Expense Coverage.

3. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

   a. $2,500 for furs, fur garments and garments trimmed with fur.

   b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   c. $2,500 for patterns, dies, molds and forms.

   d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

   These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

   This limitation, C.3., does not apply to Business Income Coverage or to Extra Expense Coverage.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 71 of 186 PageID #: 75

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

   However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

## D. Additional Coverage   Collapse

The coverage provided under this Additional Coverage Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in **2.a.** or **2.b.**;

      (2) One or more of the "specified causes of loss";

      (3) Breakage of building glass;

      (4) Weight of people or personal property; or

      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage   Collapse** does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   b. Awnings, gutters and downspouts;

   c. Yard fixtures;

   d. Outdoor swimming pools;

   e. Fences;

   f. Piers, wharves and docks;

   g. Beach or diving platforms or appurtenances;

   h. Retaining walls; and

   i. Walks, roadways and other paved surfaces;

   if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

      (1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

      (2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

   a. The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

   b. The personal property which collapses is inside a building; and

   c. The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

   The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 72 of 186 PageID #: 76

6. This Additional Coverage Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage Collapse will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage Collapse as described and limited in D.1. through D.7.

E. **Additional Coverage Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in E.2. and E.6. only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

   a. A "specified cause of loss" other than fire or lightning; or

   b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

   c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under E.2. of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

   If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage Collapse.

6. The following, 6.a. or 6.b., applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 73 of 186 PageID #: 77

a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

F. **Additional Coverage Extensions**

1. **Property In Transit**

This Extension applies only to your personal property to which this form applies.

a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

b. Loss or damage must be caused by or result from one of the following causes of loss:

(1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

(2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

(3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

c. The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

3. **Glass**

a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension, F.3., does not increase the Limit of Insurance.

G. **Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(1) The cost of filling sinkholes; or

(2) Sinking or collapse of land into man-made underground cavities.

Copyright, ISO Properties, Inc., 2007

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 74 of 186 PageID #: 78

**b.** Falling objects does not include loss or damage to:

   **(1)** Personal property in the open; or

   **(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 75 of 186 PageID #: 79



## GLOBAL INDEMNITY
GROUP, INC.

Penn-America Insurance Company®
Penn-Star Insurance Company®
Penn-Patriot Insurance Company
United National Insurance Company®
Diamond State Insurance Company®
United National Specialty Insurance Company®
United National Casualty Insurance Company®

Robert V. Massaro
Direct Line: (610) 538-2463
rmassaro@global-indemnity.com

Imperial Park Trust, Llc
1001 Rosemont Terrace
Smyrna TN 37167

06/16/2011

Insured:          Imperial Park Trust, Llc
Policy Number:    PAC6895329
Claimant:         ASSD
Claim:            11028765

Dear Sir/Madam:

This will acknowledge receipt of the above captioned matter. I am the claims examiner in our office assigned to the handling of this matter. Please direct all future inquiries to me at (610) 538-2463.

Very truly yours,

Robert V. Massaro
Global Indemnity Group Inc.
Claims Department

See Page 2 For State Fraud Warning

Tennessee Underwriters, Inc.
140 Fourth Avenue South
Franklin TN 37064

PO Box 532 Willow Grove, PA 19090 ● e-mail claims@global-indemnity.com
Three Bala Plaza East ● Suite 300 ● Bala Cynwyd, PA 19004 ● P: 610.664.1500 ● F: 610.660.8885
A member of UnitedAmerica Indemnity, Ltd.



EXHIBIT
C

**State Fraud Warning**

For your protection Tennessee law requires the following statement to appear on this form. "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."

PO Box 532 Willow Grove, PA 19090 ∙ e-mail claims@global-indemnity.com
Three Bala Plaza East ∙ Suite 300 ∙ Bala Cynwyd, PA 19004 ∙ P: 610.664.1500 ∙ F: 610.660.8685
A member of UnitedAmerica Indemnity, Ltd.



*PREPARED FOR:*

MR. ROBERT MASSARO
GLOBAL INDEMNITY GROUP, INC.
P.O. BOX 532
WILLOW GROVE, PENNSYLVANIA 19090

IMPERIAL PARK, LLC
783 FOURTEENTH AVENUE
SMYRNA, TENNESSEE 37167
CLAIM NUMBER: 11028765
DONAN PROJECT NUMBER: 07-11060634-0

*PREPARED BY:*

DONAN ENGINEERING CO., INC.
1000 ELM HILL PIKE
NASHVILLE, TENNESSEE 37210
615-886-4128

JULY 18, 2011          JEFFREY L. COYNE, P.E.
                       SENIOR FORENSIC ENGINEER



EXHIBIT

D

John O. Donan, Jr., P.E.
Chairman of the Board

J. Lyle Donan, P.E.
President



CORRESPOND TO:
1000 Elm Hill Pike
Nashville, Tennessee 37210
615-886-4128
615-886-4147 fax

July 18, 2011

Mr. Robert Massaro
**Global Indemnity Group, Inc.**
P.O. Box 532
Willow Grove, Pennsylvania 19090

      RE:    **Imperial Park, LLC**
           **783 Fourteenth Avenue**
           **Smyrna, Tennessee 37167**
           **Claim Number: 11028765**
           **Donan Project Number: 07-11060634-0**

Dear Mr. Massaro:

    At your request, on June 30, 2011, and again on July 1 and July 6, 2011, studies were made on the building at the above-referenced address. The purpose of the studies was to determine the cause and extent of damage to the structure and provide a repair protocol. Mr. John Lenahan, the building owner, and Mr. Tim Binkley, plant manager for the facility, were present to point out areas of concern and to provide firsthand information. This letter, with the attached photographs, is the report of my findings and conclusions.

*Description of Property*

    For purposes of this report, the facility is considered to face south toward Sam Ridley Parkway (Photograph 1 and Figure 1). The subject building is a single-story structure over a slab-on-grade. The facility was originally constructed as a large meat freezer, and the walls and roof of the structure are built with structural insulated panels (SIPs). The exterior walls are covered with metal panels (siding), and the roof is clad with a ballasted EPDM (ethylene propylene diene monomer) roof. The roof structure (i.e. SIPs) of the building is supported by a large rack system inside the building that extends from the floor to the ground. The building was built in 1991, and Mr. Lenahan has owned it for approximately three years.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 79 of 186 PageID #: 83



**Figure 1: Aerial Image of the Facility with Freezer Building Shown[1]**

*Background*

On June 15, 2011, a storm producing high winds blew over a section of the front siding and framing onto the neighboring lot. The local fire department reportedly entered the building after the event and informed the owner to shut off the electrical breaker because of a large volume of water intrusion. The owner placed large tarps over the roof to deter water intrusion through the roof. The facility is situated near the Smyrna Airport; unofficial weather data indicates that a 56 mile per hour (mph) wind gust was recorded at the airport that originated from a north to northwesterly direction (Figure 2). Wind gusts at this site may have been higher than that recorded at the airport.

---

[1] Google Earth





**Figure 2: Smyrna Airport Data from June 15, 2011 with 56 mph Gust[2]**

## *Observations*

The south metal wall panels of the building are detached from the SIPs (Photographs 2 and 3). The wall section at the west end of the front wall has been removed from the site; the remaining section of the wall remains for study. . The metal wall is approximately 34 feet high; 10 feet of the wall extended above the roof line as a parapet wall section (Figure 3). The metal siding is attached to girts which were attached to seven steel columns (Photograph 4). The steel columns were bolted to poured concrete footings at the bottom of the wall and attached to channels just below the gutter line (Photographs 5 and 6). Guy wires were installed through the most eastern column and the middle column; both guy wires failed when the wall collapsed (Photographs 7 and 8 and Figure 4).

---

[2] Weather Underground, www.wunderground.com – This is unofficial weather data





**Figure 3: Parapet Wall Above Freezer Building[3]**

The SIP walls are approximately 24 feet high; the main wall extends about 22 feet continuously before being spliced with a shorter SIP wall (upper wall) near the roof line (Photograph 9). The SIP main wall is offset from the upper wall as it is leaning outward (Photograph 10). This was confirmed by plumbing the wall in three locations. The wall is out of plumb as much as 2 inches over a 20 foot height, (i.e. 0.10 inches per foot). The west end of the wall was near plumb, but the middle and east ends were both out of plumb about 0.10 inches per foot. The north interior wall of the freezer building was also plumbed near the east end for comparative purposes, and the wall measures plumb for the same height. Six channels are connected to the SIPs on the exterior-side; another smaller channel is bolted to the top flange of the larger channel and the smaller channel projects outward from the wall (Photographs 11 and 12). A steel plate is welded to the web of the smaller channel and the plate is welded and bolted to the columns (Photographs 13 through 15). When the wall collapsed, most of the plates failed in shear without causing failure at the welds; it should be noted that the plates are corroded. At least one of the upper panels is torn (Photograph 16).

---

[3] Microsoft Bing Maps, www.bing.com/maps. Note photograph taken before renovations of north building.



The larger channels attached to the exterior side of the SIPs are connected to the wall with through bolts. The through bolts are inserted through an angle on the inside of the building and the angle is attached to the most southern rack system (Photographs 17 through 19). The main wall is displaced from the upper wall just above the channels (Photographs 20 and 21).



**Figure 4: Aerial Image Pointing To Guy Wires[3]**

The framing for an interior rack system is placed at the ends of the 4-foot by 12-foot roof SIPs; in other words, the rack system supports much of the roof (Photograph 22). Scuffing is present on the bottom-side of the panels over the rack systems (Photograph 23). The markings are not due to movement of the roof structure (i.e. roof diaphragm) over the racks as markings are present on both sides of the racks and marks are present where the bottom of the panels are not flush with the top of the racks (Photographs 24 and 25). In one area near the front wall, SIP ends are not positioned over the rack system (Photographs 26 and 27). On the opposite panel end where this was observed, channels are installed between the rack system and the SIPs (Photographs 28 and 29). This was done by a previous owner.

Water is present on the floor in three areas of the freezer; two occur along the front wall, at both ends, and the other occurs on the west end of the building near the interior wall, where it abuts the neighboring steel-framed building



(Photographs 30 through 35). Water intrusion at the front of the building occurred after the event; however, no roof damage is found where the water intrusion is occurring at the west side of the building (Photograph 36). It should be noted that the bottom of several racks are corroded, which is not due to the recent event (Photographs 37 and 38).

A large tarp was installed by the owner after the event occurred to prevent moisture infiltration inside the building (Photograph 39). The tarp was pulled back near the front wall to observe the roof. As noted earlier, damage is found at the front edge of the roof and at the southeast corner; the remaining roof is not damaged by this event. The SIPs are sagging between ends, which is allowing water to pond on this roof (Photographs 40 through 43). This is also evident near the front wall as algae have grown beneath the ballast (Photograph 44). Ponding water on this roof is not recent as it is seen in old aerial images of the building. A leak was also reported at the north wall at the transition from this freezer building into another; however, no storm damage was found at this location (Photograph 45 and 46).

### Analysis and Conclusions

Positive wind pressures pushed the wall over during the storm. Approximately 10 feet of the wall extended above the roof line and it stretched about 120 feet across the front wall. It is believed that the wall was built 10-foot above the roof line (i.e. 10-foot parapet) for aesthetic purposes to match the height of the neighboring building. However, the parapet wall provided a large surface area to catch wind. Current building codes require that structures built in this area are able to withstand a 90-mph 3-second gust at a height of 33 feet in the air. Older building codes, such as the one used when this building was built, had adopted a 70-mph design requirement.

The front SIP wall displaced during the event as the framing for the siding wall was connected to the SIPs. It appears that the rack system prevented additional damage of the front wall as the front SIP wall was anchored to the rack system. The lower front SIP wall displaced relative to the upper SIP wall panel section, just above the exterior and interior channels. The event resulted in water intrusion near the south edge of the roof and water accumulated in two areas inside the building. The water leak along the west wall is not related to this event as no damage is found in this area. The bottom of the rack system is heavily deteriorated (i.e. corroded) in some areas; this is also not due to this event.



Ponding water has been a chronic issue on this roof and the roof SIPs are deflecting considerably. Water accumulation on roofs with SIPs is detrimental to the roof system as water adds a large amount of weight that the panels were not designed for; it should be noted that the National Roofing Contractors Association (NRCA) recommends that water drains from a roof with in a 48-hour period. Considerable weight is already present from the river rock ballast on the roof.

The storm not only caused damage to the metal siding and framing it also displaced the south SIP wall. Also, damage to the roof occurs near the edge of the south wall and at the southeast corner, which both resulted in water intrusion into the building. One of the shorter upper wall panels is torn. There are on-going problems with the building that are unrelated to this event; these include, but are not limited to: deflecting SIP roof panels, unsupported panel edges due to large deflections of the panels, water ponding on the roof, water leakage through the roof and into the panels, and corrosion at the base of the rack system.

Repair recommendations for this building cannot be provided without the guidance of a design engineering firm. Consideration should also be given to contacting the manufacturer of the SIPs as they may have design guidelines and details that prove helpful. The manufacturer of the panels could not be determined; however, two of the most commonly known manufacturers of cold storage SIPs are Aluma Shield (also known as Kingspan) and Metl-Span.

### *Summary of Conclusions*

In summary, based on what is known at this time, I am of the opinion that:

- High winds blew over the siding wall and framing on the south side of the building.

- The framing for the siding wall was attached to the south SIP wall, and the SIP wall displaced outward when the siding wall blew over.

- The south side of the roof membrane is damaged and water intrusion occurred on both ends of the building. This damage does not extend beyond 10 feet from the roof line.



- At least one upper panel was damaged during the event. The tops of other upper panels and the edges of the roof panels were concealed with a tarp during all three studies.

- Problems with this building are found that predate the recent event. These include, but are not limited to: deflecting SIP roof panels, unsupported panel edges due to large deflections of the panels, water ponding on the roof, water leakage through the roof and into the panels away from the south wall, and corrosion at the base of the rack system.

- Repair recommendations for this building cannot be provided without the guidance of a structural design engineering firm familiar with metal insulated panels.

We appreciate your confidence in our professional services.

Sincerely,
DONAN ENGINEERING CO., INC.

Jeffrey L. Coyne, P.E.
Senior Forensic Engineer

Attachment



**From:** Cindy Simkins <csimkins@zanderins.com>

**To:** Matt <reruntn@aol.com>

**Subject:** Fwd: Imperial Park Trust 11028765

**Date:** Mon, 15 Aug 2011 1:21 pm

**Attachments:** 06581024-734241-734262.TIF (12K), 06582025-734242-734261.TIF (31K),
06583026-734243-734260.TIF (79K), 06584027-734244-734259.TIF (29K),
06585028-734245-734258.TIF (145K), 06586029-734246-734257.TIF (136K),
06587030-734247-734256.TIF (44K), 06588031-734248-734255.TIF (36K),
06589032-734249-734254.TIF (19K)

Matt,

Attached is the requested report.

Please feel free to contact me if you need anything further.


Cindy Simkins
Account Executive
Zander Insurance Group
212 Oceola Avenue / Nashville, TN 37209
Toll Free:  800.356.4282, Ext. 3315
Direct: 615.850.3343 / FAX: 615.352.2850

This e-mail may contain PRIVILEGED and CONFIDENTIAL information. Any disclosure,
copying, distribution or other use of this information except by the intended
recipient(s) is prohibited. If you have received this transmission in error,
please delete it and immediately notify the sender by return e-mail. Thank you.



------------------Original Message------------------
From: Massaro, Robert
Sent: AUG 15 2011 13:11 PM
To: Cindy Simkins
Subject: Imperial Park Trust  11028765

Cindy


See attached.


Robert Massaro

Property Claims Examiner II

Global Indemnity Group, Inc.

A member of Global Indemnity p/c

P. O. # 532

Willow Grove, PA 19090

Email:rmassaro@global-indemnity.com

Office No.: 610-538-2463

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 87 of 186 PageID #: 91



0001. South side of the building.



0002. Collapsed wall at the front of the building. Note the section on one side of the fence has been removed.



0003. Collapsed wall at the front of the freezer building. Note gutter trough was positioned just below the roof line.
Freezer building is built next to a steel-framed building



0004. Metal siding attached to girts and columns.



0005. Columns were attached to anchor bolts at their base. The bolts have yielded or failed in shear.



0006. Column attachment to walls is through these channels. Note channels are installed below an upper structural panel.

Case 3:14-cv-00609  Document 1-1  Filed 03/06/14  Page 90 of 186 PageID #: 94



0007.  Broken guy wire at the north side of the building.



0008.  Broken guy wire that once attached to the collapsed wall.

DECI #: 07-11060634-0                                                        Donan Engineering Co., Inc.



0009. Main wall and "upper" wall of the freezer building. Roof panels sit on top of upper wall.



0010. Sighting along the top of the wall just above the wall panels and upper wall panels.



0011. Channels are connected to SIPs and another channel is bolted to the top flange.



0012. Failure at column 1 channel. Note weld at top of channel failed.



0013. Failure at column 3 channel. Plate still attached to channel.



0014. Failure at column 3 channel. Weld did not fail; shear failure occurred at plate.



0015. Column 3 failure occurred at welded connection. Note plate is still bolted to column, but bottom of plate is missing.



C016  Torn upper panel.



0017.  Structural insulated panels are about 6 inches in thickness.    This is an interior wall at an opening.



0018.  The rack system inside the freezer building.



0019. Channel that runs across the front wall connected to wall with angles



0020. Channel connecting the rack system to the front wall. Note the channel is below the upper panel.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 97 of 186 PageID #: 101



0021. Displacement of the lower panel from the upper panel as if the bottom wall panels have pulled outward, away from the building.



0022  Racks support ends of structural insulated panels.



0023. Scuff marks on the bottom side of insulated ceiling panels. Note they occur on either side of the panels.



0024. Scuff marks are present regardless of whether steel racks are flush with panels or not. They also do not occur at ends of panels only

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 99 of 186 PageID #: 103



0C25. Note marks occur where there are gaps between panels and rack system.



0026. Some panel ends are not positioned over rack system.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 100 of 186 PageID #: 104


0027. Some panel ends are not positioned over rack system


0028. Channels inserted between rack system and insulated metal panels.



0029  Channels installed between the ceiling panels and the rack system.



0030.  Water ponding on the floor at the southwest corner due to a roof leak.



0031. Ponding water at the southeast corner. Note tarps over finished goods



0032. Tarp hanging from ceiling along west wall. Note buckets and drums placed underneath the tarp.



0033. Drum and containers placed underneath tarp. This water intrusion is not the result of this event.



0034. Damage to the roof at the south wall.



0035. Damage to roof a southeast corner where guy wire failed.



0036. Ponding on the roof near the tarped ceiling location.



0037. Corrosion of rack systems did not occur due to this event.



0038. Corrosion and deterioration of a column and plate for the rack system



0039. Most of the roof is covered with a tarp.



0040. Insulated panels are deflecting.

DECI #: 07-11060634-0                    Dohan Engineering Co., Inc.



0041. Insulated roof panels are sagging between supports allowing water to pond on roof.



0042. Edge of panel slopes toward gutter.



0043. Opposite end of same panel slopes away from gutter.



0044. Tarp removed on third visit to site.    Note the dark staining on the edge of the roof where water ponds.



0045. No damage to roof or wall at north side of building.



C046. Unbonded seam above entrance.

 **Gmail**

John Lenahan< rerunoftn10@gmail.com>

## Imperial Park Claim
9 messages

**John Lenahan< rerunoftn10@gmail.com>**
To: "Massaro, Robert" <rmassaro@global-indemnity.com>

Mon, Nov 12, 2012 at 10:30 AM

Good Morning Mr. Massaro,

We are still awaiting word from you on the engineering report and construction estimate which was forwarded to you. We need
to move forward on this project as soon as possible.
Please advise us at your very earliest convenience as to when we can move forward with this project.

Thanks in advance,

Mac Finley
for ReRun of Tennessee

**Massaro, Robert < rmassaro@global-indemnity.com>**
To: John Lenahan <rerunoftn10@gmail.com>

Tue, Nov 13, 2012 at 8:16 AM

Just got back in. I will back with you this week.

**From:** John Lenahan [mailto:rerunoftn10@gmail.com]
**Sent:** Monday, November 12, 2012 11:31 AM
**To:** Massaro, Robert
**Subject:** Imperial Park Claim

[Quoted text hidden]

**John Lenahan< rerunoftn10@gmail.com>**
To: "Massaro, Robert" <rmassaro@global-indemnity.com>

Fri, Nov 16, 2012 at 11:41 AM

Mr. Massaro,

I hope all is well with you. As you are aware, it has been 17 months since our storm damage occurred.
We are hoping to hear from you today.

Thanks in advance,

Mac Finley
for ReRun of TN

[Quoted text hidden]

EXHIBIT
E

**Massaro, Robert < rmassaro@global-indemnity.com>**
To: John Lenahan <rerunoftn10@gmail.com>

Fri, Nov 16, 2012 at 12:55 PM

We sent the $35,000 on the BI. We did get the revised estimate for the 2,900,000. This was unexpected. We have enlisted the services of an adjuster named Greg Martin. The new estimate needs to be reviewed and discussed. Mr. Martin has been contacted and is up to speed on what has been going on. He will be taking the lead on this adjustment.

**From:** John Lenahan [mailto:rerunoftn10@gmail.com]
**Sent:** Friday, November 16, 2012 12:42 PM
**To:** Massaro, Robert
**Subject:** Re: Imperial Park Claim

[Quoted text hidden]

John Lenahan< rerunoftn10@gmail.com>                     Fri, Nov 16, 2012 at 1:06 PM
To: reruntn <reruntn@aol.com>

[Quoted text hidden]

John Lenahan < rerunoftn10@gmail.com>                     Fri, Nov 16, 2012 at 2:00 PM
To: "Massaro, Robert" <rmassaro@global-indemnity.com>

Mr. Massaro,

Thank you for your reply.

We were told by all the engineering companies who looked at the storm damage that no determination could be made as to the full extent of the damage until the roof area was exposed. Honeycutt Engineering, Inc. made their determination only after the racks were emptied, and the roof was exposed.

It is imperative to us that the repair work start very soon. This section of the building is used as our finished goods holding area, and is presently shut down, creating a major business interruption to our normal process flow.

The business interruption policy covers $200,000.00, and we are quickly approaching that number, and construction activities have yet to begin. As you are aware, the damage occurred 17 months ago, and Fresh Start has estimated a 10-12 month project.

We need the contact information for Mr. Martin, so we can contact him today to move forward on this project without any further delay.

Thanks in advance,



**GLOBAL INDEMNITY**
GROUP, INC.

Robert V. Massaro
Direct Line: (610) 538-2463
rmassaro@global-indemnity.com

Diamond State Insurance Company*
Penn-Star Insurance Company*
Penn-Patriot Insurance Company*
Penn-Star Insurance Company*
United National Casualty Insurance Company*
United National Insurance Company*
United National Specialty Insurance Company*

July 3, 2013

<u>**VIA UPS GROUND**
**AND U.S. FIRST CLASS MAIL**</u>

Imperial Park, LLC
1001 Rosemont Terrace
Smyrna, TN 37167
Attn: Mr. John Lenahan

RE:   **OUR CLAIM NUMBER:**   11028765
     **OUR INSURED:**   **IMPERIAL PARK, LLC**
     **DATE OF LOSS:**   06/15/11
     **POLICY NUMBER:**   **PAC6895239**

Dear Mr. Lenahen:

Penn-Star Insurance Company, under Policy PAC6895239, effective January 25, 2011 to January 25, 2012, provides coverage against risks of direct physical loss in the amount of $3,200,000 for your Building and $200,000 for Business Income and Extra Expenses located at 783 14th Avenue, Smyrna, TN 37167. Coverage is written on a Replacement Cost Basis with an Agreed Amount clause with a $2,500 policy deductible. The Mortgagee on your policy is SunTrust Bank out of Atlanta, GA.

On or about June 16, 2011, we received a notice of a wall collapse claim at your building located at 783 14th Avenue, Smyrna, TN 37167. The investigation and adjustment process has been on-going since June 16, 2011. To date, Penn-Star Insurance has paid your extra Expense claim in full in the amount of $200,000. With respect to the structure, we have made a payment in the amount of $622,559.93 on September 16, 20011 which we believed to be the Actual Cash value of the loss. There was a holdback pending as this is a Replacement Cost policy.

Since the first payment, the amount of the Actual Cash Value loss has increased and therefore we are in a position to release the balance of the ACV amount. With respect to the Replacement Cost conditions, we direct your attention to portion of your policy entitled **"BUILDING AND PERSONAL PROPERTY COVERAGE FORM"**, Form CP 00 10 (06/07), which reads, in part, as follows:

PO Box 532 Willow Grove, PA 19090 • e-mail claims@global-indemnity.com
Three Bala Plaza East • Suite 300 • Bala Cynwyd, PA 19004 • P: 610.664.1500 • F:

*A member of Global Indemnity plc*

11028765-0039/2013

**EXHIBIT**
_____F_____

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

**G.    Optional Coverages**

If shown as applicable in the declarations, the following Optional Coverages apply separately to each item.

**3.    Replacement Cost**

a.    Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b.    This Optional Coverage does not apply to:

(1)    Personal property of others;

(2)    Contents of a residence;

(3)    Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-abrac; or

(4)    "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c.    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d.    We will not pay on a replacement cost basis for any loss or damage:

(1)    Until the lost or damaged property is actually repaired or replaced; and

(2)    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. With respect to tenants' improvements and betterments, the following also apply:

(3)    If the conditions in d.(1) and d.(2) above are not met, the value of tenants' improvements and betterments will be determined

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 114 of 186 PageID #: 118

as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property. If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

During our investigation, we ask that you cooperate with Greg Martin as they have been retained to assist us in this matter, with the understanding that no act of any Company representative while investigating this loss further shall be construed as an admission and/or liability under the above-referenced policy. Mr. Martin has advised that the Replacement cost damage are $1,684,085.11, less depreciation of $587,590.93 for an ACV loss of $1,096,494.18.

At this time we are issuing the balance of the ACV damages of $472,239.72, this will be mailed under separate cover.

There may be other reasons, which affect coverage in addition to those cited in this letter, and Penn-Star Insurance Company waives none of its rights in relation to raising any other applicable policy condition, provision or exclusion, which may affect coverage.

11028765-0039/2013

Page 4

Waiving none and reserving to Penn-Star Insurance Company all of its rights and defenses under and pursuant to Policy PAC6895329.

Very truly yours,

Robert V Massaro
Sr. Claims Examiner I
PENN-STAR INSURANCE COMPANY

cc:    Greg Martin
Property General Adjuster LLC
7111 W 151th St, Suite 323
Overland park, KS 66223

Tennessee Underwriters, Inc.
140 Fourth Avenue South
Franklin, TN 37064

Zander Insurance Group
212 Oceola Avenue
Nashville, TN 37105

For your protection Tennessee law requires the following statement to appear on this form. "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."

11028765-0039/2013

# BOB LYNCH, JR.
### Attorney at Law

Rose Blankenship
Paralegal

Suite 316, Washington Square
222 Second Avenue North
Nashville, Tennessee 37201

Telephone: 615-255-2888
Fax: 615-256-5737

*Email: office@boblynchlaw.com*

*September 6, 2013*

Robert V. Massaro
Sr. Claims Examiner I
Penn-Star Insurance Company
P.O. Box 532
Willow Grove, PA 19090

*via U.S. Mail & email* rmassaro@global-indeminity.com

Re:   Claim Number:   · 11028765
      Imperial Park, LLC
      Date of Loss: 06/15/2011
      Policy Number:   PAC6895239

Dear Mr. Massaro:

I have been retained by Imperial Park, LLC to assist it in resolving its claim concerning property loss at its manufacturing plant as a result of a weather incident.   In conducting my initial due diligence, I have discovered that Penn-Star Insurance Company has not provided my client with the necessary sworn proof of loss as required in my client's Commercial Property Coverage Part Declaration on pg. 9, under E. (Loss Conditions), Section 3, subsection (7).

I would appreciate it if you would send me this necessary proof of loss in order that my client may comply with the conditions of the policy and submit it to you if we are not able to resolve this claim.

If you have any questions pertaining to this matter, please do not hesitate to contact me at my office.

Sincerely,

Bob Lynch, Jr.

BL/rb
Cc:   Imperial Park, LLC

1

EXHIBIT

# SWORN STATEMENT IN PROOF OF LOSS

**$3,200,000.00**
AMOUNT OF POLICY AT TIME OF LOSS

PAC6895329  Claim # 11028765
POLICY NUMBER ......CLAIM #

**01/25/2011**
DATE ISSUE
**01/25/2012**
DATE EXPIRES

Global Indemnity Group, Inc.

Bala Cynwyd, PA

To the **GLOBAL INDEMNITY GROUP, INC.**
Of **3 Bala Plaza East, Bala Cynwyd, PA**
At time of loss, by the above indicated policy of insurance you insured **Commercial Property Building: $3,200,000 agreed amount - Replacement cost**

against  loss _____ to the property described under Schedule "A", according to
by _____
the terms and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

1. **Time and Origin:** A **wind storm and/or tornado** loss occurred about the hour of **17:27 pm**
STATE KIND
on the **15th** day of **June, 2011**. The cause and origin of the said loss were: **Wind storm / tornado.**
**Winds clocked at 57 miles per hour.**

2. **Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no
other purpose whatever: **Warehouse – light manufacturing, storage / lease**
**Particulars of occupancy were observed by Global's Agents within 24 hours of loss.**

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was
**owner** _____ No other person or persons had any interest therein or
encumbrance thereon, except: **SunTrust Bank had a mortgage / 1st lienholder which was disclosed to Global directly or through its**
**agents**

4. **Changes:** Since the said policy was issued there has been no  assignment thereof, or change of interest, use, occupancy,  possession,
location or exposure of the property described, except: **Refinanced with Wilson Bank & Trust in September 2012.**

5. **Total Insurance:**  The total amount of insurance upon the property described by this policy was, at the time of the loss,
**$3,200,000.00** _____, as more particularly specified in the apportionment attached under Schedule "C", besides which there was
no policy or other contract of insurance, written or oral, valid or invalid.

6. The Actual Cash Value of said property at the time of the loss was ........................................... $  **3,200,000 ***

   *because it was replacement cost and documentation shows that amount to replace it.

7. The Whole Loss and Damage ........................................................................................ $ _____

8. Deductible

9. The Amount Claimed under the above numbered policy is ...................................................... $  **3,200,000**

   The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or
with the privily or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned
herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been
concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information
that may be required will be furnished and considered a part of this proof.

The furnishing of this blank proof of loss or the preparation of the proof of loss by a representative of the above insurance
company is not a waiver of any of its rights.

State of _____
County of _____
Subscribed and sworn to before me this **7th** day of **October** 20**13**

_John J. Lenahan_
_Imperial Park L.L.C._
Insured

X _Jacqline Blankenship, notary_
(May 3, 2016)

EXHIBIT
H

## SCHEDULE "A" - POLICY FORM

Policy Form No. _____ Dated _____

Item 1. $ _____ on _____
Item 2. $ _____ on _____
Item 3. $ _____ on _____
Item 4. $ _____ on _____
Situated _____
Coinsurance, Average, Distribution, or Deductible Clauses, if any _____
Loss, if any, payable to _____

## SCHEDULE "B"
## STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE

| | | ACTUAL CASH VALUE | LOSS AND DAMAGE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Totals: | | | |

## SCHEDULE "C" - APPORTIONMENT

| POLICY NO. | EXPIRES | NAME OF COMPANY | ITEM NO. ____ | | ITEM NO. ____ | |
|---|---|---|---|---|---|---|
| | | | INSURES | PAYS | INSURES | PAYS |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Totals: | | | | | | |

_____ Adjuster

## RECEIPT FOR PAYMENT

Received of _____ **Penn-America Insurance Company** _____ of _____ **Hatboro, Pennsylvania** _____

_____ Dollars ($ _____ )

n full satisfaction and indemnity for all claims and demands upon said company on account of said loss and damage and the said policy is
ereby _____ (State whether Reduced, Reduced and Reinstated or Canceled by payment.)

)ated _____ 20 _____

)ated _____ 20 _____

_____ The Insured

_____ The Mortgagee

# BOB LYNCH, JR.
## *Attorney at Law*

Rose Blankenship
Paralegal

Suite 316, Washington Square
222 Second Avenue North
Nashville, Tennessee 37201

Telephone: 615-255-2888
Fax: 615-256-5737

Email:  *office@boblynchlaw.com*

*October 7, 2013*

Robert Massaro
Sr. Claims Examiner I
Global Indemnity Group, Inc.
A member of Global Indemnity PLC
P.O. Box #532
Willow Grove, PA 19090      *via U.S. Mail and email:*      *rmassaro@global-indemnity.com*

Re:    **Imperial Park Matter**
          **Claim Number: <u>11028765</u>**

## <u>EXHIBIT A</u>

Dear Mr. Massaro,

Thank you for sending me the appropriate Global Indemnity, hereinafter "Global", proof of loss form pursuant to the commercial property policy #<u>PAC6895329 E3a(7)</u>, which requires my client to provide said sworn proof of loss as a condition within sixty (60) days after Global requests it. The same provision requires Global to supply the necessary proof of loss form. Since Global never requested that my client provide said form, I on September 6, 2013, wrote you via email and requested it, because it appears that Global and Imperial Park cannot agree on my client's loss.

On September 6, 2013, you sent the Global sworn proof of loss form, which Global requires under its policy entitled **"Duties in the Event of Loss."** Please find attached my client's properly executed proof of loss. Because my client is seeking the policy limits in the amount of $3,200,000, I am writing to incorporate pertinent facts bearing on my client's claim for the policy limits. Please note that my client's representative, John Lenahan, is notarizing this letter and incorporating it into his necessary sworn proof of loss. This letter will be designated as <u>Exhibit A</u> to the sworn proof of loss. It is also my position that this letter is in response to pg. 2 of 2 of the sworn statement and proof of loss.

The pertinent facts that support, in part, my client's proof of loss are as follows:

1. On June 15, 2011, a wind storm and/or tornado substantially damaged my client's insured property located at 783 14th Avenue and D Street, Smyrna, Tennessee 37167.

1.

2.  Under the policy, my client performed all **"Duties in the Event of Loss"** which are set forth as follows:

    a.  Mr. Lenahan immediately notified the police and other first responders to the scene.

    b.  Mr. Lenahan provided Global or its agents prompt notice of the direct physical loss and damage from the storm. He was told that it was his responsibility to protect the contents of the building and do whatever was required to prevent further loss. He did so.

    c.  Within 24 hours, Mr. Lenahan met with Global's agent, Mr. Robert Zander, on the premises and Mr. Zander fully observed the condition of the damaged building. During that meeting, Mr. Lenahan provided Mr. Zander a full description of how, when, and where the direct physical loss and damage occurred.

    d.  In the meantime, Mr. Lenahan immediately took reasonable steps to protect the covered property from further damage including tarping the roof, tarping the goods inside the property, placing barrels and various plastic containers inside in an effort to collect the water leaking in the building, and removing extensive debris from the affected area.

    e.  Presumably Mr. Zander contacted Global because on June 16, 2011, you wrote Mr. Lenahan informing him that you would be the claims examiner on the loss and assigned Imperial Park the claim number 11028765.

    f.  In addition and on June 16, 2011, Mr. Lenahan contacted Mr. Wilburn Honeycutt of Honeycutt Engineering, who within 24 hours physically inspected the damage. Mr. Honeycutt took photographs of the damaged facility, which I understand you have received during the normal course of business. Mr. Lenahan obtained the services of Mr. Honeycutt because he is a structural engineer and given the structural damage, Mr. Lenahan was very concerned about the physical integrity of the building itself.

    g.  Pursuant to Imperial Park's duties under the policy, Mr. Lenahan permitted your agent, Mr. Jeffrey Coyne of Donan Engineering Co., to visit and inspect the site on June 30, 2011; July 1, 2011; and July 6, 2011. You informed Mr. Lenahan that Donan Engineering Co. would be on the premises and that they would prepare an engineering report to determine the cause and extent of damage to the structure and provide a repair protocol. Mr. Lenahan, of course, fully cooperated with Mr. Coyne.

    h.  As you recall, Mr. Lenahan informed you or your agent that he was very anxious to

2

receive the Donan Engineering Co. report in order to speed the repair or replacement of the affected property.  On July 11, 2011, Mr. Lenahan emailed Mr. Coyne and requested the report.  Mr. Coyne informed Mr. Lenahan he needed to talk to Mr. Jim Crofts, which he did.  Mr. Crofts informed Mr. Lenahan that he would be Global's claims adjuster on this project.

i.  Mr. Lenahan sought the Donan Engineering report for approximately one month. After much effort and working with Mr. Zander, my client received the report on August 15, 2011, which was dated July 18, 2011.  My client, Mr. Lenahan, was immediately disappointed when the Donan report concluded that "repair recommendations for this building cannot be provided without the guidance of a design engineering firm."  My client incorporates the Donan report within his proof of loss.

j.  On August 24, 2011, Mr. Rob West of Fresh Start Restoration appeared at the site and informed Mr. Lenahan that he had been retained by Mr. Crofts to perform an estimate of the repair costs.  Mr. Lenahan was somewhat perplexed because under the policy he is entitled to recover the full replacement cost of the loss rather than the repair.  Mr. Lenahan was also concerned and expressed to you and Mr. Crofts on many occasions that any estimate should incorporate informed opinions from a structural engineer.

k.  Mr. Lenahan specifically emailed your office seeking the Fresh State estimate, which he received on or about September 13, 2011.  This estimate was in the amount of $887,539.00, and it appears that Global was treating Imperial Park's claim as if it were for the cash value of the loss.  This is so because the Fresh State estimate did not rely on a structural engineer, and when Mr. Lenahan received an unsolicited check from Global dated September 16, 2011, in the amount of $622,559.63, the check was identified as "ACV Payment."  This "ACV" concept is defined in the policy as the actual cash value.

l.  Concerned, Mr. Lenahan made it very clear to Mr. Crofts that he expected Global to pay the full replacement value of the loss as provided for in the policy and that because no structural engineer analysis had been incorporated in the Fresh Start estimate, it was impossible to place the replacement value on the loss until a structural engineer provided the appropriate analysis.

m.  Thereafter, and beginning in November of 2011, Honeycutt Engineering began its work in earnest to design and frame a plan to assist a contractor in replacing the property.  Mr. Crofts was fully aware of Honeycutt's work and approved it.

n.  Beginning in May 2012, Honeycutt Engineering informed Mr. Lenahan that it would be necessary for the lessee which occupied the building to remove its stored materials from it in order for Honeycutt to complete its design plan.  Mr. Crofts

3

authorized the payment of $200,000.00 for the removal and storage of materials covering a period of four months. Because of the delay of repairing and replacing the loss, the lessee is still storing this property off premises. During this period of time, Mr. Lenahan was waiting on the Honeycutt Engineering report and he continually kept you and Mr. Crofts apprised of any and all issues for which he was dealing resolving with this complicated proposed rebuilding and replacing of the building.

o.  Honeycutt engineering completed its report on or about October 12, 2012. Mr. Lenahan anticipated that because the structural engineering report was completed, Global's designated contractor, Fresh Start, would prepare a complete and thorough estimate as to the cost to restore and replace the damaged building consistent with any appropriate code regulations. Fresh Start estimated that the cost to restore and replace the property is $2,953,257.00. At this point, Global rejected that Fresh Start estimate, did not authorize the construction, and informed Mr. Lenahan on November 16, 2011, that Global was replacing Mr. Crofts with Mr. Greg Martin as claims adjuster.

p.  As you can imagine when Global rejected the Fresh Start estimate and replaced Mr. Crofts with Mr. Martin, Mr. Lenahan became very concerned about the status of the replacement of his loss. On November 27, 2011, Mr. Lenahan met with Mr. Martin where he informed Mr. Lenahan that Global desired additional estimates from different contractors and engineers. Although Mr. Lenahan was skeptical, pursuant to his perceived obligations under the policy, he continued to cooperate with a multitude of contractors, engineers, and adjusters. At the same time Imperial Park's lessee was suffering damages because of the storage fees being incurred, and loss of use of rack and floor space due to the lack of replacement of the damaged property. The lessee also continued to exist in and around a safety hazard because of the continued water intrusion upon the premises since the time of the storm. My client understands that even though Global rejected the estimate bids from Fresh Start, Mr. Martin continued to accept its bids.

q.  I do not see the point in itemizing Mr. Lenahan's many efforts to resolve any continued differences with Global while Mr. Martin is the claims adjuster. Suffice it to say that on or about June 14, 2013, Mr. Greg Martin stated via phone conversation that he had finished his report and sent it to Global. Mr. Martin's estimate to replace the property was approximately $1,700,000.00, and if Mr. Lenahan did not accept this estimate, you would require the bidding process to start over again. Mr. Lenahan objected to Mr. Martin submitting this estimate to Global. Mr. Lenahan rejected this estimate because both he and Mr. Martin knew that the estimate did not include all the necessary items based on the specs in the Honeycutt engineering report, but Mr. Martin submitted the estimate to Global anyway.

4

r.  You adopted Mr. Martin's position when you sent my client the July 3, 2013 letter
    informing him that the total payment that he could expect to receives is
    $1,684,085.11.  Your July 3rd estimate is consistent with Mr. Martin's last offer to
    Mr. Lenahan, although it appears as if Global has always handled this matter based
    on the actual cash value rather than the replacement cost value.  My client has
    performed his due diligence and he believes it is impossible to retain the
    appropriate contractor and/or engineer to perform the necessary construction to
    replace the property consistent with the codes regulations for the monies you
    offered in your July 3rd letter.  It thus appears that we are in dispute and it is for that
    reason that I requested the proof of loss in order to proceed to protect my client's
    interest.

Since your file includes all the pertinent documents with respect to the various estimates of
construction engineering and other costs, it is not my intention to provide those materials as
exhibits to the proof of loss, other than this letter.  If I had made reference to any documents that
you do not have, please let me know and I will be happy to provide them.

One other matter might be pertinent here, on May 29, 2013; Mr. Lenahan emailed Mr. Martin and
yourself and stated that under the terms of the policy repairs must begin within two years of the
covered cause of the loss or Global has to issue an extension in writing to the insured.  Because of
all the delays, he requested that extension in writing prior to June 15, 2013.  Mr. Lenahan never
heard back from Global except Mr. Martin, on that same date, acknowledged receiving the email
and stated that he would "work with UNIC to obtain the extension."

As I mentioned to you in my September 6, 2013 letter, I am conducting due diligence on behalf of
my client concerning this event.  If I have misstated any facts herein, I would appreciate it if you
would inform me of same.

Suffice it to say, it is my client's position that all of the materials generated during this claim
process supports his loss up to and including policy limits of 3.2 million dollars.  By making this
demand for the policy limits, my client is not waiving any other claims that he may have under this
policy or under Tennessee law.

As mentioned above and pursuant to the policy, I had my client execute the proof of loss you
provided me.  Given the facts and circumstances of this case, rather than reduce all these facts
down to the Schedule A, I have essentially substituted this letter for the Schedule A.  Quite
frankly, given the complexity of the matter, this is the only logical method to use to perfect my
client's claim.  If Global is not satisfied with this proof of loss, please let me know how I can
make it compliant with the policy.

Hopefully, we can resolve this problem.  I would also appreciate a prompt response to my client's
sworn proof of loss.  If you have any questions pertaining to this matter, please do not hesitate to
contact me at my office.

5

Sincerely,

Bob Lynch, Jr.


After having being duly sworn, I have read this letter and can verify that it is true and correct.

John Lenahan


Sworn to and subscribed before me this 7th day of November, 2013.

Notary Public _Aung McBlankinship_

My Commission Expires: _May 3, 2016_

MARNE ROSE BLANKINSHIP
STATE OF TENNESSEE
NOTARY PUBLIC
DAVIDSON COUNTY


*BL/rb*
Cc:    Imperial Park (via email)

6

**GLOBAL INDEMNITY**
GROUP, INC.

Diamond State Insurance Company*
Penn-America Insurance Company*
Penn-Patriot Insurance Company*
Penn-Star Insurance Company*
United National Casualty Insurance Company*
United National Insurance Company*
United National Specialty Insurance Company*

Robert V. Massaro
Direct Line: (610) 538-2463
rmassaro@global-indemnity.com

October 17, 2013

**VIA UPS GROUND**
**AND U.S. FIRST CLASS MAIL**

Imperial Park Trust, LLC
1001 Rosemont Terrace
Smyrna, TN 37167
Attn: Mr. John Lenahan

| Re: | **Our File #:** | **11028765** |
|---|---|---|
| | **Our Insured:** | **Imperial Park Trust, LLC** |
| | **Policy #:** | **PAC6895329** |
| | **Date of Loss:** | **06/15/11** |

Dear Mr. Lenahan:

This letter will serve to confirm receipt of your letter dated October 7, 2013 via email and hard copy received on October 11, 2013 in regards to the above captioned matter.

Your letter included a copy of a signed Proof of Loss dated October 7, 2013. Please be advised at this time that Penn-Star is rejecting this Proof of Loss with respect to actual damages related to the wind storm loss that occurred on June 15, 2011.

Penn Star position has been to adjust the loss fairly and to the insured's satisfaction. During the entire adjustment process, several experts and consultants have been enlisted to assist in the finalization of the claim handling. Penn-Star has obtained proposed a method of repairs as outlined in our adjuster's and expert's estimate.

Enclosed you will find a revised estimate for the repairs completed by Robins & Morton who can do the work required to complete the work as stated in the estimate. The replacement Cost amount is $1,895,269.00. There would be recoverable depreciation amount of $624,186.84 which you are entitled to collect after the work is completed. We have issued an additional check for $57,769.56 as the difference, which is the actual cash value loss amount. The property payments to date now total $1,152,569.21. Please be advised the property does not afford coverage for foundations or excavation cost.

**PO Box 532 Willow Grove, PA 19090 ● e-mail claims@global-indemnity.com**
Three Bala Plaza East ● Suite 300 ● Bala Cynwyd, PA 19004 ● P: 610.664.1500 ● F: 610.66
*A member of Global Indemnity plc*



11028765-0487/2013

We call your attention to **"BUILDING AND PERSONAL PROPERTY COVERAGE FORM"** CP 00 10 (06/07) which reads, in part, as follows:

### BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

**A.    Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**2.    Property Not Covered**

Covered Property does not include:

**f.**    The cost of excavations, grading, backfilling or filling;

**g.**    Foundations of buildings, structures, machinery or boilers if their foundations are below:

**(1)**    The lowest basement floor; or

**(2)**    The surface of the ground, if there is no basement;

**m.**    Underground pipes, flues or drains;

Next, we direct your attention the section entitled, "Optional Coverages," which reads in part, as follows:

**3.    Replacement Cost**

**c.**    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.**    We will not pay on replacement cost basis for any loss or damage:

**(1)**    Until the lost or damaged property is actually repaired or replaced; and

**(2)**    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

11028765-0487/2013

Again, we ask you to continue to cooperate with our adjuster Greg Martin to bring this matter to a conclusion. We thank you in advance for your assistance in this adjustment process.

There may be other reasons, which affect coverage in addition to those cited in this letter. Penn-Star Insurance Company waives none of its rights in relation to raising any other applicable policy condition, provision or exclusion, which may affect coverage.

Waiving none and reserving to Penn-Star Insurance Company all of its rights and defenses under and pursuant to Policy PAC6895329.

Very truly yours,

Robert Massaro
Sr. Claims Examiner I
PENN-STAR INSURANCE COMPANY

Cc:    Bob Lynch
       Attorney at Law
       Washington Square Building
       222 Second Avenue North
       Suite 316
       Nashville, TN 37201

       Greg Martin
       Property General Adjusters, LLC
       7111 W 151st Street
       Suite 323
       Overland Park, KS 66223

**For your protection Tennessee law requires the following statement to appear on this form. "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."**

11028765-0487/2013





# RE: Claim Number: 11028765 (Imperial Park, LLC)

**Bob Lynch Law** <office@boblynchlaw.com>
To: "Massaro, Robert" <rmassaro@global-indemnity.com>
Cc: Cathy <cathyluna@hotmail.com>, reruntn@aol.com

Fri, Nov 8, 2013 at 2:45 PM

Dear Mr. Massaro:

I acknowledge receipt of your letter dated October 17, 2013. I acknowledge that Penn-Star is rejecting my client's proof of loss.

You asked that my client continue to cooperate with your adjuster, Mr. Greg Martin, to bring this matter to a conclusion. Without waiving any of my client's rights, I have advised Mr. Lenahan to do so. Mr. Martin directly contacted me, and I informed him that I would arrange a conference call between himself, my client and me.

In the meantime, I have continued to do my due diligence concerning this matter and because of a multiple set of events which have arisen from the occurrence of the damage to my client's place of business and the many delays which have occurred because of the failure to replace it according to the policy; Imperial Park, LLC. is now facing claims from ReRun of Tennessee, LLC., for expenses and losses it has incurred as a result of the occurrence of the storm and subsequent events. I have asked ReRun of Tennessee, LLC. to document and invoice those expenses and losses. Those invoices are as follows:

1.  **$21,756.00:**     Emergency labor response to secure property; remove debris with tow motors, knuckle boom and scissor lift; and other temporary repairs of the building including water retraction immediately after the storm hit.

                   Water retraction has to be done every time it rains and creates a safety hazard for employees.

2.  **$10,000.00:**     Demolition of outside wall damaged by windstorm.

3.  **$2,250.00:**     Drilling holes for floor moisture evaluation and grade beam and footer evaluation.

4.  **$23,656.00:**     Clean out building damaged in storm. Labor and equipment.

5.  **$98,000.00:**     Costs associated with assisting engineers and contractors assessing scope of damages to quote and re-quote repair bids.

6.  **$412,378.00:**     Loss of use of facility space of premises due to impaired property including additional space lost for rebuild, (timeframe estimated at 5 months with assumption that rebuild takes 6 months).

Case 3:14-cv-00609    Document 1-1    Filed 03/06/14    Page 129 of 186 PageID #: 133

**Total: $568,040.00.**     The invoices are attached to this email for your review.

My client is hereby filing a claim under his general liability coverage (Policy #PAC6895329), to pay or reimburse it for ReRun's claims for expenses and damages. By making this claim, my client is not waiving any rights it may have for recovery either under property coverage of his policy and/or any common or statutory law claims under Tennessee law. Mr. Lenahan informed Mr. Zander back in June 2013 that ReRun was filing a claim against my client's liability policy. Mr. Zander informed Mr. Lenahan that ReRun couldn't make a claim because you can't sue yourself. I disagree with Mr. Zander because ReRun and Imperial Park are separate and distinct limited liability companies with independent existence.

I acknowledge my client's duties under the liability policy at Section III(2) and it is my client's position that he has fully complied with his duties in connection with his complete cooperation with Penn-Star in connection with his claim under Policy No. #PAC6895329. Both the liability policy and the property coverage policy were written under the same policy number. I might add that many of these ReRun expenses were incurred as a result of Penn-Star's and/or its agent's instructions to perform these functions. A substantial amount of these expenses was the labor of ReRun employees which performed these functions at a more reasonable rate than other contractors could have done.

In light of the fact that you have rejected my client's proof of loss; in light of the fact that you have requested that my client continue to work with Mr. Martin and in light of my client's refined and amended claim under the general liability part of its policy, I would request that Penn-Star and my client execute a tolling agreement from today's date forward tolling the running of any time schedules under these policies.

By making this request, I am not suggesting that any time deadlines have passed but given the delays in this process as documented in my October 7, 2013 correspondence, and quite frankly the complexity of this matter as a result of the delays, I think a tolling agreement would be appropriate. Absent a tolling agreement, I would feel compelled to utilize Rule 3 of the Tennessee Rules of Civil Procedure to file suit in the Chancery Court of Rutherford County, Tennessee to freeze the running of any potential time deadlines.

Sincerely,


Bob Lynch, Jr.

Attorney at Law

Washington Square Building

222 Second Avenue North, Suite 316

Nashville, TN 37201

615-255-2888

615-256-5737 fax


*Dicated but not read*

📄 **SKMBT_28313110812230.pdf**
1097K

**Bob Lynch Law** <office@boblynchlaw.com>
Reply-To: office@boblynchlaw.com
To: "Massaro, Robert" <rmassaro@global-indemnity.com>
Cc: Cathy <cathyluna@hotmail.com>, reruntn@aol.com

Fri, Nov 8, 2013 at 2:45 PM

[Quoted text hidden]

📄 **SKMBT_28313110812230.pdf**
1097K

# RERUN OF TENNESSEE LLC
1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

## INVOICE

Imperial Park LLC
1001 Rosemont Terrace
Nashville, TN 37211

Date: September 16, 2013
P.O. No. n/a
Terms: receipt of invoice

| Item | Description | Qty. | Price | TOTAL |
|------|-------------|------|-------|-------|
| | Loss of use of facility space of premises due to impaired property resulting from wind damage (June 15, 2011) June 2011 thru September 2013 | | | |
| | -1,100 rack spaces | | | $292,600.00 |
| | -10,600 square feet warehouse space | | | $106,425.00 |
| | **Rebuild timeframe\*** | | | |
| | -additional loss of 120 rack spaces | | | $7,620.00 |
| | -additional loss of 3,200 sq. ft. floor space | | | $5,733.00 |
| | \* 5 months estimate with assumption that repair/rebuild takes 6 months | | | |
| | Remit To: ReRun of Tennessee 783 D Street Smyrna, TN 37167 | | | |
| | | | **TOTAL** | **$412,378.00** |

# RERUN OF TENNESSEE LLC

1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

## INVOICE

Imperial Park LLC
1001 Rosemont Terrace
Nashville, TN 37211

| | | |
|---|---|---|
| Date: | September 16, 2013 |
| P.O. No. | n/a |
| Terms: | receipt of invoice |

| Item | Description | Qty. | Price | TOTAL |
|---|---|---|---|---|
| | Emergency response costs to secure property due to damage sustained from wind storm (June 15, 2011) | | | |
| | -Labor | | | $8,056.00 |
| | -Equipment (tow motors, knuckle boom, scissor lift) | | | $3,000.00 |
| | -Materials | | | $2,000.00 |
| | | | | |
| | Remove fallen building debris from sub-lessee personal property on day of storm (June 15, 2011) | | | |
| | - Labor and equipment | | | $400.00 |
| | | | | |
| | Temporary Repairs (materials, labor, and equipment) | | | |
| | - Install temporary lights | | | $1,300.00 |
| | - Patch south wall (32' H x 6') | | | $1,700.00 |
| | - Water retraction (after each rainfall over 27 months) | | | $5,300.00 |
| | | | | |
| | Remit To: | | | |
| | ReRun of Tennessee | | | |
| | 783 D Street | | | |
| | Smyrna, TN 37167 | | | |
| | | | **TOTAL** | **$21,756.00** |

# RERUN OF TENNESSEE LLC
1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

## INVOICE

Imperial Park LLC
1001 Rosemont Terrace
Nashville, TN 37211

Date:       September 16, 2013
P.O. No.    n/a
Terms:      receipt of invoice

| Item | Description | Qty. | Price | TOTAL |
|------|-------------|------|-------|-------|
|  | Demolition of outside wall damaged by wind storm on June 16, 2011 | | | $10,000.00 |
| | | | | |

Remit To:
ReRun of Tennessee
763 D Street
Smyrna, TN 37167

| | | | TOTAL | $10,000.00 |
|---|---|---|-------|-----------|

# RERUN OF TENNESSEE LLC
1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

## INVOICE

Imperial Park LLC
1001 Rosemont Terrace
Nashville, TN 37211

Date: September 16, 2013
P.O. No. n/a
Terms: receipt of invoice

| Item | Description | Qty. | Price | | TOTAL |
|------|-------------|------|-------|---|-------|
| | 4 holes drilled to test for floor moisture evaluation | 4 | $375.00 | | $1,500.00 |
| | 2 holes drilled on exterior to determine grade beam and footer evaluation | 2 | $375.00 | | $750.00 |
| | | | | | |
| Remit To:<br>ReRun of Tennessee<br>783 D Street<br>Smyrna, TN 37167 | | | | | |
| | | | TOTAL | | $2,250.00 |

# RERUN OF TENNESSEE LLC

1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

## INVOICE

**Imperial Park LLC**
1001 Rosemont Terrace
Nashville, TN 37211

| | |
|---|---|
| Date: | September 16, 2013 |
| P.O. No. | n/a |
| Terms: | receipt of invoice |

| Item | Description | Qty. | Price | TOTAL |
|---|---|---|---|---|
| | Clean out portion of building damaged in wind storm (June 16, 2011) to assess full scope of damages | | | |
| | -Labor | | | $14,416.00 |
| | -Equipment | | | $9,240.00 |
| | | | | |
| | Remit To: | | | |
| | ReRun of Tennessee | | | |
| | 783 D Street | | | |
| | Smyrna, TN 37167 | | | |
| | | | **TOTAL** | **$23,656.00** |

**RERUN OF TENNESSEE LLC**
1001 Rosemont Terrace
Smyrna, Tennessee 37167
Tel: (615) 331-3650
Fax: (615) 534-2505

**INVOICE**

Imperial Park LLC
1001 Rosemont Terrace
Nashville, TN 37211

Date:      September 16, 2013
P.O. No.   n/a
Terms:     receipt of invoice

| Item | Description | Qty. | Price | TOTAL |
|------|-------------|------|-------|-------|
| | Costs associated with assisting engineers and contractors assessing scope of damages to quote and re-quote repair bids for the period March 2013 thru September 2013 | | | $98,000.00 |
| | Remit To:<br>ReRun of Tennessee<br>783 D Street<br>Smyrna, TN 37167 | | | |
| | | | **TOTAL** | **$98,000.00** |

# COMMERCIAL LINES COMMON POLICY DECLARATIONS

INSURANCE IS PROVIDED BY THE COMPANY DESIGNATED BY AN "X":  Stock Company

☐ PENN-AMERICA INSURANCE COMPANY

☒ PENN-STAR INSURANCE COMPANY

State Control Number 1948

PREMIUM IS 25% MINIMUM EARNED

PAC6857549
Renewal of Number

Bala Cynwyd, Pennsylvania 19004

POLICY NUMBER: **PAC6895329**

1. NAMED INSURED: IMPERIAL PARK, LLC

   DBA:

   MAILING ADDRESS:  1001 ROSEMONT TERRACE

   SMYRNA    TN 37167

EXHIBIT

K

2. POLICY PERIOD:  From  01/25/2011  To  01/25/2012  at 12:01 A.M.
   Standard Time at your mailing address shown above.

3. FORM OF BUSINESS: OTHER    OTHER DESC:LLC

4. BUSINESS DESCRIPTION: PROPERTY OWNER (TENANT: RECYCLING OPERATION)

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

5. THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | | PREMIUM | |
|---|---|---|---|
| Commercial General Liability Coverage Part | $ | 2,600.00 | THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THIS STATE AND IS ISSUED AND DELIVERED AS A SURPLUS LINE COVERAGE PURSUANT TO THE TENNESSEE INSURANCE STATUTES. |
| Commercial Property Coverage Part | $ | 8,566.00 | |
| Commercial Crime Coverage Part | $ | NOT COVERED | |
| Commercial Inland Marine Coverage Part | $ | NOT COVERED | |
| Professional Liability Coverage Part | $ | NOT COVERED | |
| Liquor Liability Coverage Part | $ | NOT COVERED | |
| Commercial Umbrella Coverage Part | $ | NOT COVERED | |
| Owners Contractors Protective Coverage Part | $ | NOT COVERED | |
| TRIA | $ | NOT COVERED | |

6. TOTAL PREMIUM PAYABLE AT INCEPTION  $  11,166.00    NO FLAT CANCELLATION

   Policy Fee  $  150.00

   TN Taxes  $  347.15

   $

   $

   $

   $

   $

   TOTAL  $  11,663.15

7. FORM(S) AND ENDORSEMENT(S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:*
   AS PER FORM COMSCHD(10/00) ATTACHED

   *Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Agency Code:  02076
Tennessee Underwriters
140 Fourth Ave. South
Franklin, TN 37064
TS    01/28/11

By  _Donna M. Quest_
Authorized Representative

S1100(11/07)    INSURED



# COMMERCIAL GENERAL LIABILITY COVERAGE PART
## DECLARATIONS

**POLICY NUMBER:** <u>PAC6895329</u>

1.   **NAMED INSURED:** IMPERIAL PARK, LLC

2.   **LIMITS OF INSURANCE - INSURANCE APPLIES ONLY FOR COVERAGE FOR WHICH A LIMIT OF INSURANCE IS SHOWN.**

| | | |
|---|---|---|
| General Aggregate Limit (Other than Products/Completed Operations) | $2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ INCLUDED | |
| Each Occurrence Limit | $1,000,000 | |
| Personal & Advertising Injury Limit | $1,000,000 | |
| Damage to Premises Rented to You Limit | $ 100,000 | any one premises |
| Medical Expense Limit | $ 5,000 | any one person |

3.   **LOCATIONS** of all premises you Own, Rent, or Occupy

| No. | Address | City | State | Zip |
|---|---|---|---|---|
| | 783 14TH AVENUE & D STREET | SMYRNA | TN | 37167 |

4.

| | CLASS ** | PREMIUM BASIS Code / Exposure | RATES Prod/CO | RATES All Other | ADVANCE PREMIUM Prod/CO | ADVANCE PREMIUM All Other |
|---|---|---|---|---|---|---|
| | | ** If Classifications are Numbered, the coverage applies to the corresponding Location No. | | | | |
| No. | 61212 | a) 93,000 | INCL | 27.957 | INCLUDED | 2,600.00 |

Buildings or Premises - bank or office - mercantile or manufacturing (lessor's risk only)-Other than Not-For-Profit. Products-completed operations are subject to the General Aggregate Limit.

No.

No.

No.

No.

** If Classifications are Numbered, the coverage applies to the corresponding Location No.

**TOTAL: $     2,600.00**

| | | |
|---|---|---|
| (s) gross sales - per $1000 | (c) total cost - per $1000 | (m) admissions - per 1000    (e) each |
| (p) payroll - per $1000 | (a) area - per 1000 sq. ft. | (u) units    (o) other |

5.   **Policy may be AUDITABLE**        (t)   see classification notes in company or ISO Commercial Lines Manual

6.   **SPECIFIC GENERAL LIABILITY FORMS/ENDORSEMENTS**
         AS PER FORM COMSCHD(10/00) ATTACHED

**This page alone does not provide coverage and must be attached to a Commercial Lines Common Policy Declarations Common Policy Conditions, Coverage Part Coverage Form(s) and any other applicable forms and endorsements.**

S2000 (06/01)                    **INSURED**

# COMMERCIAL LINES COMMON POLICY DECLARATIONS
## SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER: | NAMED INSURED |
|---|---|
| PAC6B95329 | IMPERIAL PARK, LLC |

Form/Endorsement No./Edition Date
Forms Applicable - PAC COVERAGE

Form/Endorsement No./Edition Date
ADDITIONAL FORMS ATTACHED

| | |
|---|---|
| NAA105[12-09] | UNITED AMERICA PRIVACY NOTICE |
| PA01411[04-07] | POLICYHOLDER NOTICE |
| IL0017[11-98] | COMMON POLICY CONDITIONS |
| S1003[08-91] | MINIMUM EARNED PREMIUM |
| EAA230[12-09] | SERVICE OF SUIT |
| S1056[04-09] | IN WITNESS CLAUSE |
| ADDTINFO | ADDITIONAL INFORMATION |

Forms Applicable - GL COVERAGE

| | |
|---|---|
| S2000[06-01] | GL SUBDEC |
| IL0021[07-02] | NUCLEAR ENERGY LIAB EXCL |
| CG0001[12-07] | CGL COVERAGE FORM |
| CG2144[07-98] | LIMIT OF COVG TO DESIG. PREM. |
| CG2147[12-07] | EMPLOYMENT RELATED PRAC EXCL |
| CG2155[09-99] | TOTAL POLLUTION EXCLUSION |
| CG2167[12-04] | FUNGI OR BACTERIA EXCLUSION |
| CG2173[01-08] | EXCL OF CERTIFIED ACTS OF TERRORISM |
| CG2186[12-04] | EXCLUSION-EXTERIOR INSUL & FINISH SYSTEMS |
| CG2196[03-05] | SILICA OR SILICA-RELATED DUST EXCL |
| CG2426[07-04] | AMEND OF INS. CONTRACT DEFINITIO |
| S2002[08-02] | COMBINED PROVISIONS END'T |
| S2005[06-05] | ASSAULT OR BATTERY EXCLUSION |
| S2033[02-94] | LEAD CONTAMINATION EXCLUSION |
| S2041[06-03] | LIMITATION/DESIGN. CLASS. OPS. |

Forms Applicable - PROP COVERAGE

| | |
|---|---|
| S3000[08-2009] | COMM'L PROP. COVG. PART DEC. |
| CP0090[07-88] | COMM'L PROPERTY CONDITIONS |
| IL0415[04-98] | PROTECTIVE SAFEGUARDS |
| IL0935[07-02] | EXCL. CERTAIN COMPUTER RELATED |
| IL0953[01-08] | EXCL OF CERTIFIED ACTS OF TERRORISM |
| CP0010[06-07] | BUILDING AND PERS PROP COV FORM |
| CP0030[06-07] | BUS INC (EXTRA EXP) COV FORM |
| CP0140[07-06] | EXCL OF LOSS DUE TO VIRUS OR BACTERIA |
| CP1030[06-07] | CAUSE OF LOSS - SPECIAL FORM |

# UNITED AMERICA INDEMNITY GROUP, INC.

## PRIVACY NOTICE

We at United America Indemnity Group, Inc. which includes Diamond State Insurance Company, Penn-America Insurance Company, Penn-Patriot Insurance Company, Penn-Star Insurance Company, United National Insurance Company, United National Casualty Insurance Company, United National Specialty Insurance Company and our affiliated companies and subsidiaries, are required to protect our customers' nonpublic personal financial information.

We collect your nonpublic personal financial information from the following sources:

- Information obtained from you, including information from your application, such as name, address, telephone number, social security number, assets and income.

- Information about transactions and experiences, such as your premium payment and claims history.

- Information from a consumer reporting agency, such as your credit history.

WE DO NOT DISCLOSE YOUR NONPUBLIC PERSONAL FINANCIAL INFORMATION, EXCEPT AS PERMITTED OR REQUIRED BY LAW. WE RESERVE THE RIGHT, HOWEVER, TO CHANGE THIS POLICY AT ANY TIME. SHOULD THIS POLICY CHANGE WE WILL GIVE AFFECTED CUSTOMERS AN OPPORTUNITY TO DIRECT THAT THEIR NONPUBLIC PERSONAL FINANCIAL INFORMATION NOT BE DISCLOSED.

We maintain electronic, physical and procedural safeguards that comply with Federal regulations to protect your nonpublic personal financial information. We limit access to your nonpublic personal financial information to those employees who need to know that information to perform their job responsibilities.

We disclose nonpublic personal financial information of former customers to affiliated and nonaffiliated third parties as permitted by law.

NAA-105 12 2009      INSURED      Page 1 of 1.



**PENN-AMERICA INSURANCE COMPANY**
**PENN-STAR INSURANCE COMPANY**
**PENN-PATRIOT INSURANCE COMPANY**
Three Bala Plaza East, Suite 300, Bala Cynwyd, PA 19004
Phone: 610-664-1500, Fax: 610-660-8882
Claims Reporting: 800-788-4780 (9 AM to 5 PM ET) OR 800-621-5410 (After 5 PM ET)

Dear Policyholder:

Welcome to the Penn-America Group family of companies. Enclosed is information regarding your insurance coverages.

> The Policy consists of:
> ~ Common Declarations
> ~ Common Policy Conditions
> ~ One or more Coverage Parts
>
> A Coverage Part consists of:
> ~ Coverage Form Declarations
> ~ One or more Coverage Forms
> ~ Applicable Endorsements

Please take a few moments to read the attached policy.

Hopefully, you will never be faced with a loss or accident involving damage to your property or injury to you or another individual. If you do need to submit a claim to us, please note:

~ Prompt reporting of all losses is a requirement of your insurance policy. Therefore, upon knowledge of a potential claim -- be it actual first-hand knowledge, a letter, a phone call or legal papers -- **contact your Insurance Broker immediately** and report the loss with as much detail as possible. Your Broker will in turn forward the loss information to our Claim Department for handling.

~ Prompt reporting of potential claims allows us the best possible opportunity to protect your rights.

~ In emergency situations, you can contact the Penn-America Claim Department at: 800-788-4780 (9 AM to 5 PM ET), or after hours by calling: 800-621-5410 (after 5 PM ET).

Please give us the opportunity to serve your interests by reporting all claims on a timely basis to your Broker.

Thank you.

Penn-America Insurance Company
Penn-Star Insurance Company
Penn-Patriot Insurance Company

PA01-411(04/07)              **INSURED**                      Page 1 of 1

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 142 of 186 PageID #: 146

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

A. **Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. **Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

C. **Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

D. **Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

E. **Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

F. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1997
**INSURED**



## MINIMUM EARNED PREMIUM
## CANCELLATIONS AND AUDITS

It is hereby understood and agreed that in the event of cancellation of coverage by the insured, the minimum earned premium under this policy shall be _____ 25 % _____ of the policy premium.

It is further understood the minimum earned premium of this policy shall be _____ 100 % _____ of the policy premium if the policy is in effect for the full term and the audit shows a lower exposure than estimated.

S1003 (8/91)                                    INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT CLAUSE

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS IN THIS POLICY

We appoint the highest State official in charge of insurance affairs (Commissioner of Insurance, Director of Insurance, Insurance Commissioner, Executive Secretary, Superintendent of Insurance, or such other official title as designated by the State) of the State of _____ and his successor or successors in office as his and their duly authorized deputies, as our true and lawful attorney in and for the aforesaid State, upon whom all lawful process may be served in any action, suit or proceeding instituted in the said State by or on behalf of any insured or beneficiary against us, arising out of this insurance policy, provided a copy of any process, suit complaint or summons is sent by certified or registered mail to Linda C. Hohn, Esquire, __PENN-STAR_____ Insurance Company, Three Bala Plaza East, Suite 300, Bala Cynwyd, PA 19004.

EAA-230 12 09                         INSURED                              Page 1 of 1

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 145 of 186 PageID #: 149



**In Witness Clause**

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Linda Hohn
Secretary

S1056 (04/09)                           INSURED                           Page 1 of 1

# REQUEST FOR ADDITIONAL INFORMATION

|  |  |  |
|---|---|---|
|  | INSURED PHONE | 615-604-6353 |
| OPTIONAL | RETAIL AGENT NAME | |
|  | RETAIL AGENT PHONE | 615-356-1700 |
| OPTIONAL | INSURED'S FEIN # | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The Insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or .

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

ISO Properties, Inc., 2001
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 148 of 186 PageID #: 152

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   (a) Any "nuclear reactor";

   (b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

   (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 149 of 186 PageID #: 153

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V Definitions.

## SECTION I- COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section III Limits Of Insurance; and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments Coverages A and B:

b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period; and

   (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**INSURED**

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 150 of 186 PageID #: 154

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 151 of 186 PageID #: 155

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"

Case 3:14-cv-00609 Document 1-1 Filed 03/06/14 Page 152 of 186 PageID #: 156

(2) Any loss, cost or expense arising out of any:

    (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

    (b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

ISO Properties, Inc., 2006

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

ISO Properties, Inc., 2006

CG 00 01 12 07

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 154 of 186 PageID #: 158

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

p. **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

q. **Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 155 of 186 PageID #: 159

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   b. **Material Published With Knowledge Of Falsity**
      "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

   c. **Material Published Prior To Policy Period**

      "Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

   d. **Criminal Acts**

      "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   e. **Contractual Liability**

      "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   f. **Breach Of Contract**

      "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   g. **Quality Or Performance Of Goods - Failure To Conform To Statements**

      "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   h. **Wrong Description Of Prices**

      "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

   i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

      "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

      However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

   j. **Insureds In Media And Internet Type Businesses**

      "Personal and advertising injury" committed by an insured whose business is:

      (1) Advertising, broadcasting, publishing or telecasting;

      (2) Designing or determining content of web-sites for others; or

ISO Properties, Inc., 2006

CG 00 01 12 07

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 156 of 186 PageID #: 160

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

ISO Properties, Inc., 2006

Case 3:14-cv-00609  Document 1-1  Filed 03/06/14  Page 157 of 186 PageID #: 161

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 158 of 186 PageID #: 162

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I - Coverage A - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   (1) "Bodily injury" or "personal and advertising injury":

      (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

      (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

      (d) Arising out of his or her providing or failing to provide professional health care services.

   (2) "Property damage" to property:

      (a) Owned, occupied or used by,

      (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

      you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 159 of 186 PageID #: 163

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

ISO Properties, Inc., 2006

CG 00 01 12 07

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 160 of 186 PageID #: 164

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I Coverage A Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 161 of 186 PageID #: 165

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    (a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    (b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

    **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

    **b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

    **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

    **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

ISO Properties, Inc., 2006

CG 00 01 12 07

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

ISO Properties, Inc., 2006

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

     (1) Power cranes, shovels, loaders, diggers or drills; or

     (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

     (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

     (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:

     (a) Snow removal;

     (b) Road maintenance, but not construction or resurfacing; or

     (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

ISO Properties, Inc., 2006

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 164 of 186 PageID #: 168

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

       (1) Products that are still in your physical possession; or

       (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

          (a) When all of the work called for in your contract has been completed.

          (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

          (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

       Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    b. Does not include "bodily injury" or "property damage" arising out of:

       (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

       (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

       (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    For the purposes of this insurance, electronic data is not tangible property.

    As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

    a. Means:

       (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

          (a) You;

          (b) Others trading under your name; or

          (c) A person or organization whose business or assets you have acquired; and

       (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b. Includes:

       (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

ISO Properties, Inc., 2006

Case 3:14-cv-00609 Document 1-1 Filed 03/06/14 Page 165 of 186 PageID #: 169

      (2) The providing of or failure to provide warnings or instructions.

  c. Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

  b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

      (2) The providing of or failure to provide warnings or instructions.

ISO Properties, Inc., 2006

CG 00 01 12 07

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 166 of 186 PageID #: 170

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Premises: |
|---|
| Project: |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

2. The project shown in the Schedule.

Copyright, Insurance Services Office, Inc., 1997
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 167 of 186 PageID #: 171

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily Injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**INSURED**

ISO Properties, Inc., 2006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION
# WITH A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2., Exclusions of Section I Coverage A Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

f. **Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(a) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(b) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 Copyright, Insurance Services Office, Inc., 1998
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 169 of 186 PageID #: 173

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

ISO Properties, Inc., 2003
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 170 of 186 PageID #: 174

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

B. The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage"; "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

 Copyright ISO Properties, Inc., 2007
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 171 of 186 PageID #: 175

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the Definitions Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

ISO Properties, Inc., 2003
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 172 of 186 PageID #: 176

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA - RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

2. Exclusions

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

C. The following definitions are added to the Definitions Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

ISO Properties, Inc., 2004

INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 173 of 186 PageID #: 177

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph 9. of the **Definitions** Section is replaced by the following:

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

ISO Properties, Inc., 2004
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 174 of 186 PageID #: 178



# COMBINED PROVISIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Commercial General Liability Coverage Part · Commercial Professional Liability Coverage Part
Liquor Liability Coverage Form**

In consideration of the premium charged it is agreed that the following special provisions apply to this policy.

## PUNITIVE DAMAGES EXCLUSION

It is part of the conditions of this policy that the Company shall not be liable for any damages awarded against an insured as punitive or exemplary damages.

## ASBESTOS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this policy will not provide coverage, meaning indemnification or defense costs arising out of:

(A) Asbestos or any asbestos related bodily injury or property damage; or
(B) Any alleged act, error, omission or duty involving asbestos, its use, exposure, presence, existence, detection, removal, elimination, transportation, disposal or avoidance; or
(C) The use, exposure, presence, existence, detection, removal, elimination or avoidance of asbestos in any environment, building or structure.

## EARTH MOVEMENT EXCLUSION

In consideration of the premium charged, it is understood and agreed that this policy specifically excludes and does not extend to or provide coverage or indemnity for any claim of liability for bodily injury or property damage caused by, resulting from, attributable or contributed to, or aggravated by the subsidence or movement of land as a result of earthquake, landslide, mudflow, earth sinking or shifting, resulting from, aggravated by or contributed to by operations of the named insured or any subcontractor of the named insured.

S2002 (08/02)

INSURED



# ASSAULT OR BATTERY
# GENERAL LIABILITY EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**COMMERCIAL LIABILITY UMBRELLA**

In consideration of the premium charge, it is understood and agreed that this insurance does not apply to liability for damages because of "bodily injury", "property damage", "personal and advertising injury", medical expense arising out of an "assault", "battery", or "physical altercation" that occurs in, on, near or away from an insureds premises:

1)  Whether or not caused by, at the instigation of, or with the direct or indirect involvement of an insured, an insured's employees, patrons or other persons in, on, near or away from an insured's premises, or

2)  Whether or not caused by or arising out of an insured's failure to properly supervise or keep an insured's premises in a safe condition, or

3)  Whether or not caused by or arising out of any insureds act or omission in connection with the prevention, suppression, failure to warn of the "assault", "battery" or "physical altercation", including but not limited to, negligent hiring, training and/or supervision.

4)  Whether or not caused by or arising out of negligent, reckless, or wanton conduct by an insured, an insured's employees, patrons or other persons.

**DEFINITIONS:**

For purposes of this endorsement:

"Assault" means any attempt or threat to inflict injury to another including any conduct that would reasonably place another in apprehension of such injury.

"Battery" means the intentional or reckless physical contact with or any use of force against a person without his or her consent that entails some injury or offensive touching whether or not the actual injury inflicted is intended or expected. The use of force includes but is not limited to the use of a weapon.

"Physical altercation" means a dispute between individuals in which one or more persons sustain bodily injury arising out of the dispute.

All other terms, conditions and definitions of the Policy otherwise apply.

S2005 (06/05)                    INSURED                         Page 1 of 1



# LEAD CONTAMINATION EXCLUSION

This endorsement modifies coverage found under the following coverage part:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**
**COVERAGE C - MEDICAL PAYMENTS**
**COMMERCIAL PROFESSIONAL LIABILITY COVERAGE PART**

In consideration of the premium charged it is hereby understood and agreed that this policy will not provide coverage, meaning indemnification or defense costs, arising out of:

"Bodily Injury", "Property Damage", Personal Injury, Advertising Injury, Medical Payments or any other damages because of liability, alleged liability, or occurrence resulting from, caused by, arising out of or in any way connected with:

The existence of lead, the removal of lead, the testing for lead, or exposure to lead in any form which is or has at any time been present in, on, or near: the insured's premises; or, at any location at which the insured is working or has worked in connection with such existence, removal or testing:

1)  Whether or not caused by, at the instigation of, or with the direct or indirect involvement of the insured, the insured's employees or other persons on the insured's premises or work site; or,

2)  Whether or not caused by or arising out of the insured's failure to properly supervise or keep the work site in a safe condition.

S2033 (02/94)
INSURED

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 177 of 186 PageID #: 181



# LIMITATION OF COVERAGE TO DESIGNATED CLASSIFICATIONS OF OPERATIONS

This endorsement modifies coverage found under the following coverage parts:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**COMMERCIAL LIABILITY UMBRELLA COVERAGE PART**

This insurance applies only to "bodily injury," "property damage," "personal injury," "advertising injury" and medical expenses arising out of only those operations designated, listed and described in the Declarations, under 4. CLASSIFICATION.

Case 3:14-cv-00609   Document 1-1   Filed 03/06/14   Page 178 of 186 PageID #: 182

# BOB LYNCH, JR.
## *Attorney at Law*

Rose Blankenship
Paralegal

Suite 316, Washington Square
222 Second Avenue North
Nashville, Tennessee 37201

Telephone: 615-255-2888
Fax: 615-256-5737

*Email: office@boblynchlaw.com*

*November 26, 2013*

Robert V. Massaro
Sr. Claims Examiner I
Penn-Star Insurance Company
P.O. Box 532
Willow Grove, PA 19090

*via U.S. Mail & certified read receipt email rmassaro@global-indeminity.com*

Re:  Claim Number:  11028765
     Imperial Park, LLC
     Date of Loss: 06/15/2011
     Policy Number:  PAC6895239

## NOTICE OF BAD FAITH UNDER T.C.A. § 56-7-105

Dear Mr. Massaro:

I last wrote you on November 8, 2013, indicating that notwithstanding my client's multiple attempts to resolve this matter, it was prepared to continue good faith negotiations in an attempt to do so.   I further stated that because of the passage of time and the complexity of this case, I believed that a tolling agreement was reasonable.   You have not responded to that letter.

I also wrote that if Penn-Star did not agree to a tolling agreement, I would file suit on behalf of my client in the Chancery Court of Rutherford County, Tennessee.  I intend to do so.  Before I file suit, I am hereby giving Penn-Star the statutory sixty (60) day notice required by T.C.A. § 56-7-105(a), because Penn-Star has engaged in a bad faith failure to pay my client's claim promptly as reflected in Penn-Star's letter dated October 17, 2013, when Penn-Star rejected my client's proof of loss.

There exists a good faith basis to assert bad faith based on the events I set forth in my letter to you dated October 7, 2013.   Although Penn-Star denied my client's sworn proof of loss which was attached to that letter, it did not address any of the factual allegations set forth at paragraphs #1 and #2(a-r).  Since Penn-Star did not dispute those factual allegations, I must assume they are true.



Please be advised that my client is not waiving any other claims that it may have against Penn-Star and/or its agents for claims including but not limited to the following:

1. Breach of contract;
2. Violations of the Tennessee Consumer Protection Act under T.C.A. §§ 47-18-101, *et seq.*;
3. Negligence;
4. Unjust enrichment;
5. Reckless and intentional conduct as the basis for punitive damages under the common law of Tennessee; and
6. The breach of the duty of good faith and fair dealing.

I will address matters concerning my client's liability claim asserted in my November 8, 2013 letter separately from this claim. I am still waiting on Penn-Star's decision to defend Imperial Park on the third party claim asserted therein.

<u>Under Tennessee law, you have sixty (60) days to respond to this demand; otherwise I will take the enumerated action.</u>

Sincerely,

Bob Lynch, Jr.

BL/rb
Cc: Imperial Park, LLC (*via email*)

2 | P a g e

**GLOBAL INDEMNITY**
GROUP, INC.

Diamond State Insurance Company®
Penn-America Insurance Company®
Penn-Patriot Insurance Company®
Penn-Star Insurance Company®
United National Casualty Insurance Company®
United National Insurance Company®
United National Specialty Insurance Company®

Kate Wilkinson
Direct Line: (610) 660-5445
kwilkinson@global-indemnity.com

December 4, 2013

Bob Lynch, Jr.
Attorney at Law
Suite 316, Washington Square
222 Second Avenue North
Nashville, Tennessee 37201

| Re: | **Our Claim Number:** | **11028765** |
|---|---|---|
| | **Our Insured:** | **Imperial Park Trust, LLC** |
| | **Policy Number:** | **PAC6895329** |
| | **Date of Loss:** | **06/15/2011** |

Dear Mr. Lynch:

This letter will serve to confirm receipt of your recent emails and letters dated November 8 and November 26, 2013.

I will also take this opportunity to acknowledge your October 7, 2013 letter which was responded to previously, and for the record, we do not agree with the allegations set forth in that October 7, 2013 letter. Penn-Star Insurance Company is unaware if these facts are true or false.

You have requested a tolling agreement be entered into regarding this claim. At this time, I do not see a need for a tolling agreement nor have you asserted a reason for a need of a tolling agreement other than "to freeze the running of any potential time deadlines". If you are aware of any deadlines or concerned with any deadlines specifically, please advise the undersigned and we can address them accordingly.

We have determined a replacement cost number for the damages to the insured's property that occurred due to a wind loss. We have sent you a copy of the estimate completed by Robins & Morton who advised the replacement cost damages to this building amount to $1,779,256.06. Based on that estimate, we have issued a check for the actual cash value of those damages which amount to $1,152,569.29. As you and your client are aware, if and when the insured rebuilds this property and incurs cost up to the $1,779,256.06 figure, that he is entitled to present a hold-back claim to Penn-Star Insurance Company . As I am sure you are aware, the policy allows the insurance carrier to pay the actual cash value of the damages, until the replacement cost amounts are incurred by the insured.

---

**PO Box 532 Willow Grove, PA 19090** ● e-mail claims@global-indemnity.com
Three Bala Plaza East ● Suite 300 ● Bala Cynwyd, PA 19004 ● P: 610.664.1500 ● F: 610.6

*A member of Global Indemnity plc*

11028765-0636/2013

EXHIBIT

M

It's my understanding and as of today, December 2, 2013, the insured has done no repairs to this building since the loss of June 15, 2011, even though payments have been made to the insured as early as September 16, 2011 when we issued the $622,559.93 undisputed amount. I do not fully understand your comments in all of your letters regarding good faith negotiations. As stated above, we have issued payment on this claim in accordance to the policy provisions which allow us to pay the actual cash value. We have never been presented with a holdback claim from the insured.

Regarding the liability claim that is being made against the insured by ReRun, please be advised that a separate file has been opened and a general liability claim representative will be in touch with you and/or your client regarding the claim that is being presented by your tenant, ReRun.

As stated in the above paragraph, the insured's tenant, ReRun of Tennessee, LLC is a recycling center, and I am confused the September 2013 invoices that ReRun issued to the insured stemming from the June 15, 2011 date of loss. I don't know if these invoices are part of the liability loss that is being presented by ReRun against Imperial Park. All of the invoices are from September 2013, but talk about work performed or needed back in 2011. I ask that you please specify if these invoices are for the first-party or third-party claim. If they are for the first-party claim, I would request the original invoices from the date that the work was performed and any documentation to support the insured had incurred these expenses. I would also ask at this time if you are aware of any claim that ReRun has turned in to their first-party carrier for some of these incurred costs since it involved ReRun's business personal property and that the wind damage would be a covered cause of loss under that policy.

I will state that the $98,000.00 costs associate with assisting engineers and contractors that ReRun incurred does not appear to be a covered cause of loss under this first-party property coverage. Also, the $412,000 invoice for loss of use of the facility space, whether it is an invoice being presented from ReRun to Imperial Park, or Imperial Park's loss of use, we have paid our policy limit of $200,000 under the Business Income/Extra Expense portion of the policy which exhausted those limits. It also appears to me at this point in time, some of these costs would be part of the actual cash value payment which has already been issued to the insured. Again, if you could please give us specifics on these invoices so we can address them correctly.

Regarding the liability claim presented against your client, Imperial Park, I am assuming that ReRun of Tennessee, LLC will be using separate counsel since it appears that you would have a conflict of interest in representing both Imperial Park in their claim against Penn-Star, as well as ReRun of Tennessee in presenting a claim against your client, Imperial Park. If you have any information regarding ReRun of Tennessee's counsel in this matter, I would appreciate that information at this time.

Regarding your bad faith allegations, I am once again confused by your letters and statements. Penn-Star Insurance Company within ninety (90) days of this loss issued a check to the insured in excess of $600,000.00. The insured was not in agreement with this amount and he had not retained a contractor do preform the repairs and indicated to us that he would be "waiting until sometime in the spring of 2012 to make any decision regarding rebuilding". We had obtained an estimate from a local reputable contractor who is willing to stand behind his estimate and make the repairs to this building as needed. At this point in time, we have paid what is due and owing under this policy of insurance, I am still surprised that almost thirty (30) months after this date of loss and my insured, your client, has not even started the repairs on this building.

11028765-0636/2013

If you have any questions in regard to the above, I would be more than happy to have a conversation with you regarding all aspects of this claim so that you can fully understand our position in this matter.

Waiving none and reserving to Penn-Star Insurance Company all its rights and defenses under and pursuant to Policy PAC6895329.

Very truly yours,

Kate Wilkinson
Director - Claims
PENN-STAR INSURANCE COMPANY

.11028765-0636/2013

June 26th , 2013



Rerun of Tennessee
783 14th Avenue
Smyrna TN, 37167

Re: Structural Damage

To: Mr. John Lenahan,

The above listed building sustained structural damage from a storm on June 15th 2011. More than sufficient time has been allowed to complete the repairs. The power must remain off and that section building area cannot be occupied until designs are completed by a Registered Engineer and repairs completed.

If you desire a hearing on this matter, you should bring a copy of this letter to:
    Steve Smith
    Building Official
    Department of Codes and Building Safety
    315 S. Lowry St.
    Smyrna, TN 37167

Should you have questions, or if I can be of assistance, please fell free to contact me at (615) 355-5704. Ex - 2178

Sincerely,

Steve Dawson
Building Inspector #889
Fire Inspector #945
Codes Enforcement Officer #893



EXHIBIT

315 South Lowry Street • Smyrna, TN 37167 • Office: (615) 459-9742 • Fax: (615) 355-5715 • www.townofsmyrna.org

```
A   75251 TN         6/15/11    Sta #2        01-2011-0000613-000                    NFIRS - 1
    FDID State     Incident date Station             Incident number                     Basic
================================================================================================
B       No         00000C                           Street address        No
    Alternative location  Census tract                   Location          Emergency
------------------------------------------------------------------------------------------------
    783 D ST, SMYRNA, TN, 37167
    Address
================================================================================================
C   Wind storm, tornado/hurricane assessment
    Incident type
================================================================================================
D   None
    Aid given or received
================================================================================================
E1              Date      Time   | E2 On Duty Personnel      1     000
    Alarm        6/15/11 17:27:28 |  Shift            Alarms  District
    Dispatch     6/15/11 17:27:29 |
    Enroute      6/15/11 17:27:29 |
    Arrival      6/15/11 17:27:29 |
    Controlled   0/00/00  0:00:00 |
    Last unit cleared 6/15/11 18:06:08 |
================================================================================================
F   Investigate
    Primary action taken (1)
================================================================================================
G1   Yes            Apparatus Personnel   No      | G2            Losses    Value
    Apparatus/ Suppression    0      0    Resource counts | Property       0       0
    personnel       EMS       1      2    include aid      | Contents       0       0
    form used      other      3      1    received resources |
================================================================================================
H1          Injuries Deaths |              H3 None
    Fire service    0     0   |              Hazardous materials release
================================================================================================
I   Not mixed use             | J  Manufacturing, processing
    Mixed use property        |    Property use
================================================================================================
M   Dwayne Stacey                Captain          SHIFT-SUPERVISOR     6/15/11
    Officer in charge          Position or rank   Assignment             Date
    STACY HARRILL                Lieutenant       SHIFT-SUPERVISOR     6/15/11
    Member making report       Position or rank   Assignment             Date
================================================================================================
```

Floor



7012 3460 0002 8941 9437