## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IMPERIAL PARK, LLC AND RERUN OF TENNESSEE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:14-cv-609 Judge Aleta A. Trauger |
| v. | ) ) | Magistrate Judge Griffin |
| PENN-STAR INSURANCE COMPANY and/or GLOBAL INDEMNITY GROUP, INC., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the court are two Rule 56 motions. The defendants, Penn-Star Insurance Co. ("Penn-Star") and Global Indemnity Group, Inc. ("Global"), have filed a Motion for Summary Judgment seeking dismissal of all claims by both plaintiffs. (Docket No. 31.) Plaintiff Imperial Park, LLC ("Imperial Park") has filed a Motion for Summary Judgment seeking judgment on certain claims. (Docket No. 33.) For the reasons stated herein, the defendants' motion will be granted in part and denied in part, Imperial Park's motion will be denied, and certain claims by both plaintiffs will proceed to trial.

## BACKGROUND

### I. Overview

On June 15, 2011, a violent windstorm damaged a commercial building on a property located in Smyrna, Tennessee (the "Property"), owned by Imperial Park and occupied by its lessee, ReRun of Tennessee ("ReRun"). After the storm, Imperial Park made a claim under its insurance policy with Penn-Star. While there is a dispute of fact about the exact nature of their relationship, Penn-Star is an affiliate of Global. This case concerns Penn-Star and Global's

handling of Imperial Park's insurance claim. On January 31, 2014, Imperial Park and ReRun filed a Verified Complaint against Penn-Star and Global, asserting claims for breach of contract, bad faith and refusal to pay, negligence, misrepresentation and fraud, punitive damages, unjust enrichment and recovery in *quantum meruit*, violations of the Tennessee Consumer Protection Act, Tenn. Code. Ann. §§ 47-18-101 *et seq.* ("TCPA"), breach of the duty of good faith and fair dealing, and equitable relief (in the form of a constructive trust).[1]

The defendants have moved for summary judgment on all claims on multiple grounds. Imperial Park has moved for summary judgment on its claims for breach of contract, bad faith refusal to pay, and equitable relief.

## II. **The Parties' Submissions**

The parties have filed a large volume of materials related to the two motions.

In support of Imperial Park's Motion for Summary Judgment, Imperial Park has filed a Memorandum of Law (Docket No. 34), a Statement of Material Facts Not In Dispute (Docket No. 35), the Declaration of Cathy Luna (Docket No. 36 (attaching three exhibits)), the Declaration of John Lenahan (Docket No. 37), and an Appendix of testimonial exhibits (Docket No. 38).[2] In response, the defendants filed a Memorandum of Law (Docket No. 48), a Response to Imperial Park's Statement of Undisputed Facts (*id.*, Attach. No. 1), the Affidavit of Bob

---

[1] This case was original filed in Davidson County, Tennessee Chancery Court. The defendants removed the case to this court on the basis of diversity. (Docket No. 1.)

[2] The exhibits include the Verified Complaint with certain attachments, as well as transcript excerpts and certain exhibits from the depositions of (1) Robert Massaro, Jr., (2) Greg Martin, (3) Jim Crofts, (4) Michael J. Reddington, P.E, and (5) James R. Watson, Jr.

Massaro (*id.*, Attach. No. 2), the Supplemental Affidavit of Kate Wilkinson (*id.*, Attach. No. 3),[3]

excerpts from the deposition of Rob West (*id.*, Attach. No. 4), and complete transcripts with

exhibits for the depositions of Greg Martin, Michael J. Reddington, and James Watson (Docket

No. 52 (manual filing)). Imperial Park filed a Reply (Docket No. 55), in support of which it filed

the Second Declaration of John Lenahan (Docket No. 56), a Notice of Filing that attached

excerpts from the Massaro and West deposition transcripts (Docket No. 56), and a Notice of

Filing that attached additional excerpts from the Massaro deposition (Docket No. 58).

   In support of their Rule 56 motion (Docket No. 31), the defendants filed three separate

Memoranda of Law (*id.*, Attach. Nos. 1, 2, and 3),[4] a Statement of Undisputed Facts (*id.*, Attach.

No. 4) and the Affidavit of Kate Wilkinson with attached exhibits (*id.*, Attach. No. 5 (affidavit)

and 6-11 (Exs. 1-6 thereto)). In response, the plaintiffs filed a Memorandum of Law (Docket

No. 53), a Response to the defendants' Statement of Facts (Docket No. 45), the Second

Declaration of Cathy Luna with attached exhibits (Docket No. 46) (relating to ownership),[5] and a

---

[3] In substance, the Massaro Declaration and the Supplemental Wilkinson Declaration are identical.

[4] With some exceptions, the legal briefs are unnecessarily repetitive and should have been condensed into a single brief (perhaps with leave to exceed the 20-page limit), as the court suggested in its April 13, 2015 Order. (Docket No. 27.) Because the plaintiffs have not complained, the court will overlook this issue.

[5] The Second Luna Declaration attaches, *inter alia*, Articles of Organization for Imperial Park (Ex. A), Annual Reports filed with the State of Tennessee by Imperial Park (Ex. B), federal tax returns for Imperial Park (Ex. C), and copies of the three unsolicited checks sent by the insurers (Exs. D-F).

Notice of Filing that attached transcript excerpts from the Massaro and Wilkinson depositions (Docket No. 47). The defendants filed a Reply (Docket No. 54).[6]

### III. <u>Facts</u>[7]

#### A. Imperial Park and ReRun

On June 27, 2007, Cathy Luna and John Lenahan, who are husband and wife, purchased the Property. (Wilkinson Dep., Ex. 1.) According to the Second Declaration of Cathy Luna, she and her husband purchased the Property for a single purpose: to operate as a manufacturing facility for their recycling business. (Second Luna Decl. ¶ 2.) Luna avers that, based on the advice of counsel, she and her husband created Imperial Park to hold the Property. (*Id.*) On July 19, 2007, their attorney, Robert Laird, Jr., filed Articles of Incorporation of Imperial Park, LLC with the State of Tennessee. (*Id.* ¶ 3 and Ex. A.) At an unspecified time in or before July 2007, Luna and Lenahan also created ReRun, which operated the recycling business on the Property. Luna and Lenahan own both companies. Luna avers that, at the time they created Imperial Park, she and Lenahan believed that their attorney had filed a quitclaim deed transferring their interest in the Property to Imperial Park. (*Id.* ¶ 4.)

In July of 2007, ReRun entered into a formal ten-year lease agreement with Imperial Park. (Verified Complaint ("VC"), Ex. A.) The agreement identifies Imperial Park as the lessor and ReRun as the lessee, obligates ReRun to pay Imperial Park $6,430.00 per month for the duration of the lease, and represents that "[a]t the commencement of the lease term, LESSOR

---

[6] The record does not appear to contain transcripts for the depositions of Imperial Park or its owners, if those depositions were taken.

[7] The court's summary of the facts is drawn from the parties' respective statements of fact, their responses to those statements, and the evidentiary record as a whole.

shall deliver possession of the premises to LESSEE."  Luna signed on behalf of each party to the

lease.  Since that time, ReRun has been the Property's sole tenant, utilizing the building to

process solid waste.  Imperial Park has no employees and its sole source of income is the rent

paid by ReRun.  Under the terms of the Imperial Park-Rerun lease agreement, Imperial Park's

rental income is paid directly to SunTrust Bank under its mortgage agreement with Imperial

Park.

From 2007 forward, Luna and Lenahan filed Annual Reports on behalf of Imperial Park

(Second Luna Decl., Ex. B (2007 to 2014 Annual Reports)), as well as federal tax returns

premised on Imperial Park's ownership of the Property (*id.*, Ex. C, 2007 to 2014 federal returns).

The federal tax returns indicate that Imperial Park held a "commercial building" at the Property's

address (*i.e.*, the Property), with respect to which Imperial Park collected rental income (from

ReRun), held a mortgage, paid interest, and took depreciation.  (*See, e.g.*, 2007 Annual Return,

Forms 8825 and 4562; Form 1065 Schedule L, Line 14 Supporting Statement (prepaid interest).)

Luna avers that, unbeknownst to her and her husband, their attorney did not in fact file a

quitclaim deed to Imperial Park in June 2007.  (Second Luna Decl. ¶ 4.)  She avers that she and

her husband had no reason to doubt that their attorney had filed that deed until September 2012

(over one year after the date of loss at issue), when Imperial Park attempted to refinance its

mortgage on the Property.  (*Id.*)  She avers that, after discovering this issue, she and her husband

immediately corrected the mistake by filing a quitclaim deed on September 21, 2012.  (*Id.*; *see

also* Wilkinson Dep., Ex. 4 (Sept. 21, 2012 quitclaim deed).)

### B.  Global and Penn-Star

According to the Wilkinson Declaration, Penn-Star is a Pennsylvania company with a

principal place of business in Bala Cynwyd, Pennsylvania.  Global is a Delaware corporation

with its principal place of business in Bala Cynwyd, Pennsylvania. The indirect parent of both companies is Global Indemnity, PLC, an Irish company that is a publicly traded corporation trading on the NASDAQ under the symbol "GBLI." Wilson avers that Global is a holding company. According to deposition testimony from Wilkinson, Penn-Star is one of several insurance companies within the "Global family."[8]

### C. The Insurance Policy

From 2009 forward, Imperial Park maintained commercial property insurance from Penn-Star, renewing its policy annually. In relevant part, on or about January 21, 2011, Luna signed a "Commercial Insurance Application" through an insurance broker, Bud Zander of Zander Insurance. (Wilkinson Decl., Ex. 2.) According to Luna, the application presented to her identified the "carrier" as "Penn-Star Ins Co," the "applicant" as "Imperial Park, LLC," and the type of policy as a "Commercial General Liability" policy. In the section related to "Description of Primary Operations," the application states: "Lessor's Risk – Occupied by Rerun of Tennessee, LLC . . . ." In an attached record (also signed by Luna) entitled "Property Section," the Property is identified by address, and the "Subject of Insurance" section contains two entries, including one for "Building" (in the amount of "$3,200,000" for "replacement costs" with a $2,500 deductible), and the other for "Business Income" (in the amount of $200,000).

In light of that application and effective January 25, 2011, Penn-Star issued a general liability policy and a commercial liability policy that identified Imperial Park as the "named insured." (Wilkinson Decl., Ex. 1.) The policy charged separate premiums for each type of coverage ($2,600 for general liability and $8,566 for commercial property). In the

---

[8] Additional facts regarding the relationship between Penn-Star and Global are discussed in the Analysis section herein, as it pertains to Global's argument that it is not a proper party.

"Declarations" section of the Commercial Property Coverage Part of the policy, coverage is extended to the "building" at the Property's address for $3.2 million, along with coverage for "Business Income – with Extra Expense" for $200,000. The declarations identify the "mortgage holder" as "SunTrust Bank." Imperial Park paid the respective premiums.

The "Building and Personal Property Coverage Form" within the policy contains several relevant provisions. It states that the insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations by or resulting from any Covered Cause of Loss." The "Covered Property" is defined as "the [b]uilding, meaning the building or structure described in the Declarations …." (Building and Personal Property Coverage Form, A.1.) For any damage by a "Covered Cause of Loss to a building that is Covered Property," the insurer agrees to pay increased costs to comply with enforcement of an ordinance or law in the course of repair, rebuilding, or replacement of the damaged parts of that property up to $10,000. (*Id.*, 4.e.) This $10,000 coverage comes with two caveats: (1) the insurer will not pay the increased costs until the property is actually repaired or replaced, and (2) the repairs or replacement are made "as soon as reasonably possible after the loss or damage, not to exceed two years," a deadline that the insurer "may extend . . . in writing during the two years." (*Id.*, 4.e.7(a).)

In a section setting forth "Duties in the Event of Loss or Damage," the insured party is directed to take the following actions. In relevant part, the insured must: provide prompt notice of the loss to the insurer; "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of [its] expenses necessary to Protect the Covered Property for consideration in the settlement of the claim;" "[a]s often as may be reasonably required, permit [the insurer] to inspect the property proving the loss or damage and examine [the insured's]

7

books and records;" "within 60 days after our request" send the insurer "a signed, sworn proof of loss containing the information [the insurer] request[s] to investigate the claim" (and for which the insurer "will supply [the insured] with the necessary forms"); and to "cooperate with [the insurer] in the investigation or settlement of the claim." (*Id.* E.3.a.) The policy states that the insurer "will give notice of our intentions within 30 days after we receive the sworn proof of loss" (*id.*, 4.a.c.), "will not pay [the insured] more than [the insured's] financial interest in the Covered Property" (*id.*, 4.e.4), and will pay within 30 days after receiving the sworn proof of loss, provided that the parties have either agreed on the amount of loss or an appraisal award has been made. (*Id.*, 4.g.)

Imperial Park elected "Replacement Cost" coverage under the policy. (*Id.*, G.3.) Under that election, the insurer agreed to pay the replacement or repair costs for a covered loss, provided that the lost or damaged property is actually repaired or replaced and the repairs or replacement are made as soon as reasonably possible. (*Id.*, G.d.3.) The coverage also indicates that an insured may elect to receive the actual cash value of the loss ("ACV") instead of the replacement cost value ("RCV") to repair or replace the damage property. If an insured initially elects to receive the ACV, the insured may change its election to the RCV by notifying the insurer within 180 days of the loss. (*Id.*, G.3.c.) Subject to the $10,000 cap specified in another section of the policy, the cost of repair or replacement does not include code upgrade costs. (*Id.*, G.3.f.)

Another document in the policy conditions indicates that "[n]o one may bring a legal action against [the insurer] under this Coverage Part unless: (1) There has been full compliance with all of the terms of this Coverage Part; and (2) The action is brought within 2 years after the

date on which the direct physical loss or damage occurred." (Policy, Commercial Property Conditions at ¶ D.)

### D. The Storm and the Associated Claim

#### 1. The Storm and the Loss

On June 15, 2011, a windstorm caused serious structural damage to the building located on the Property. After police notified Lenahan of the damage, Lenahan went to the Property, observed the damage, and assisted first responders in securing the building and preventing further damage. He reported the damage to Bud Zander (the insurance broker), who met with Lenahan at the Property, observed the damage, and took photos. According to the Verified Complaint, Lenahan "provided Mr. Zander a full description of how, when, and where the direct physical loss and damage occurred," and "Lenahan also fully disclosed to Mr. Zander that Imperial Park and ReRun were closely held corporate entities and that he was using ReRun employees and assets to secure and salvage the property because Imperial Park has no employees." (VC ¶ 13.) Imperial Park avers that, with Zander's approval, Lenahan took reasonable steps to protect the Property from further damage by tarping the roof, tarping the goods inside the property, and placing barrels and plastic containers inside the building to collect leaking water. (VC ¶ 14.) The defendants do not dispute that Lenahan's initial response was appropriate.

On June 16, 2011, presumably in response to a report from Zander, Robert Massaro, a Senior Claims Examiner for Penn-Star, retained Jim Crofts of Tenco Services, Inc. ("Tenco") to serve as the independent adjuster on the loss.[9] (*See* Crofts Dep., Ex. 2 (6/16/11 Massaro Email

_____

[9] According to Ms. Wilkinson, companies in the Global family (including Penn-Star) typically retain independent adjusters to adjust insurance claims. As described herein, the parties dispute

to Tenco with instructions).)  On that same day, Massaro sent a letter to Imperial Park acknowledging receipt of the claim and indicating that he was the claims examiner assigned to handle the matter.  (VC., Ex. C.)  Massaro's letter – his first communication to Imperial Park – is on Global Indemnity letterhead and the signature block reads "Robert V. Massaro, Global Indemnity Group Inc., Claims Department."

In the meantime, having observed serious structural damage to the building, Lenahan contacted Mr. Wilburn Honeycutt of Honeycutt Engineering – a structural engineer – to assess the damage.  On June 17, 2011, Honeycutt physically inspected the damaged building and took photographs.

### 2.  Tenco/Crofts' Initial Assessment

The record contains a letter from Crofts to Imperial Park, dated June 16, 2011, that bears a typewritten signature block (but no handwritten signature) for Crofts.   The letter purports to inform Imperial Park of its statutory rights, including (among others) the right to have repairs made by a contractor of the insured's choice, the right to be informed of the need to file a proof of loss, and the right to receive a detailed estimate of the scope of damage and cost of repairs. (Crofts Dep., Ex. 5.)  The parties dispute whether Crofts sent this letter.[10]

Within days of the loss, Crofts conducted an initial inspection, with Lenahan's cooperation.  On June 22, 2011, Crofts sent an initial report to Massaro.  (Crofts Dep., Ex. 4.)

_____

whether Massaro was acting on behalf of Global as well as Penn-Star in handling Imperial Park's claim.

[10] Imperial Park denies that it ever received this letter.  For his part, Crofts had no personal knowledge whether he or anyone in his office sent the letter, and he did not believe that Tenco had any present way of determining whether it had actually sent the letter to Imperial Park. (Crofts Dep at 47:9-48:9.)  The court finds that there is a genuine dispute of fact as to whether Imperial Park received this letter.

Crofts reported that the insurance policy covered Imperial Park on a RCV basis up to $3.2 million and for a loss of business income up to $200,000. He reported that it appeared that high winds had blown down a wall at the property and that an engineer would be confirming the cause of loss. He reported that SunTrust held a mortgage lien on the Property. He also indicated that, on June 20, 2011, Massaro had authorized Tenco to retain a structural engineer to assess the full extent of the damage and that Crofts accordingly had retained engineer Jeff Coyne at Donan Engineering to complete the investigation. Crofts initially recommended a loss reserve of just $80,000. He also indicated that, once a structural engineer confirmed the cause of loss and Tenco had secured bids to remove debris, they would "be in a position to secure an agreed price to complete the required repairs with the insured's contractor of choice."

### 3. The Donan Engineering Report

On June 30, July 1, and July 6, 2011, with cooperation from Lenahan, Donan Engineering conducted an on-site analysis to assess the damage. On July 18, 2011, Donan Engineering (via Coyne) issued a written report to Tenco. (VC, Ex. D, Donan Engineering Report.) In most relevant part, Coyne concluded that high winds in fact caused damage to the building, that water intrusion occurred, that some "problems" with the building predated the wind damage, and that "repair recommendations for this building cannot be provided without the guidance of a structural design engineering firm familiar with the metal insulated panels."

On July 11, 2011, Lenahan emailed Coyne to request the report, and Coyne referred Lenahan to Crofts. The report was not ready at that time.

On July 21, 2011 (three days after receiving the Donan Engineering Report), Crofts sent a follow-up report to Massaro, which attached the Donan Engineering Report. Crofts represented to Massaro that winds in fact caused the loss, that there were some issues raised by Imperial Park

that were not related to the wind damage, and that Tenco needed approval to have Donan Engineering retain a design engineer familiar with the building's structure.

In response to Crofts' July 21, 2011 report, Massaro asked whether Imperial Park had been "pushing" for an expert estimate of damages. (Crofts Dep., Ex. 5.) Massaro indicated that "John from ReRun" (presumably referring to Lenahan) had called him seeking a copy of the engineer's report.

Crofts responded to Massaro's questions by email. Crofts begins by stating that "[t]he Insured's business is very small compared to what it used to be. He may very well be in need of cash." Crofts admitted at deposition that this statement was irrelevant to Imperial Park's claim. Crofts' email also states that Imperial was "trying to get the engineer to include repairs that are not related to the storm event in his assessment of the wind damage." At deposition, Crofts admitted that the Donan Engineering Report did not state that Lenahan was "trying" to include damages not related to the wind damage, that he never discussed with Lenahan whether Lenahan was attempting to include non-covered damages, and that the only source for this statement would have been verbal discussions with Coyne (of which Crofts had no recollection). In the email, Crofts also indicates that a structural design engineer would be required to complete an estimate, confirms with Massaro that "[y]es, *Lenahan is the owner and insured*" (emphasis added),[11] and suggests that "the engineer's report not be provided to the insured until we receive the final engineer's report. . . ," because he "would not want to have a dispute with the insured at this time over one of the engineer's conclusions noted in his initial report while we still need the insured's assistance in our handling of this claim." Crofts admitted at his deposition that he had

[11] Crofts admitted at deposition that he understood at the time that ReRun operated within "the Imperial Park building." (Crofts Dep. at 85:15-19.)

no reason, at the time, to believe that providing the report to Lenahan would lead to a dispute. However, Crofts testified that he wanted to make sure that the report provided to the insured was complete, not preliminary, in order to avoid any unnecessary controversy about initial conclusions that Donan Engineering might have later revised based on the design engineer's findings. (Crofts Dep. at 87:16-25.)

In response to Crofts' email, Massaro stated, "Got it[,]" authorized an expert to estimate the loss, and agreed to "hold off on sending the report at this time." Although the insurers later permitted their engineers and contractors to rely upon structural design information prepared by Honeycutt Engineering – Imperial Park's retained design engineer – neither the insurers nor their agents ever retained their own structural design engineer to estimate the loss.

Lenahan avers that he requested the Donan Engineering Report from Penn-Star "continually" for the next several weeks. On August 3, 2011, Massaro wrote to Lenahan (again on Global letterhead and with a Global signature block), stating that "we" were still investigating the claim and could not "bring the matter to a conclusion" because "We are waiting on our structural engineer's report." (Crofts, Ex. 7.) Lenahan avers that he reached out to Mr. Zander for the Donan Engineering Report, which Zander provided to him on August 14, 2011. After reviewing the report, Lenahan avers that he informed the insurer that Honeycutt Engineering was available to provide the structural engineering "guidance" that Donan Engineering required to complete a cost estimate. Lenahan claims that he received no response.

On August 22, 2011, Crofts sent a follow-up report to Massaro, indicating that he had advised Coyne at Donan Engineering to retain a design engineer to complete an estimate "for the required repairs," that Crofts had instructed the design engineer to separate out "code upgrades"

from the required repairs, and that this estimate "should be forthcoming soon." (Crofts Dep., Ex. 6.)

### E.  EMC Structural Engineers and the First Fresh Start Estimates

Donan Engineering contacted EMC Structural Engineers, P.C. ("EMC") to perform the design engineering assessment that Massaro had authorized.[12]

On August 25, 2011, EMC sent a "Proposal" to Donan Engineering to perform that work. (Crofts, Ex. 8 at 00379-380.)  The proposal outlined EMC's "understanding" of potential design requirements for the building, indicated that site visits would be required for a full assessment, and included a signature block for Donan Engineering to countersign.

To the best of Crofts' and Massaro's knowledge, Donan Engineering did not accept EMC's proposal and EMC never prepared a formal report.  Crofts nevertheless characterized EMC's proposal as a "report" in a communication to Massaro (Crofts Dep., Ex. 8 (emphasis added)).  In the same communication, Crofts also indicated to Massaro that he had retained a local contractor – Rob West at Fresh Start Restoration – to prepare an estimate for the cost of repairs based on the Donan Engineering Report and the EMC "report."  Crofts represented that Rob West had visited the Property the day before as part of his assessment.  It is not self-evident why Crofts retained Fresh Start to prepare the estimate, rather than going back to Donan Engineering, nor is it clear why Crofts permitted Fresh Start to proceed without the input of a

_____

[12] By way of clarity: after Donan Engineering informed Crofts that it required the services of a structural design engineer, Crofts asked Massaro for permission to have Donan Engineering retain that type of engineer.  Massaro gave that authorization to Crofts, who in turn authorized Donan Engineering to retain a structural design engineer, and Donan Engineering accordingly reached out to EMC.

structural design engineer. At any rate, Massaro responded by stating: "I really need to settle this." (*Id.*)

As Crofts had reported, on August 24, 2011, Rob West at Fresh Start Restoration had in fact appeared at the Property. According to Lenahan, West informed Lenahan that he had been retained by Crofts to perform an estimate for *repair* costs (not replacement costs). Lenahan avers that he told both West and Crofts that he wanted the full *replacement* of the building, not repair, and that they should consider using Honeycutt Engineering to provide an informed structural design estimate.

On or about August 30, 2011, Rob West at Fresh Start prepared at least two cost estimates (*see* Crofts Dep., Exs. 11A and 11B), one for $949,557.12, the other for $1,206,978.62. On or about September 13, 2011, West provided a third cost figure to Crofts, reflecting a RCV of $887,538.82 less $262,478.89 in depreciation – for an ACV of $625,538.82.[13] As best the court can discern from Crofts' testimony, Crofts believed at the time that only the third figure (Ex. 11C) represented a repair estimate based on the Donan Engineering Report and the EMC "report" (*i.e.*, more complete information).

Accordingly, on September 13, 2011 (after receiving West's updated estimate), Crofts sent a follow-up report to Massaro that purported to enclose the revised Fresh Start estimate (Ex. 11C), the "minimum design requirements" from EMC Structural Engineers (in reality, a contract proposal), multiple building valuations and photographs, and the Fresh Start restoration estimate. (Crofts Dep., Ex. 9.) Crofts also reported that EMC had "submitted a recommendation that their

---

[13] Throughout the claims process, the insurer did not pay out the differential between the RCV and the ACV, which the insurer seems to contend reflects "depreciation" that it was entitled to hold in reserve until Imperial actually paid for repairs. The defendants have not made to clear to the court what policy provision has allowed them to withhold this differential.

services be secured to submit drawings (plans) for the design requirements," that they be permitted to conduct site visits, and that they had "submitted an estimate of $13,000 for their services related to their recommendations." Crofts indicated that the "the costs included in [Fresh Start's] estimate "could vary based on Design Engineer's final drawings/plans and specifications." Crofts also specifically advised Massaro that, "[o]n losses of this size, we would recommend a Deed / Title search be completed to confirm if any liens or encumbrances exist." Crofts suggested a specific vendor for that purpose. Crofts indicated that he would await instructions from Massaro regarding a "deed/title search" and "any other questions you [Massaro] may have."

Massaro admits that he did not authorize a title search as Crofts had suggested. It does not appear that Massaro questioned Crofts about the lack of a structural design engineering report or the possibility of a "revised" estimate in light of that type of report, as Crofts continued to suggest was necessary.

Lenahan received a copy of the Fresh Start estimate on September 13, 2011.

### F. Reactions to the Fresh Start Estimate

It appears that neither Massaro nor Imperial Park was pleased with the Fresh Start repair estimate – albeit for different reasons.

Lenahan was displeased, and expressed concern, because he believed that the estimate was not based on a structural design engineering report (as the Donan Engineering Report had indicated was necessary) and reflected an estimate for repair rather than replacement. By contrast, according to Massaro's notes, Massaro was surprised that the Fresh Start estimate was considerably higher than the initial reserve that Crofts had suggested ($900,000 compared to $80,000). Massaro called West at Fresh Start to inquire as to why the loss estimate was almost

16

$900,000, and Massaro received an explanation from West.  (*See* Massaro Dep. at 105:1-20 and Ex. 1 at 00111.)  Internal notes from another Global official, David Elliot, state that "[t]his is specialized construction, thus the high cost[,]" and that "[t]his is an RCV policy thus reserves for same *as all indications are the insured will rebuild*."  (emphasis added).

On September 16, 2011, Massaro emailed Crofts to inform him that "[m]anagement agreed to the revised estimate and the sending of the ACV amount to the insured."  Massaro's email did not acknowledge the substance of Crofts' September 13, 2011 report, which was that a design engineer's report was still required to accurately assess the RCV.  Crofts testified that, at the time, he believed that the $662,000 ACV figure represented only a partial value for the loss. Nevertheless, Global and Penn-Star issued a check for the ACV of $622,559.63, which reflected the RCV ($887,538.82) less $262,478.89 in depreciation.  As the court understands it, the defendants now contend that they would have paid the depreciation balance, to the extent that restoration costs exceeded the ACV payment.  The defendants did not request a proof of loss form before releasing this ACV check.

Lenahan accordingly received an unsolicited check in the amount of $622,559.63.  The check identified itself as an "ACV Payment," bore the "Global Indemnity" logo, and was signed by Penn-Star.  Lenahan avers that no one discussed or otherwise informed him of the nature of the payment or the associated holdback.  Indeed, the record contains no written documentation regarding the nature of the check, the existence of a holdback, the basis for the holdback, or a notification to Lenahan that the independent adjuster believed that the check reflected only a partial payment on the loss.  Lenahan did not cash the check.

In response to Massaro's (vague) internal communication on September 16, 2011 about the $622,000 check, Crofts emailed Massaro on October 17, 2011 to ask: "Based on the

information in your email, do I have your settlement authority to attempt to secure an executed partial Proof of Loss"?  He asked for this authority because there was "obviously going to be more to the claim than what's – than the estimate amount."  (Crofts Dep. at 154:23-25.) According to Crofts, Massaro never responded to that question, although the email string indicates that Massaro sent Crofts' email to himself twice without comment (on November 1 and 11, 2011).

In November of 2011, having seen no movement by the insurer, Lenahan requested that Honeycutt Engineering begin designing a plan that could be used by a contractor in replacing the building.  Lenahan avers that Crofts was aware of Honeycutt's work and approved it.  Honeycutt Engineering performed design and drafting work through the Spring of 2012.

On December 24, 2011, after discussing the matter internally, the insurer informed Lenahan that it would not renew Imperial Park's policies.  (*See* Luna Decl., Ex. 2.)

### G.  Movement of ReRun, Potential 2012 Business Income Losses, the Honeycutt Engineering Report, and Crofts' Final Estimate

In May 2012, Honeycutt Engineering informed Lenahan that ReRun needed to remove its stored materials from the building so that Honeycutt could complete the design plan.  On June 15, 2012, Crofts wrote to Massaro, stating that he had been in contact with Imperial Park and "their contractor of choice, Rob West and Fresh Start Construction."  (Crofts, Ex. 14.)  Crofts indicated that repairs would likely begin soon and that Imperial Park would incur expenses subject to the $200,000 "Extra Expense" coverage in the policy to "relocate and store the product during the repair process."

In a follow-up letter on June 19, 2012, Crofts provided more detail concerning the relocation project and indicated that he had "met with *the insured, John Lenahan*, along with his

assistant, Mac Findley."[14]  (Crofts Dep., Ex. 15 (emphasis added).)  Crofts reiterated to Massaro

that Lenahan was "being very careful" not to remove any product and perform repairs without

reaching an understanding with the insurer first.  The report consistently referred to "the insured"

as "he" and "him."

On June 29, 2012, Crofts again wrote to Massaro about this issue, reporting that the

insured had obtained two estimates to relocate product from the building.  (Crofts Dep., Ex. 16.)

As with previous communications, Crofts sometimes referred to "the insured" as "he" in the

letter.  ("The insured is trying to have all their questions answered and potential problems with

the relocation of the product addressed before proceeding with the process.  *He is very much*

*concerned* the $200,000.00 Limit of Insurance for Extra Expenses will be exhausted . . . .")

(emphasis added).)

On July 24, 2012, Finley "for Rerun of TN" (using Lenahan's email address), wrote to

Massaro.  (Massaro Dep., Ex. 14.)  Finley indicated that, after obtaining a $160,000 quote from a

contractor for relocation expenses that Crofts had forwarded to Massaro's attention, ReRun was

willing to perform the same tasks for that amount.  Finley also advised Massaro that any delays

beyond three months would likely result in expenses that exceeded the $200,000 extra expense

policy coverage.  In response, Massaro informed ReRun: "Yes that will be Ok."  The email

corroborates Lenahan's uncontradicted averment that, in late July 2012, Massaro authorized

ReRun via email to fund the movement and storage of inventory for up to $200,000, knowing

that (according to ReRun) any additional delays would likely cause ReRun to incur more than

$200,000 in costs and potential business losses.

---

[14] In the written correspondence, Crofts consistently misspells Mac Finley's name in multiple
ways.

With Massaro's approval, ReRun accordingly removed the inventory. With Crofts'

approval, Honeycutt Engineering inspected the damages and prepared a report dated October 12,

2012, which made detailed repair recommendations. (*See* Crofts Dep., Ex 19/Massaro Dep., Ex.

15, Oct. 29, 2012 Letter from Crofts to Massaro (attaching Oct.12, 2012 Honeycutt Engineering

Report).)

On October 29, 2012, Crofts communicated to Massaro that he had provided the

Honeycutt Engineering Report to "the insured's contractor of choice," Rob West at Fresh Start,

who had prepared a revised repair estimate of $2.9 million based on the repair recommendations.

(*Id.* (October 24, 2012 Fresh Start Revised Estimate attached thereto).)[15] Crofts acknowledged

that Fresh Start's previous estimate of approximately $900,000, which was the basis for the

$622,000 ACV check issued to Lenahan, had been "submitted before the product was removed

from the freezer and before receiving the engineer's report [.]" In light of Fresh Start's revised

estimate, Crofts recommended that the insurer increase the loss reserve to $2.9 million and that it

retain a building contractor to review the Fresh Start estimate and prepare its own repair

estimate.

### H. Retention of Martin to Replace Crofts as the Independent Adjuster

In November of 2012, the insurers decided to retain another claims adjuster to handle

Imperial Park's claim. Whatever the motivation for this decision, it appears that the insurers

were surprised that the dollar value of the claim had nearly tripled to $2.9 million. The record

contains no contemporaneous acknowledgement by the insurers that the earlier $900,000

---

[15] The parties dispute whether and when the plaintiffs involved Fresh Start in the estimating and
bidding process.

estimate was itself only a partial estimate and that it was subject to change based on a structural engineer's report that Crofts had never commissioned on behalf of the insurers.

On November 15, 2012, the insurers retained Greg Martin, an adjuster based in Kansas, to adjust the claim. Crofts testified that the insurers never contacted him after he submitted the revised Fresh Start estimate of $2.9 million on October 29, 2012, and that Martin never contacted him. In other words, it appears that Martin handled all claims adjustment from his date of retention forward.

Martin proceeded to handle the claim immediately. He met with Lenahan and Finley at the Property on November 16, 2012 and again on November 27, 2012. The record also contains multiple email communications between Martin and Lenahan in November of 2012, such as Lenahan sending Martin a copy of the Imperial Park-ReRun lease. (Martin Dep., Ex. 3.)

## I. Martin's Retention of DGPA and Reddington

On or about December 4, 2012, Martin retained the firm of Douglas G. Peterson & Associates, Inc. ("DGPA") to perform an independent estimate of the damages. (Martin Dep., Ex. 3 at 01096.) DGPA contracted with a mechanical engineer, Mike Reddington, to make the estimate.[16]

Martin's initial instructions to Reddington were to "make a site visit, and determine whether complete replacement is necessary," and to determine the scope of repair by a qualified commercial freezer contractor if replacement was not necessary. The initial assignment also indicated that, because "the insured will likely want to do the repairs/replacement himself,"

---

[16] As the court understands Reddington's testimony, Reddington works for a two-person partnership called MJR-Senter, which is part of a network of engineers and engineering firms that sometimes perform work for DGPA. DGPA contacted Reddington to handle the assignment from Martin, representing to Martin that Reddington was appropriately qualified for the project.

Reddington should "work with a qualified contractor to determine a detailed cost for the repair/replacement were the contractor to do the work," in order to provide Martin a measure of the loss in adjusting the claim. Reddington testified that Martin directed him to prepare two separate estimates: (1) an estimate to replace or repair the building to the state it was in on the date of loss, and (2) an estimate to replace or repair the building to comply with current codes.[17] Reddington testified that he was unaware of the policy provision that Imperial Park had to bear code upgrade costs beyond the first $10,000.

### J.  Reddington Estimate

It appears that Reddington reviewed the July 18, 2011 Donan Engineering Report and the October 12, 2012 Honeycutt Engineering Report. On the morning of December 13, 2012, Reddington sent an initial Investigation Report to Martin dated December 12, 2012. (Reddington Dep., Ex. 4.) In the initial report, Reddington acknowledged that the previous reports were "more comprehensive" than his report. He also confirmed "most" of the observations made by Donan Engineering and Honeycutt Engineering in their reports. Without specifying any areas of disagreement with those firms, Reddington estimated the pre-code restoration cost as $619,540 and the code-compliant restoration cost as $999,800 – a code upgrade differential of over $350,000 and a cost figure approximately $2 million less than what Crofts had estimated in October 2012. Contrary to Martin's initial instructions, Reddington did not report that he had visited the site and, in fact, he had not done so.

After receiving this initial report, Martin contacted DGPA to request that Reddington include additional information in his report, including names and contact information for

---

[17] As discussed above, the insurance policy only covered the first $10,000 for code upgrades. Any additional differential would be borne by the insured.

qualified contractors who would perform the recommended repairs for the amount stated. Martin indicated that it would be "helpful" to have a qualified contractor attest to the estimates stated in Reddington's report. Later that day, Reddington sent an updated Investigation Report, dated December 13, 2012, that appears to have added just one paragraph indicating that the $999,800 code compliance estimate was "based on my previous work with Burch Corporation," which Reddington represented could "build the [code-complaint building] for the cost stated in the estimate." (Reddington Dep., Ex. 6.) The report did not include any attestation from Burch Corporation, a bid from Burch Corporation, or any backup for Reddington's representation in the revised report as to whether Burch Corporation would perform the work for that amount. [18]

On December 19, 2012, Martin sent a written report to Massaro that enclosed the December 13, 2012 DPGA Investigation Report. (Martin Dep., Ex. 3.) Among other things, Martin's letter states that "*John Lenahan owns the building* and the tenant business, ReRun of TN," and that "John Lenahan advises that *he has owned the building* for about 5 years." (Emphases added). As with similar representations from Croft to Massaro in 2011 and 2012, the record contains no indication that the insurers raised any doubt concerning coverage of the Property under Imperial Park's policy, notwithstanding Martin's references to ownership of the Property by Lenahan individually (rather than Imperial Park). Martin reported that he had met with both Donan Engineering and EMC Structural Engineers but had concluded that neither engineer would be able to provide the assistance necessary to resolve the loss. He reported that

_____

[18] It is not clear from the record that Reddington actually communicated with Burch Corporation concerning this representation or what information Reddington may have provided to Burch Corporation related to the cost estimate. Reddington admitted that he had no written communications with Burch and that his communications with Burch would have been oral. He testified that he would not have provided Burch Corporation any details other than the basic dimensions of the freezer.

he had retained DGPA because of its extensive nationwide network of engineers and that DGPA had, in turn, retained Reddington, who had previous experience with commercial cooler and freezer projects. Martin reported the two estimates provided by Reddington ($619,540 pre-code and $999,800 to code), indicated that Lenahan had been pressuring him (Martin) for a copy of the December 13, 2012 DGPA Investigation Report, and provided a Statement of Loss indicating that the plaintiffs were owed an additional $6,980.07 beyond what they had already received. Martin makes no mention of the fact that Reddington did not perform a site visit as initially directed.

It appears that Martin emailed the December 13, 2012 DGPA Initial Investigation Report to Lenahan in late December 2012. (Martin, Ex. 6.) Lenahan responded by questioning the estimate because it lacked sufficient detail and because Reddington had not conducted a site visit. Lenahan requested that Martin forward him a contract or a specific proposal by a contractor to perform the work. (*Id.*)

### K. Bidding Estimates from Burch Corporation, Fresh Start, and Robins & Morton (Jamey Watson), and the Retention of Benton Garrison

In light of Lenahan's disagreement with the cost estimate, Martin had the parties solicit contractors to bid on the project. At Martin's direction, DGPA prepared a scope of work form (dated January 16, 2013) and potential bidders were given a proposed bid form. (Reddington, Ex. 8.)

On January 26, 2013, the date that bids were due, the insurers received two returned forms: (1) a detailed bid from Fresh Start for $1,650,000, and (2) an unsigned fax from Burch Corporation with an estimate of $1,685,000 (Martin Dep, Ex. 9). The Burch Corporation

"estimate" was not signed, contained no backup information, and did not include a proposed contract.

On January 29, 2013, Martin emailed Lenahan to inform him about the Burch submittal, stating that "[n]either you nor I can consider it a valid bid, *nor does Global*." (Martin Dep., Ex. 10 (emphasis added).)  Martin informed Lenahan that "*Global* requires two legitimate bids for this work to determine the basis for the adjustment" and that Reddington was attempting to engage another contractor to provide a "legitimate" bid.  (Emphasis added).  According to Reddington's testimony, Burch Corporation refused to respond to any calls or emails about the situation.  Martin suggested at deposition that Fresh Start may have contacted Burch Corporation to engage in bid rigging, although there is no independent confirmation of his suspicion in the record.

On January 29, 2013, Reddington met with representatives from Robins & Morton, a general contractor that expressed interest in performing an estimate.  An estimator at Robins & Morton, Jamey Watson, and his colleagues continued to discuss the project with Reddington over the next few days.  (*See* Martin Dep., Ex. 11.)  Martin indicated to Watson that he should not speak with other contractors about the job and that, if Robins & Morton did not ultimately get the job, the insurers would reimburse Watson for his time performing the estimate.

On February 4, 2013, a representative of Robins & Morton informed Martin and Reddington that his firm could assist with the project, but that it "probably won't be very interested in pursuing the construction of the project" and would require payment for performing the estimate under the circumstances.  Martin responded by stating that Robins & Morton would receive payment "regardless of whether you get the job," and added: "my only concern is that your pencil will be as 'sharp' as it would be if you really wanted this project.  I trust we can

proceed on that basis."[19]  The plaintiffs contend that Martin was essentially bribing Robins &

Morton to come up with a low estimate as part of a fictitious bid.  Martin testified that he merely

meant that Robins & Watson should create an accurate number, even if it was unlikely to handle

the project.  There is a genuine dispute of fact as to the insurers' motivation and Watson/Robins

& Morton's motivation in connection with this estimate.

       Another email exchange between Martin and Robins & Morton bears on this issue.  On

February 5, 2013, a representative from Robins & Morton (Eric Eitzen) emailed Martin to

indicate that Jamey Watson could "give a solid estimate" and that Martin "may be better served

with more of an independent third party opinion of the cost versus someone who may strive to

land the job and potentially be motivated to create a fat estimate."  (Watson Dep., Ex. 1.)

Nevertheless, Eitzen advised Martin to "please keep in mind that we aren't working from

detailed, permitted engineering drawings here . . . rather we're working off of preliminary

sketches, narratives, photos, discussions, e-mails, etc.  I'm sure I'm preaching to the choir, but

estimating is part art and part science . . . ."  (*Id.*)  As the court understands the record, the

missing engineering drawings referenced by Eitzen were essentially the type of engineering

drawings that Donan Engineering had recommended in July 2011 (just weeks after the loss), that

EMC Structural Engineers had proposed to provide in August 2011, that Honeycutt Engineering

could have provided, and that Lenahan had repeatedly been urging the insurers to utilize in their

cost estimates since he first received the Donan Engineering Report in August 2011.  Martin

permitted Watson to perform his estimate without the benefit of detailed engineering drawings.

---

[19] Reddington also emailed Robins & Morton to confirm that it would be paid for its estimating
services.

In the meantime, Imperial Park retained the services of engineer Benton Garrison to investigate and obtain legitimate bids. Lenahan avers that he did not realize until this time that Imperial could utilize its own contractor, having never received (he avers) the June 16, 2011 notice of rights letter from Crofts. Notwithstanding Imperial Park's retention of Garrison to solicit bids, and the fact that Robins & Morton had signaled that it would likely not be interested in performing the work, Martin continued to solicit a "bid" from Robins & Morton.

On March 1, 2013, Watson sent a Schematic Design Estimate to Martin. (Martin, Ex. 15.) Subject to various design assumptions, Watson estimated that it would cost approximately $1,174,644 million to restore the property. His estimate makes no mention of code improvements. Attachments to the report indicate that Watson received quotes from subcontractors that informed his calculations. After receiving this report, Imperial Park rejected the estimate.

### L. Garrison's $2.9 Million Estimate and Lenahan's Notice to Martin

On May 1, 2013, Honeycutt Engineering sent a set of "Bid Set Drawings" to Imperial Park, which forwarded them to Martin. It appears that Robins & Morton or its sub-contractors obtained copies of the drawings as well. Estimating from those drawings, Benton Garrison prepared a restoration estimate of approximately $2.9 million. (*See* Martin Dep., Ex. 14, at 01582 and 01585-86.) The estimate was approximately the same as the October 2012 Fresh Start estimate on which Crofts had relied. Martin received the Garrison estimate in late May 2013.

On May 29, 2013, Lenahan emailed Martin to state that, "[u]nder the terms of the policy covering this claim, repairs must begin within 2 years of the covered cause of loss or the insurance company has to issue an extension in writing to the insured. Since there is a high probability that repairs will not begin by June 15, 2013 (the 2-year anniversary date), please

ensure that I receive the extension letter prior to the anniversary date." (Martin Dep., Ex. 17.) Within minutes, Martin responded that he would work with the insurer to obtain the extension. (*Id.*)

Martin forwarded Lenahan's inquiry to Massaro. Massaro's initial response was to ask whether he could deny Lenahan's extension request. Martin responded by indicating that he did not believe that the insurers had reasonable grounds to deny the extension request. He also indicated that he had reviewed the policy and determined that it required the insured to elect RCV coverage within 180 days of the loss, which Martin indicated (in his opinion) that Imperial Park had not done to that point.[20] Apparently (somehow) construing Lenahan's extension request as Lenahan's first indication that he was seeking the RCV rather than AC (outside the 180-day window), Martin recommended that Massaro nevertheless grant Lenahan's request, with the proviso that repairs be completed within nine months.

### M. June 2014 Report and Revised Robins & Morton Estimate

On June 13, 2014, Martin issued a written report to Massaro. (Martin Dep., Ex. 14.) Martin's report attached reports from Reddington and Honeycutt Engineering about the necessity of a particular repair. Martin's report indicates that Lenahan had provided the Honeycutt Engineering Bid Set Drawings to Watson and other subcontractors, most of whom had responded with higher bids. Martin explained that he had previously revised the loss estimate upwards to $1.43 million (from Watson's figure) and upwards again to $1.7 million to account for bids on replacing the building's customized storage racks. Subject to some other adjustments, Martin (re)estimated the RCV as $1,684,085.11 – approximately $500,000 higher than Watson's March

---

[20] Lenahan maintains that, in contrast to Martin's statement, he exercised his right to recover the RCV from day one. The record is consistent with Lenahan's position.

3, 2011 initial estimate of $1.1 million, on which Martin and the insurers had relied. Martin indicated that he was working with Reddington to locate a general contractor to bid the job, perhaps for an amount lower than the $1.7 million estimate.

At some point on the same day, Martin communicated the $1.7 million estimate to Lenahan, who rejected the estimate and indicated that he would not permit another contractor to return to his property to conduct an estimate. On June 14, 2013, Martin wrote a follow-up email to Massaro, indicating that he was still looking for a contractor bid and acknowledging that Robins & Martin was "not interested in the job." He reported that Lenahan had become upset, refused to permit another contractor on the property, and demanded the insurers' position in writing. Martin recommended sending out another (unsolicited) ACV payment.

On July 3, 2013 – about three weeks after the contractual two-year limitations date – Massaro sent a letter to Imperial Park. (Martin Dep., Ex. 18.) In the letter, Massaro represented that "the amount of the Actual Cash Value of the loss has increased." Making reference to the RCV election, Massaro indicated that Martin had advised that the RCV was $1,684,085.11, less depreciation of $587,590.93, for an ACV of $1,096,494.18. Massaro accordingly remitted a check for $472,239.72, reflecting the difference between the September 2011 $622,000 check and the revised $1.1 million ACV estimate. The letter stated that Penn-Star reserved its rights. The letter made no reference to Lenahan's May 29, 2013 inquiry concerning an extension of time to begin repairs, despite Martin's recommendation to approve Lenahan's request and Martin's suggestion that Massaro formally state that the insurers would pay Lenahan the RCV (outside the 180-day window) as long as Lenahan completed the repairs within nine months. The letter made no reference to the contractual two-year limitations date. In fact, the letter directed Lenahan that,

"[d]uring our investigation, we ask you to cooperate with Greg Martin as they [sic] have been retained to assist us in this matter[.]" Lenahan did not cash the check.

At Martin's direction, Reddington asked Watson to prepare an updated estimate in August 2013. (Martin, Ex. 20.) As the court understands the record, Watson received the Honeycutt Bid Set Drawings and the updated subcontractor estimates premised on the drawings. Based on the new information, Watson issued a revised report on October 4, 2013 that estimated the replacement cost as $1,959,064 – approximately $800,000 higher than his March 3, 2013 estimate. (Reddington Dep., Ex. 15.) On October 7, 2013, Reddington emailed the revised estimate to Martin. In his email, Reddington discussed the estimate and stated as follows: "I'm not happy with the outcome; but I don't have any aces to play." (*Id.*) In response, Martin stated as follows: "So his bid goes up by $784K???? I.e. a 67% increase? This doesn't make sense. I would have expected perhaps a $500K increase in bid (his rack number alone is $376K higher), but $784K?" (*Id.*)

On October 14, 2013, Martin reported the revised estimate to Massaro and indicated that he and Reddington agreed that it should be reduced to $1,895,269 for several reasons. (Martin Dep., Ex. 22.) Subject to the adjustment, Martin reported that the ACV had risen to $1,155,089.21, with a net payment owed of $57,769.56. There is no indication in the record that anyone informed Lenahan or Imperial Park that Martin was working with Robins & Morton to revise its earlier estimate.

### N.  Plaintiffs' Retention of Counsel, and the Final Checks

In the meantime, Imperial Park retained counsel to represent it (the same counsel representing plaintiffs in this action). On September 6, 2013, Imperial Park's counsel wrote to Massaro to request a sworn proof of loss form, which the insurers had never requested be

submitted.  (VC, Ex. G.)  Massaro sent a proof of loss form to Imperial Park's counsel.  The pre-filled form identified the insurer as "Global Indemnity Group, Inc." and made no reference to Penn-Star.   On October 7, 2013, plaintiffs' counsel wrote to Massaro and attached the sworn proof of loss.  (*Id*, Ex. H.)  The letter repeatedly identifies "Global" as the insurer and sets forth detailed facts concerning "Global's" actions to date.  The letter demands at least the policy limits of $3.2 million.

On October 17, 2013, Massaro wrote back and rejected the proof of loss without explanation.  The letter does not take issue with the references to "Global" in Imperial's October 7, 2013 letter or to the sworn proof of loss identifying "Global" as the insurer.  The letter encloses a revised estimate of $1.895 million (reflecting Martin's October 14, 2013 report), and indicates that, net of depreciation, the insured was entitled to an additional $57,759.56 for the ACV of the loss relative to previous payments.  The letter urged the insured to "*continue to cooperate* with our adjuster to bring this matter to a conclusion.  We thank you in advance for *your assistance in this adjustment process*."  (emphases added).  As with previous communications, the letter did not acknowledge Imperial Park's prevailing estimate – by that point, the Garrison $2.9 million estimate – which remained over $1 million higher than the proposed payout.  As with the earlier checks that Imperial Park received, Lenahan did not cash the check.

On November 8, 2013, plaintiffs' counsel wrote to Massaro to indicate that it was "facing claims" from ReRun.  The letter attached invoices from ReRun for work performed at the building and for $412,378 in business losses due to partial loss of use of the facility space.   The letter also requested a tolling agreement.  (VC., Ex. J.)  It appears that the insurers did not respond to that letter.

On November 26, 2013, plaintiffs' counsel wrote to the insurers to provide notice of Imperial Park's intent to assert a Tennessee statutory claim for bad faith failure to pay under Tenn. Code Ann. § 56-7-105(a). As indicated above, the plaintiffs filed this lawsuit on January 31, 2014.

## STANDARD FOR CROSS-RULE 56 MOTIONS

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

32

"On cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (internal quotation marks and brackets omitted).

## ANALYSIS

### I.  The Defendants' Motion

#### A.  Overview

The defendants have moved for summary judgment on the following grounds: (1) dismissal of all claims against Global because it is not a proper party; (2) dismissal of plaintiff ReRun because it lacks standing under the insurance policy; (3) dismissal of all TCPA claims; (4) dismissal of the plaintiffs' claims for misrepresentation and fraud for failure to plead the claims with particularity; (5) dismissal of all claims because Imperial Park did not own the Property at the time the loss occurred or when it submitted the insurance claim, (6) dismissal of all claims because the plaintiffs filed suit outside of the two-year statute of limitations set forth in the insurance contract, and (7) dismissal of ReRun's bad faith claim because ReRun never submitted an insurance claim.

In response to the defendants' motion, Imperial Park states that it will proceed only on its claims for breach of contract, bad faith refusal to pay, and claims for equitable relief/constructive trust.  The court construes Imperial Park as abandoning its remaining claims.[21]  As to ReRun,

---

[21] In their Response, the plaintiffs contend that Imperial Park adequately pleaded claims for fraud, misrepresentation, breach of contract, bad faith refusal to pay, negligence, unjust enrichment/quantum meruit, TCPA violations, breach of the duty of good faith and fair dealing, equitable relief, and establishment of a constructive trust.  The plaintiffs purport to agree that Imperial Park will only "proceed" on certain claims "without waiving any of their other alleged claims."  If Imperial Park is attempting to skirt summary judgment on the claims on which it is

ReRun concedes that it cannot assert a statutory claim for bad faith refusal to pay but seeks to proceed with claims for (1) breach of contract, (2) misrepresentation, (3) fraud, (4) violations of the TCPA, and (4) unjust enrichment and/or *quantum meruit*, (5) TCPA violations, (6) duty of good faith and fair dealing, (7) equitable relief and constructive trust claim, (8) punitive damages, and (9) claims for expenses and losses under Imperial Park's insurance policy. The court will therefore address only the non-abandoned claims.

**B. Claims against Global**

The defendants argue that Global should be dismissed because it was not a party to the insurance contract. Like many of its positions at summary judgment, the defendants elevate form over substance without addressing the compelling evidence that contradicts its litigation position.

The defendants are correct that only Penn-Star appears as a signatory on the insurance policy and that Penn-Star and Global are registered as distinct corporate entities. The remainder of the record demonstrates that Global was involved in adjusting the claim:

- From start to finish, most of the communications from Massaro to Imperial Park are on "Global" letterhead and identify Massaro as a claims examiner for "Global" – not Penn-Star. (*See, e.g.*, VC., Ex. C, 6/16/11 Letter from Massaro to Imperial Park; 10/16/13 Letter from Massaro to Imperial.) Massaro also generally communicated over email from a Global address. (*See, e.g.*, VC., Ex. E.)

- Martin made representations to the plaintiffs, on which they relied, as to what "Global" required in estimating their loss.

- When Imperial Park (via counsel) requested a sworn proof of loss form from Massaro in September 2013, Massaro responded by sending a

---

not proceeding, that effort is in vain. Imperial Park has not shown that summary judgment is not warranted on these claims, which the court will dismiss summarily to the extent that they are not otherwise addressed in the Response brief.

partially pre-filled Sworn Statement Proof of Loss that identified "Global Indemnity Group, PLC" *as the insurer* and as the *addressee of the proof of loss*.  Imperial Park returned the sworn proof of loss to Global on October 7, 2013 with an accompanying cover letter that repeatedly referenced "Global" as the insurer.[22]  In his response letter on October 17, 2013, Massaro did not take issue with the fact that Imperial Park had identified Global as the insurer or that it had submitted its proof of loss to Global – as Global had requested.  (Verified Compl., Ex. I.)

- Many internal communications to and from Massaro also identify him and the entity adjusting the claim as "Global," rather than Penn-Star.  (*See, e.g.*, Donan Engineering Report.)

- At least two of the unsolicited checks sent to Imperial Park concerning the claim are from "Global Indemnity Group, Inc." only.  (*See* Second Luna Decl., Exs. E and F.)  A third contains both the Global and Penn-Star labels.  (*Id.*, Ex. d.)

- Wilkinson testified that she works for Global ("All I can tell you is, if you ask me, I work for Global Indemnity") as does David Elliot, to whom she reports.  (*See* Wilkinson Dep. at 17:1-24.)  Wilkinson testified that claims from Penn-Star and other entities in the Global corporate family are all centralized through a common "Global" claim number, physical address, and email address.  She testified that Elliot is ultimately responsible for all claims coming in from any entities within the Global "umbrella," including Penn-Star.  (*Id.* at 20:16-25.)  Both Wilkinson and Elliot played a decisive role in handling Imperial Park's claim (Wilkinson Dep., Ex. 5), and Wilkinson treated the claim as running through her.  (*See id.* at 78:14-15 ("Q. Mr. Martin was your agent here; was he not?  A: He was *my* independent adjuster.") (emphasis added) and at 79:12 ("*I was overseeing this claim.*") (emphasis added); *see also* Massaro Dep., Ex. 1, at 109, 111, 115, 116, 118, 119, 121, 124, 125, 126, 127.)  Indeed, Massaro testified that he needed Wilkinson's approval (at least) for any payment over $100,000.

---

[22] "Thank you for sending me the appropriate Global Indemnity, hereinafter 'Global,' proof of loss form pursuant to [the policy], which requires my client to provide said sworn proof of loss as a condition sixty (60) days after Global requests it.  The same provision requires Global to supply the necessary proof of loss form.  Since Global never requested that my client provide said form, I on September 6, 2013, wrote you via email and requested it, because it appears Global and Imperial Park cannot agree on my client's loss.  On September 13, 2013, you sent the Global sworn proof of loss form, which Global requires under its policy . . . ."  (VC., Ex. H.)

Aside from averring that "Global" is a "holding company" that is distinct from Penn-Star, the defendants offer no facts in support of their position that Global is not a proper party here. The defendants' Reply brief does not address the plaintiffs' cited facts or the plaintiffs' argument that the facts demonstrate that Global is a proper party. For their part, the plaintiffs do not identify a legal basis – rather than a factual one – to hold Global liable in this case, other than the doctrine of equitable estoppel.

Under the doctrine of equitable estoppel, an insured must show that the party to be estopped: (1) engaged in "conduct which "amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;" (2) "intention, or at least expectation that such conduct shall be acted upon by the other party"; and (3) "knowledge, actual or constructive, of the real facts." *Robinson v. Tenn. Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 562 (Tenn. Ct. App. 1993). Imperial Park must also show that it (1) lacked knowledge or the means of knowledge of the truth as to the facts in question, (2) relied upon the conduct of the party estopped, and (3) took actions based thereon of such character as to change its position prejudicially. *Id.* In summary fashion, Imperial Park argues that elements of equitable estoppel are satisfied here. The defendants' Reply brief is silent on this issue.

The plaintiffs also seem to argue that Global acted as an *alter ego* of Penn-Star in administering Imperial Park's claim, or that Penn-Star was Global's agent, although they do not specify either argument or cite caselaw. In Tennessee, an agency relationship exists if, based on the parties' relationship and their conduct, one entity acts for or represents another. *Wells ex rel. Baker v. State*, 435 S.W.3d 734, 755 (Tenn. Ct. App. 2013). Similarly, a subsidiary's action may be attributable to a parent corporation where the parent corporation controls the subsidiary

corporation's internal affairs or daily operations. *Id.* at 755-56. Whether an *alter ego* or agency relationship exists is a matter of fact. *Id.*

Under the circumstances, the court finds that there are genuine disputes of material fact that preclude summary judgment in favor of Global on this issue. Construing the facts in the light most favorable to the plaintiffs, Global adjusted the claim, drew no distinction between itself and Penn-Star in the administration of Imperial Park's claim, and oversaw and made final decisions concerning the claim (including payment of the initial $622,000 check, rejection of Fresh Start's October 2012 $2.9 million estimate, and the retention of a new claims adjuster to handle the claim). Based on an estoppel theory, and perhaps on an agency or *alter* ego theory, a jury could reasonably find that it would be unjust for Global to now avoid any potential liability for the consequences of its actions. The same is true with respect to the plaintiffs' non-contractual claims: to the extent Massaro or the independent claims adjusters made representations to the plaintiffs in this case, a jury reasonably could find that those representations were made on behalf of Global as well as Penn-Star.[23]

Global has not shown that it is entitled to summary judgment on the basis that it is not a proper party. The court will therefore permit the plaintiffs' claims against Global to proceed to trial.

### C. Statute of Limitations

---

[23] Given the summary manner in which this issue was briefed by both sides, it may be that the trial evidence ultimately will justify a directed verdict in favor of Imperial Park or in favor of Global on the issue of estoppel, depending on whether the evidence satisfies the requisite elements. It is not clear to the court whether the plaintiffs also intend to advance a separate *alter ego* or agency theory relative to Global.

The defendants contend that Imperial Park's claim must be dismissed because Imperial Park failed to comply with the two-year contractual statute of limitations, which the defendants contend expired on June 15, 2013 (two years from the date of the windstorm). The plaintiffs contend that the defendants cannot prevail on this defense because (1) a condition precedent in the policy was not satisfied, (2) the plaintiffs are excused from performing because the defendants substantially breached the contract first, or (3) the defendants are equitably estopped from raising a limitations defense.

1. <u>Construction of the Limitations Provision</u>

Insurance contracts are subject to the same rules of construction and enforcement as apply to contracts generally. *McKimm v. Bell*, 790 S.W.2d 526 (Tenn. 1990). Ambiguities in an agreement are resolved in favor of the insured. *Interstate Life & Accident Co. v. Gammons*, 408 S.W.2d 397, 399 (Tenn. Ct. App. 1966). Nevertheless, courts may not rewrite an insurance policy because the court dislikes its terms or because its provisions have harsh results. *Black v. Aetna Ins. Co.*, 909 S.W.2d 1 (Tenn. Ct. App. 1995).

Here, the policy indicates that "[n]o one may bring a legal action against us under this Coverage Part unless: (1) There has been full compliance with all of the terms of this Coverage Part; and (2) The action is brought within 2 years after the date on which the direct physical loss or damage occurred." (Policy, Commercial Property Conditions, at ¶ D.) Other parts of the policy define the terms "we" and "us" as the insurer, making it clear that the phrase "legal action against us" refers to a legal action by the insured against the insurer.

The plaintiffs contend that the court should read the policy provision as precluding enforcement of the statute of limitations unless (1) both parties comply with all of their obligations under the policy, and (2) the insured brings a legal action within 2 years of the date

38

of loss. Although the court agrees that there is are genuine disputes of fact as to whether the defendants breached the contract and whether the defendants acted in bad faith, the plaintiffs' construction of the limitations term is not reasonable. The terms are more naturally read as separate and independent requirements imposed *on the insured*, not as requirements imposed on the insurer. Presumably, the terms are designed to prevent an insured from (1) suing without complying with the policy's terms (which involve certain claim submissions procedures and dispute resolution procedures) and (2) doing so more than two years after the date of the physical loss. Otherwise, a plaintiff could immediately file a lawsuit without first addressing the issue with the insurer under contractually mandated procedures. Furthermore, under the plaintiffs' construction, no party could sue until both parties comply with the policy terms, which would be nonsensical because a lawsuit presumably is predicated on one side's belief that the other side breached the policy terms. The court therefore finds the plaintiffs' policy construction argument to be without merit.

2. Unclean Hands

In response to the defendants' motion, the plaintiffs argue that the defendants cannot prevail on several defenses (including the limitations defense) as a matter of law because the defendants either substantially breached the contract first or because the defendants otherwise present themselves to the court with unclean hands. The plaintiffs are correct that a finding that the defendants substantially breached the policy might preclude the defendants from relying on a limitations defense. *See Wil-Helm v Agency v. Lynn*, 618 S.W.2d 748 (Tenn. Ct. App. 1981). The plaintiffs are also correct that the doctrine of unclean hands, if satisfied, would preclude the defendants from prevailing on their defenses. *See Segal v. United Am. Bank*, 2005 WL 3543332 (Tenn. Ct. App. Dec. 28, 2005); *Hogue v. Kroger Co.*, 373 S.W.2d 714, 716 (1962).

39

Nevertheless, there are genuine disputes of material fact as to whether the defendants breached in the first place and, even if so, whether the defendants did so in bad faith. These disputes of fact preclude a finding in favor of the plaintiffs on the basis of first substantial breach or unclean hands.

### 3. Equitable Estoppel

Equitable estoppel precludes a defendant from raising a statute of limitations defense under the following conditions:

> Where by promises or appearances one party is induced to believe that the other party is going to pay a claim or otherwise satisfy the claims of the first party, and in reliance on that representation that first party delays filing suit within the applicable statute of limitations, the party making the representations may be estopped to raise the statute of limitations as a defense.

*Sparks v. Metro. Gov't of Nashville*, 771 S.W.2d 430 (Tenn. Ct. App. 1989).

Here, even construing the disputed facts in the light most favorable to the defendants, the defendants are equitably estopped from asserting their statute of limitations defense as a matter of law. The defendants negotiated with the plaintiffs before, during, and after the limitations date, leading the plaintiffs to believe that the parties were working toward a mutual resolution of their dispute concerning the appropriate replacement cost value. The defendants spent the first 18 months working with plaintiffs to adjust the claim while Crofts acted as the independent claims adjuster.[24] In October 2012, the defendants abruptly and without explanation replaced Crofts with Martin, who informed Imperial Park and ReRun that he (Martin) would be acting as

---

[24] As explained above, in September 2011, the insurers authorized an unsolicited payment of $622,000 to the plaintiffs without acknowledging – as Crofts urged Massaro to do – that it was only a partial payment, not a full payment. In October 2012 (nearly a year later), having permitted the plaintiffs to utilize Honeycutt Engineering to investigate and assess potential repairs, Crofts submitted a $2.9 million estimate to the insurers. Without explanation, the insurer rejected this estimate and retained Martin to (re)estimate the replacement or repair costs.

the independent claims adjuster from that point forward. Martin continued to adjust the claim and remained in regular contact with the plaintiffs and with Massaro concerning his investigation. The investigation remained an ongoing process, with Martin often responding to criticisms by Lenahan about the defendants' cost estimates.

When Lenahan wrote to Martin on May 29, 2013, seeking assurance that he would receive an extension to repair the building beyond two years from the date of the loss, the insurers did not respond by the June 15, 2013 limitations date or at any time thereafter. Instead, on July 3, 2013 – nearly three weeks after the deadline had passed – the insurers urged Imperial Park to *continue to cooperate with Martin* in adjusting the claim and *issued a $472,239.72 check* to Imperial Park. Martin continued to work with Reddington and Robins & Morton to prepare a revised estimate based on the Honeycutt Bid Set Drawings that had been provided to the defendants in advance of the June 15, 2013 limitations deadlines. The defendants do not dispute that the plaintiffs reasonably awaited word from the defendants concerning revised estimates. Robins & Morton in fact revised its estimates upwards substantially (by nearly $800,000), and the insurer issued *another check* to the plaintiffs in October 2013, several months after the limitations deadline. Even at that point, the defendants again urged the plaintiffs to *continue to cooperate* with Martin in his adjustment of the claim. The defendants never explicitly rejected the plaintiffs' estimates or indicated before the limitations deadline that the adjustment process was over. To the contrary, the defendants induced the plaintiffs to continue the adjustment process and to cooperate with the insurer's investigation.

On these facts, it is no wonder that the defendants' Reply brief is stone silent on the issue of equitable estoppel as it relates to their limitations defense. The defendants induced the plaintiffs to refrain from suing by continuing to adjust the claim, by issuing additional checks

past the limitations date, by soliciting the plaintiffs' continuing cooperation for months after the deadline, and by not acknowledging the plaintiffs' inquiry concerning the June 15, 2013 date. The court therefore finds that the doctrine of equitable estoppel precludes summary judgment in favor of the defendants on their statute of limitations defense.

### D. Ownership

The policy states that the insurers "will not pay you [Imperial Park] more than your financial interest in the Covered Property." The defendants contend that Imperial Park cannot recover under the insurance policy because it did not actually own the Property on the date of loss, given that Luna and Lenahan executed a quitclaim deed of the Property to Imperial Park on September 21, 2012 – over one year after the date of loss.[25] The defendants contend that they did not discover this fact until discovery in this litigation.

In response, the plaintiffs argue that (1) the defendants admitted in their Answer that Imperial Park was the record owner on the date of loss, which constitutes a binding and irrevocable judicial admission, (2) the plaintiffs have an insurable interest in the Property under Tennessee law, (3) even if the defendants are correct that the plaintiffs were not the record owners as listed by the policy, the contract should be reformed to reflect the parties' mutual understanding and intent at the time they executed the policy, and (4) even if the plaintiffs failed to disclose that they were not in fact the Property owners, the representation was not material, it was not intentional, and it did not increase the risk of loss.

---

[25] The defendants devote an entire Memorandum and their 17-page Reply to a "motion" on this single issue, often repeatedly stating the same point. The argument is straightforward and should have been included (more concisely) in a single consolidated Rule 56 Memorandum.

Having examined the referenced Verified Complaint paragraphs and associated Answer, the court finds that the defendants did not admit in their Answer that Imperial Park can recover under the policy or that, at most, the issue is unclear. Therefore, the court does not find that the Answer binds the defendants in the manner suggested by the plaintiffs.

On the merits, however, the defendants are not entitled to judgment for several reasons. As the plaintiffs point out, in Tennessee, the validity of a contract of insurance is determined by whether the insured has an "insurable interest" in the property insured, which is a more liberal and less formalistic approach than the one urged by the defendants (in reliance on cases from other states). *See Duncan v. State Farm Fire & Cas. Co.*, 587 S.W.2d 375 (1979)); *Adams v. Tenn. Farmers Mut. Ins. Co.*, 2010 WL 1444477 (Tenn. Ct. App. Apr. 13, 2010). As explained in *Duncan*, Tennessee follows "the principle that one has an insurable interest in property if by its continued existence he will gain an advantage, or if by its damage or destruction he will suffer a loss, whether or not he has any title in, lien upon or possession of the property." *Id.* Furthermore, Tennessee statutory law states that "[n]o written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for a contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter presented increases the risk of loss." Tenn. Code Ann. § 56-7-103.[26]

Here, as stated in the un-contradicted Second Luna Declaration, she and Lenahan formed Imperial Park as a sole-purpose entity to hold title to the building and to collect rents, they

---

[26] The defendants' briefing does not reference Tennessee law on this issue, nor do the defendants address the facts or caselaw relied upon by the plaintiffs.

believed that their attorney had quitclaimed the Property to Imperial Park in 2007, and they had no knowledge at the time of loss that their attorney had not processed a quitclaim deed on behalf of Imperial.  The undisputed facts also show that Imperial Park acted in all respects as the actual owner: it signed a lease agreement with ReRun, collected rental payments from ReRun, paid federal taxes related to Imperial's Park ownership in the building from 2007 forward, and made annual reports to the Tennessee Secretary of State.  The defendants identify no conceivable motivation for Imperial Park to have lied about owning the Property when it signed the policy in January 2011 or when the loss occurred in July 2011.  Under these facts, the court finds that the plaintiffs had an insurable interest in the Property both when the policy was signed and when the loss occurred.

In the alternative, even if the plaintiffs did not formally have an insurable interest on the date of loss, the defendants are not entitled to judgment.  The defendants have not shown that the issue of ownership was material, as the defendants' own conduct indicates.  The defendants multiple times received reports from their claims adjusters that Lenahan individually might have owned the property or that a title search might be warranted, but the defendants never reacted or made that an issue.

Although the plaintiffs did fill out a Sworn Proof of Loss form in October 2013 (approximately one year after they had executed the Quitclaim Deed) that stated that the plaintiffs owned the Property on the date of loss, it is not clear what difference this makes.  It was the *plaintiffs' counsel* who requested the sworn proof of loss form, which the defendants had not requested in the intervening 27 post-loss months of dialogue with the plaintiffs.  The question is whether the plaintiffs intended to deceive the defendants when they signed the policy and made a claim in 2011, an issue on which the defendants offer no evidence to contradict (or

44

conceivable motivation that would undermine) the plaintiffs' sworn assertions of good faith. Thus, the defendants have not presented evidence from which a jury could conclude that the plaintiffs sought to deceive or conceal Imperial Park's insurable interest in the Property on the date of loss. Indeed, ownership was a matter of public record and was readily discoverable without the need for discovery of the plaintiffs or their owners in this litigation.

Finally, the defendants offer no explanation as to how the alleged misrepresentation would have increased the risk of loss. Indeed, Imperial Park is seeking to enforce the parties' understanding when they signed the insurance agreement, namely the insurer's belief that it was ensuring Imperial Park's ownership interest in the Property in return for certain policy premiums (which Imperial Park in fact paid).

For all of these reasons, the court finds that the defendants are not entitled to judgment on the issue of ownership and that there is no genuine dispute of material fact on this point for the jury to resolve.

### E. Claims by ReRun

The court agrees with the defendants that ReRun cannot recover under the policy because the plaintiffs have not identified any contents damage and Lenahan testified that the contents were not in fact damaged.

The defendants also argue that "the plaintiffs'" TCPA claims must be dismissed because the TCPA does not apply to insurance claims. *See* Tenn. Code Ann. § 56-8-113; *see Montesi v. Nationwide Mut. Ins. Co.*, 2013 WL 4522905 (W.D. Tenn. Aug. 26, 2013) (finding that § 5-8-113 "effectively eliminates the TCPA as a viable cause of action for disputes arising from the insurer-insured relationship") By its terms, the insurance statute provides the "sole and exclusive statutory remedies and sanctions applicable to an insurer . . . for alleged breach of, or for alleged

45

unfair or deceptive practices in connection with, a contract of insurance . . . ."  Tenn. Code Ann.

§ 56-8-113.  Given that the court agrees with the defendants that ReRun cannot recover under the

insurance policy in the first place, ReRun similarly cannot assert a TCPA claim as an insured

party or beneficiary.  As to whether ReRun can maintain a TCPA claim apart from the insurance

policy, ReRun cannot proceed under the TCPA against the insurers to the extent that the claim is

premised on "unfair or deceptive practice *in connection with [] a contract of insurance*."

(emphasis added).  The basis for ReRun's TCPA claim is that the defendants made misleading

representations in connection with handling Imperial Park's insurance claim – a theory of

liability that falls within the broad ambit of Tenn. Code Ann. § 56-8-113.  ReRun's TCPA claims

therefore will be dismissed.

As to ReRun's fraud and misrepresentation claims, the defendants argue that the Verified

Complaint does not set forth these claims with the particularity required by Rule 9(b) and,

therefore, that ReRun has failed to state a claim on which relief may be granted.  The defendants

appear to be moving for judgment on the pleadings.  While it is permissible to move for

judgment on the pleadings under Rule 12(c) at this stage, it is quite late in the proceedings for the

defendants to be challenging the sufficiency of the pleadings.  Regardless, both the Verified

Complaint and the record contain sufficient evidence to support claims for fraud and

misrepresentation that are independent of the insurance policy itself.

The elements of fraud are: "(1) an intentional misrepresentation of a material fact, (2)

knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the

representation, and (4) the requirement that the misrepresentation involve a past or existing fact."

*Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006).  A claim for

misrepresentation has the following six elements: (1) the defendant made a representation of an

existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly, (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation. *Stanfill v. Mountain*, 301 S.W.3d 179, 188 (Tenn. 2009). Here, the defendants made representations to ReRun about the time frame for repairs, the defendants were on notice (from Imperial Park, ReRun, and their retained independent adjusters) that long delays could have resulted in substantial business income losses and accrued expenses to Imperial Park and to ReRun, ReRun relied on the defendants' representations that they were attempting to adjust the claim in good faith, and there is a genuine dispute of fact concerning the defendants' motivation for these representations (*i.e.*, whether they misrepresented that they intended to pay Imperial Park the amount to which it was entitled under the insurance policy to replace or repair the building). Moreover, Imperial Park and ReRun have indicated that they intend to seek distinct forms of damages at trial, including business losses suffered by ReRun that are distinct from Imperial Park's losses.[27]

These same facts favor permitting ReRun's claims for breach of contract and breach of good faith and fair dealing (apart from coverage under the policy), unjust enrichment/recovery in *quantum meruit*, and equitable relief to proceed to trial with respect to ReRun's losses.

For these reasons, the court will dismiss ReRun's breach of contract and good faith and fair dealing claims (as they relate to coverage under the policy), bad faith insurance denial, and TCPA claims. In all other respects, the court will permit ReRun's remaining claims, including its independent breach of contract claim, to proceed to trial.

---

[27] To the extent that damages sought by Imperial Park and ReRun overlap (such as a bill that Imperial Park owes to ReRun), the plaintiffs will not be permitted to double recover.

## II. **Imperial Park's Motion**

Imperial Park asserts that it is entitled to summary judgment on its breach of contract and bad faith refusal to pay claims. Genuine disputes of material fact preclude summary judgment in favor of Imperial Park, although the matter is a closer call than the defendants acknowledge.

As it relates to the substance of the claims, the defendants generally rely on the notion that there is a genuine dispute as to whether the figure ultimately adopted by the defendants (the RCV of approximately $1.9 million) is a better, good faith estimate of the replacement cost than the higher amounts now claimed by the plaintiffs. The defendants focus only on the end of the proceedings, not the years of back-and-forth that preceded it.

The defendants' myopic focus is not surprising, because it is difficult to see how Crofts' and Massaro's handling of the claim through October 2012 is defensible. Crofts made a hash of the proceedings. He initially provided a grossly understated loss reserve recommendation to Massaro of $80,000, after which he failed to secure the services of a structural design engineer (via Donan Engineering) to prepare a repair estimate – as his contractor had requested and as Massaro had authorized. The record contains no coherent explanation as to why Crofts did not ultimately follow Donan Engineering's request, why Crofts had Fresh Start prepare multiple cost figures – none of which were arguably accurate – or why Crofts never went back to Donan Engineering (rather than Fresh Start) to prepare a cost estimate. The record also contains no indication that Massaro critically examined the reports that Crofts was sending, nor does it indicate why Massaro failed to question Crofts' inconsistent handling of the claim. Furthermore, Massaro was initially vague, and later silent, as to whether the $662,000 check reflected only a partial payment, even though Crofts reminded him multiple times that the loss was likely higher.

Massaro also provides no coherent explanation as to why he ignored Crofts' request to secure a partial proof of loss from the plaintiffs.

Moreover, when Crofts reported a repair estimate of $2.9 million a year later, the defendants balked, marginalized Crofts, and hired a new claims adjuster. The documentary record contains no indication from the defendants as to why they immediately rejected the $2.9 million estimate, other than the fact that it was much higher than Crofts' previous partial replacement cost estimate. At any rate, even the defendants' final RCV estimate of about $1.9 was approximately *double* its initial RCV estimate, making it difficult to ascertain how the defendants will establish that their initial estimate was made in good faith, particularly where they did not communicate to Imperial Park Crofts' belief that the initial Fresh Start estimate was only partial.

Ultimately, it will be for the jury to determine whether this sequence of events reflects poor communication, negligent oversight, or bad faith. In evaluating this evidence, it will be clear to the jury that Crofts was the defendants' agent and that his actions are attributable to the defendants.

The plaintiffs also argue that the second independent adjuster, Martin, handled the claims in bad faith by causing Reddington and Robins & Morton to report artificially low restoration estimates. The plaintiffs' contentions are premised on drawing inferences in their own favor from the facts, not from any "smoking gun." For example, when Martin indicated that he wanted Robins & Morton to utilize a "sharp" pen, the jury reasonably could believe that Martin only meant that Robins & Morton should treat the request as realistic and not invent a number, regardless of whether it had the capacity to take on the project. To take another example, the plaintiffs argue that it was bad faith for Martin not to utilize a structural design engineer, given

that Donan Engineering had indicated to Crofts (back in 2011) that a structural design engineer was required to prepare its own repair estimate and Massaro had granted that request. Donan Engineering's recommendation (and the insurer's initial adoption of it) does not mean that, as a fact, a structural design was actually necessary. Indeed, Martin and Reddington both contend that a structural design engineer was *not* necessary to prepare an accurate estimate and, in 2013, they reported an estimate without the involvement of that type of engineer. Of course, it does raise an eyebrow that every time a contractor prepared an estimate based on design drawings and other materials from Honeycutt (*i.e.*, based on more information), the cost estimates rose significantly. Furthermore, tt is also apparent that the insurers – despite their stated intention – never obtained a bid from a contractor who could, and would, do the work for the amount(s) that the insurers were proposing as the RCV.

The court also agrees that there is a genuine dispute of material fact concerning the appropriate replacement cost estimate. The record now contains multiple potential cost estimates, including multiple estimates from Fresh Start, DGPA, Robins & Morton, and Garrison that range from about $900,000 to over $2.9 million. It is not clear which of these estimates is the most accurate.

The jury reasonably could construe the disputed facts in favor of the defendants, which would support a verdict in favor of the defendants on Imperial Park's claims. Thus, summary judgment is not warranted.

## **CONCLUSION**

For the reasons stated herein, the defendants' Rule 56 motion will be granted in part and denied in part and Imperial Park's Rule 56 motion will be denied. The defendants are precluded from relying on their statute of limitations defense, improper party defense (relative to Global),

and lack of ownership defense at trial. Imperial Park's claims for breach of the contract, bad faith refusal to pay, and equitable relief will proceed to trial, while Imperial Park's remaining claims will be dismissed. ReRun's breach of contract claim and breach of good faith and fair dealing claims (as they relate to coverage under the policy), bad faith refusal to pay claim, and TCPA claim will be dismissed. ReRun's claims for breach of contract and breach of good faith and fair dealing (apart from coverage under the policy), unjust enrichment/recovery in *quantum meruit*, fraud, misrepresentation, and equitable relief will proceed to trial.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge